IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Civil Division)

| | | |
|---|---|---|
| MICHAEL SHIELDS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | APPENDIX TO DEFENDANT FEDERAL |
| | ) | EXPRESS' AND INDIVIIDUAL DEFENDANT |
| FEDERAL EXPRESS CORPORATION, | ) | PATRICK J. QUIRKE'S MEMORANDUM IN |
| AND PATRICK J. QUIRKE | ) | SUPPORT OF MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**Tab**                         **Description**

Unpublished Decisions

1                              Michael Shields' Deposition Transcripts
                               Excerpts ("P. Dep.")

2                              Plaintiff's January 19, 2000 Offer Letter

3                              Declaration of Patrick J. Quirke and Attachments
                               thereto

4                              Plaintiff's December 19, 1997 Verbal Counseling/
                               PRISM Exception

5                              Plaintiff's June 29, 1998 Written Counseling/Safety
                               Topic Compliance

6                              Plaintiff's July 24, 1998 Letter of Concern
                               (PERFORMANCE)

7                              Plaintiff's February 2, 1999 Written Counseling

8                              Plaintiff's February 29, 2000 Documented
                               Counseling-GFTP packets

9                              Plaintiff's March 29, 2000 Past Due Prism Letter

| | |
|---|---|
| 10 | Plaintiff's June 9, 2000 Missorted Freight Letter |
| 11 | Plaintiff's September 30, 1999 Performance Review |
| 12 | Declaration of Cissy Braslow and attachments thereto |
| 13 | Declaration of Gay H. Burvis and attachments thereto |
| 14 | Plaintiff's October 13, 2000 Performance Planner |
| 15 | October 17, 2000 Revised Performance Planner |
| 16 | Plaintiff's January 8, 2001 Warning Letter-Failure to Follow Performance Planner |
| 16A | Plaintiff's January 8, 2001 Performance Reminder-Failure to Follow Performance Planner Evaluation |
| 17 | Plaintiff's February 19, 2001 Performance |
| 18 | Plaintiff's February 19, 2001 Performance Reminder/Decision Day |
| 19 | Plaintiff's February 20, 2001 Performance Planner |
| 20 | Email to Plaintiff from Patrick Quirke regarding Planner Specifics |
| 21 | Plaintiff's February 23, 2001 Performance Planner |
| 22 | Interoffice Memorandum from Patrick Quirke to Plaintiff regarding Suspension with Pay |
| 23 | Plaintiff's February 26, 2001 Termination Letter |
| 24 | Declaration of Clinton L. Barnes |
| 25 | Declaration of Charles H. Hergesheimer |
| 26 | Plaintiff's February 1, 1999 Record of Receipt |
| 27 | Plaintiff June 7, 2001 EEOC Charge |

Service: Get by LEXSEE®
Citation: 1998 us app lexis 30855

*1998 U.S. App. LEXIS 30855, \**

MAY LINDA HEYWARD; EARL SAMUEL, Plaintiffs-Appellants, v. MICHAEL C. MONROE, individually and in his official capacity as District Director of Health Education for the South Carolina Department of Health and Environmental Control; SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Defendants-Appellees.

No. 97-2430

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 30855

October 27, 1998, Submitted
December 7, 1998, Decided

**NOTICE: [\*1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: <u>1998 U.S. App. LEXIS 37142.</u>

Certiorari Denied June 24, 1999, Reported at: <u>1999 U.S. LEXIS 4454.</u>

**PRIOR HISTORY:** Appeal from the United States District Court for the District of South Carolina, at Columbia. Patrick Michael Duffy, District Judge. (CA-95-3400-23-3).

**DISPOSITION:** AFFIRMED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant employee sought review of the order of the United States District Court for the District of South Carolina, which granted summary judgment to appellee employer in a race and gender discrimination action.

**OVERVIEW:** Appellant employee, a black female, was employed by appellee employer when a white male was given a promotion appellant sought. The white male became appellant's supervisor and reprimanded appellant for failure to follow his direction. Appellant then failed to show up for work for three days without report or excuse and was terminated. Appellant filed suit for race and gender discrimination contending that other similarly situated white employees were not terminated under similar circumstances. The trial court dismissed appellant's action and appellant sought review. The court affirmed because it found appellant was not similarly situated to those individuals who were not terminated in the same manner she was. With reference to disparate disciplinary practices, appellant did not show that appellee's reason for her termination was pretextual. Appellant's claim of retaliation failed because appellant's complaint occurred two years prior to her termination. The court held that the remainder of appellant's claims were barred by the statute of limitations.

**OUTCOME:** The summary judgment in favor of appellee employer in appellant employee's race and gender employment discrimination action was affirmed because appellant was not similarly situated to other terminated individuals and appellant did not

show that the legitimate reason for her termination was pretextual.

### LexisNexis(TM) HEADNOTES - Core Concepts - ♦ Hide Concepts

📄 Civil Procedure > Summary Judgment > Summary Judgment Standard

**HN1**⬇ Summary judgment is appropriate if the pleadings and evidence of record show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor.

📁 Labor & Employment Law > Discrimination > Disparate Treatment

**HN2**⬇ In order to demonstrate a prima facie case of disparate disciplinary practices, a plaintiff must show that: (1) she is a member of a protected class; (2) the prohibited conduct in which she engaged was as serious as the misconduct of employees outside the protected class; and (3) the employer imposed harsher disciplinary measures against her than against employees outside the protected class.

📄 Labor & Employment Law > Discrimination > Retaliation

**HN3**⬇ In order to establish a prima facie case of retaliation, plaintiff must prove that: (1) she engaged in a protected activity; (2) adverse employment action was taken against her; and (3) a causal connection existed between the protected activity and the adverse action.

**COUNSEL:** Hemphill P. Pride, II, Columbia, South Carolina, for Appellants.

Hardwick Stuart, Jr., William K. Witherspoon, BERRY, ADAMS, QUACKENBUSH & STUART, P.A., Columbia, South Carolina, for Appellees.

**JUDGES:** Before ERVIN and WILKINS, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

**OPINION: OPINION**

PER CURIAM:

May Linda Heyward and Earl Samuel appeal the district court's judgment awarding summary judgment to the Defendants and dismissing their civil complaint. Heyward, who worked for the Defendant South Carolina Department of Health and Environmental Control ("DHEC"), alleged she was discriminated against because of [*2] her race and gender and retaliated against for having filed an informal complaint with the South Carolina Human Affairs Commission in violation of Title VII, 42 U.S.C.A. §§ 2000e-2000e-17 (West 1994 & Supp. 1998) ("Title VII") and 42 U.S.C. § 1983 (1994). She also alleged state law claims of breach of contract, breach of implied covenant of good faith and fair dealing, and violation of South Carolina public policy. Samuel alleged loss of consortium. Finding no reversible error, we affirm.

Heyward, a black female, was employed by the DHEC in September 1987. In November 1988, Michael C. Monroe, a white male, was given a promotion Heyward sought. Monroe became Heyward's supervisor. In March 1989, Monroe reprimanded Heyward for not meeting with him concerning her performance appraisal. Heyward was attending another meeting which Monroe had previously instructed her not to attend.

In April 1989, Heyward met with Bobby Gist of the South Carolina Human Affairs Commission

and complained that Monroe was harassing her because of her race. As a result of this contact, a meeting was arranged among Monroe, Gist and Alan Pregnall, Assistant Director [*3] of Personnel Services for the DHEC. Pregnall agreed to investigate Heyward's complaints and see what could be done.

In May 1991, Monroe issued Heyward an action plan in order to address proper use of her work time. Among other things, the action plan required Heyward to indicate specifically the places and persons she was visiting when she was out of the office. She was also informed that Monroe reserved the right to make unannounced visits to places where she was scheduled to be. Monroe did make such unannounced visits, and at least one other employee thought the visits were excessive. (J.A. at 105).

On January 22, 1992, Heyward notified her office that she was ill and taking the day off to go to the doctor. Heyward did not report to work for the next three work days between January 23 and January 27, nor did she contact the office. On January 27, 1992, Monroe concluded that Heyward had abandoned her job because she did not report to work or notify anyone of her whereabouts for three consecutive work days and terminated her employment pursuant to DHEC policy. Heyward contends that other similarly situated white employees were provided with notice of pending termination due to abandonment [*4] and more time to resolve the matter.

Heyward married Samuel on April 4, 1992. The instant complaint was filed in October 1995. The magistrate judge concluded that Heyward established a genuine issue of material fact as to whether her termination was based upon Heyward's gender and race. As for her retaliation claim, the magistrate judge found that Heyward failed to raise an inference of retaliation because her protected conduct occurred two years before she was disciplined. The magistrate judge also concluded that the § 1983, breach of contract, and breach of covenant of good faith claims were barred by South Carolina's three-year statute of limitations. With regard to the public policy claim, the magistrate judge recommended it be dismissed because Heyward had statutory remedies. As for the loss of consortium claim, the magistrate judge found Samuel was not entitled to relief because he was not married to Heyward at the time of the alleged injury. He also concluded the claim was barred by the three-year statute of limitations.

The district court largely adopted the magistrate judge's report and recommendation. However, it dismissed the discriminatory termination claims because [*5] it found Heyward was not similarly situated to those individuals who were not terminated in the same manner she was.

We review the grant of summary judgment de novo. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). HN1 Summary judgment is appropriate if the pleadings and evidence of record "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

HN2 In order to demonstrate a prima facie case of disparate disciplinary practices, Heyward must show that: (1) she is a member of a protected class; (2) the prohibited conduct in which she engaged was as serious as the misconduct of employees outside the protected class; and (3) the employer imposed harsher disciplinary measures against her than against employees outside the protected class. See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993). [*6]

Evidence showed that other employees were treated more leniently than Heyward. In addition to Heyward, seven other employees, one white male, one black male, two white

females, and three black females were terminated for abandonment during the period of Heyward's employment. The seven employees were either given notice of pending termination or more time to resolve the matter; however, all were eventually terminated. Monroe was not involved in the termination of the seven other employees. Nor was there any evidence that any of the seven employees had a disciplinary history similar to Heyward's.

Heyward has not shown that either the two male employees or the two white female employees were similarly situated. She must show that they are similar in all relevant respects. There is no evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1982); see also Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997). [*7] None of the other employees were supervised or disciplined by Monroe. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (employees were not similarly situated because they were not supervised by the same person). If different decision makers are involved, employees are generally not similarly situated. See Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 350 n.3 (7th Cir. 1997).

As far as the two white female employees are concerned, there appear to be mitigating circumstances regarding the difference in treatment, in addition to having different supervisors. One employee was on leave of absence status due to a family illness, the other employee went on medical leave without pay due to a work-related injury. Heyward, on the other hand, did not provide her employer any reason for her absence. Nor did she contact Monroe to inform him that she would not attend a meeting between the two of them scheduled for January 27.

Presuming Heyward established a prima facie case, she did not show that DHEC's legitimate reason for her termination was pretextual. Black employees were treated as leniently as white employees and female employees [*8] were treated as leniently as male employees. See Hughes v. Bedsole, 48 F.3d 1376, 1384-85 (4th Cir. 1995) (evidence that a female was treated more leniently than female plaintiff undercuts argument that reason for discipline was pretext). Thus, we conclude that summary judgment was appropriate on this claim.

Turning to Heyward's claim of retaliation for having complained to South Carolina Human Affairs Commission in April 1989, [HN3] in order to establish a prima facie case of retaliation, Heyward must prove that: (1) she engaged in a protected activity; (2) adverse employment action was taken against her; and (3) a causal connection existed between the protected activity and the adverse action. See Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

We find this claim fails because Heyward's complaint occurred two years prior to her termination. See Carter, 33 F.3d at 460 (temporal proximity between protected activity and adverse employment decision is element of causality). Moreover, there is no evidence linking the protected activity with the adverse employment decision. The evidence of any on-the-job harassment, beyond Heyward's conclusory [*9] statements, is slight.

With regard to Heyward's § 1983 claims, there is no federal statute of limitations for § 1983 actions; the analogous state statute governing personal injury actions applies. See Wilson v. Garcia, 471 U.S. 261, 280, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985). The statute of limitations for such causes of action arising in South Carolina is three years. See S.C. Code Ann. § 15-3-530(5) (Law. Co-op. Supp. 1997). Heyward's action accrued when she was terminated on January 27, 1992. She did not commence this action until more than three years later, in October 1995.

Heyward contends that because the parties were in negotiations prior to the commencement of the action, the doctrine of equitable estoppel prevents the Defendants from asserting a

statute of limitations defense. In applying the state statute of limitations, the court must also apply state principles of tolling to that limitation period. See <u>Board of Regents v. Tomanio, 446 U.S. 478, 485-88, 64 L. Ed. 2d 440, 100 S. Ct. 1790 (1980).</u>

The Defendants may be estopped from claiming a statute of limitations defense if the delay is induced by the Defendants' conduct. **[*10]** This may consist of either an express representation that the claim will be settled without litigation or by conduct suggesting a lawsuit is unnecessary. See <u>Vines v. Self Memorial Hosp., 314 S.C. 305, 443 S.E.2d 909, 911 (S.C. 1994).</u> Settlement negotiations alone do not bar a statute of limitations defense. Id. We agree with the district court that there is no evidence supporting Heyward's contention that the Defendants made an express representation that the claim would be settled. Accordingly, Heyward's § 1983 claims are barred by the statute of limitations. Likewise, the three-year statute of limitations bars Heyward's breach of contract and breach of covenant of good faith claims. See § 15-3-530(1).

We also find that Heyward's public policy claim was appropriately dismissed. South Carolina permits an action under the public policy exception when an at-will employee is terminated for refusing to violate the law. It has not been extended to circumstances where there is a statutory remedy for employment discrimination, as in this case. See <u>Dockins v. Ingles Mkts., Inc., 306 S.C. 496, 413 S.E.2d 18, 18 (S.C. 1992).</u> Finally, we find Samuel's **[*11]** action for loss of consortium also barred by the three-year statute of limitations. His cause of action accrued when he possessed "sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." See <u>Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996).</u> Even assuming Samuel could not maintain this action until he was married, see S.C. Code Ann. § 15-75-20 (Law. Co-op. 1977), * his own affidavit reveals that the cause of action accrued on April 4, 1992, the date he and Heyward married. (R. 24). Since he did not bring this action until October 1995, it is time barred.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

* Section 15-75-20 permits a person to maintain a cause of action for damages arising out of the loss of the right to companionship with their spouse.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Accordingly, we affirm the judgment of the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional **[*12]** process.

AFFIRMED

Service:  **Get by LEXSEE®**
Citation:  **1998 us app lexis 30855**
View:  Full
Date/Time:  Friday, February 7, 2003 - 7:31 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

h          e     c      e e ch e  e  e          f          c  cf  b cfb e      c  c  e

Service:  **Get by LEXSEE®**
Citation:  **1998 us app lexis 866**

*1998 U.S. App. LEXIS 866, \**

JOAN M. TOLLEY, Plaintiff-Appellant, v. HEALTH CARE AND RETIREMENT CORPORATION, INCORPORATED, d/b/a HCR West Nursing Center, Incorporated, Defendant-Appellee.

No. 96-2094

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 866

October 31, 1997, Argued
January 21, 1998, Decided

**NOTICE:  [\*1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1998 U.S. App. LEXIS 3445.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of South Carolina, at Greenville. G. Ross Anderson, Jr., District Judge. (CA-95-1510-6-3).

**DISPOSITION:** AFFIRMED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff ex-employee appealed a decision of the United District Court for the District of South Carolina, which granted the motion of defendant ex-employer for summary judgment in the ex-employee's action against her ex-employer for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C.S. § 636. The ex-employee began this action in state court and the ex-employer removed it to federal court.

**OVERVIEW:** After the ex-employee, a 51-year-old nurse, was fired for filling in a patient's chart for a colleague, she brought an action under the Age Discrimination in Employment Act, 29 U.S.C.S. § 636. The district court granted the ex-employer's motion for summary judgment. On appeal, the court affirmed this decision and held that the ex-employee had not sufficiently supported her claim of being treated more harshly than younger employees. The ex-employer took similar action against both the ex-employee and a younger co-worker for falsifying the chart by offering them the option of being fired or resigning. An affidavit stating that older workers were treated more harshly than younger workers, by itself, was not sufficient to establish a prima facie case of discrimination. There was insufficient evidence to support the claim that the ex-employee was discriminated against for publicly protesting the firing of her supervisor, an older worker. Under South Carolina law, the ex-employer did not breach an employment contract because the employee handbook contained an acknowledgement page, which the ex-employee signed, with a specific disclaimer that employees were at-will employees.

**OUTCOME:** The court affirmed a decision of the district court, which granted summary judgment to the ex-employer, who fired the ex-employee for falsifying a chart. The court

h        e    c    ee ch e e  e      b e f ee    c f c   f       c  c  e

held that the nurse had failed to establish a prima facie case of age discrimination under the Age Discrimination in Employment Act because she had not sufficiently proved her claim of being treated more harshly by the ex-employer than younger employees.

### LexisNexis(TM) HEADNOTES - Core Concepts - ♦ Hide Concepts

Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions
HN1 To establish a prima facie case of discrimination in the enforcement of employee disciplinary measures under the Age Discrimination in Employment Act (ADEA), the plaintiff must show: (1) that she is a member of the class protected by the ADEA; (2) that the protected conduct in which she engaged is comparable in seriousness to misconduct of employees substantially younger than she; and (3) that the disciplinary measures enforced against her are more severe than those enforced against those other employees. Once a plaintiff has made out a prima facie case that disciplinary measures were discriminatorily taken, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Finally, the plaintiff must rebut the defendant's proffered reason with evidence that the employer's reason was a pretext, and that the discipline was instead imposed for discriminatory reasons.

Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions
HN2 A party cannot make out a prima facie case of age discrimination by producing an affidavit that states, at a high level of generality and without supporting facts, simply that older workers are treated more harshly than younger employees.

Labor & Employment Law > Employment Relationships > At-Will Employment
Contracts Law > Types of Contracts > Employment Contracts
HN3 In South Carolina, a contract for permanent employment of an indefinite duration, which is not supported by any consideration other than the obligation of service to be performed on the one hand and wages to be paid on the other, is terminable at the will of either party. In the right circumstances, however, an employee handbook can create a binding employment contract, and if an employer wishes handbook not to form the basis of a contract, it must include a conspicuous disclaimer in the handbook.

**COUNSEL:** ARGUED: Edwin Lake Turnage, Travelers Rest, South Carolina, for Appellant.

James Derrick Quattlebaum, HAYNSWORTH, MARION, MCKAY & GUERARD, L.L.P., Greenville, South Carolina, for Appellee.

**JUDGES:** Before MURNAGHAN, WILKINS, and NIEMEYER, Circuit Judges.

**OPINION: OPINION**

PER CURIAM:

Joan M. Tolley, a licensed practical nurse, was discharged by her employer on October 20, 1994, after Tolley filled in a patient's chart for a colleague, making the chart false. At the time, Tolley was 51 years old. She filed this action under the Age Discrimination in Employment Act, 29 U.S.C. § 636, contending that her employer discriminated against her because of her age or retaliated against her because she "took up for" a 51-year-old co-employee who had been discharged several months earlier. Tolley also contended that her discharge breached a contract **[*2]** of employment under South Carolina common law. The district court granted the employer's motion for summary judgment, and we affirm.

h        e   c    e e c h e e e      b e f e e    c f c   f        c c   e

I

Since 1988, Tolley had been employed by Health Care and Retirement Corp., Inc. ("HCR") at its Oakmont West facility in Greenville, South Carolina. In March 1994, she received a copy of an HCR handbook which sets forth employees' rights and obligations. At the time that Tolley received the handbook, she signed an acknowledgment which indicated that she had received and read the handbook and which explained the nature of her employment relationship. It included an acknowledgment that Tolley was an "at-will employee" and that the employee did not have a contract of employment unless it was in writing on a document signed by both her and the president of HCR. Tolley contends that she did not read the text of the signed acknowledgment because she was not given an opportunity to peruse it. She indicates, moreover, that she would not have understood the acknowledgment had she read it.

Up until June 1994, Tolley had encountered no problems at HCR. Indeed, only the month before she received an award as the employee of the month. In June, however, HCR fired **[*3]** Tolley's supervisor, Mary Lamm, who was 51, and replaced her with Barbara Daniel, a younger woman. Tolley publicly protested Lamm's discharge, and HCR seems to have experienced a certain amount of employee tension as a result of the appointment of Daniel.

In August 1994, Daniel promoted Tolley to unit manager. Daniel gave Tolley a performance plan specifically designed for Tolley in her new position. Tolley claims that the tasks and standards outlined by this performance plan were impossible to meet. A few weeks later, Tolley resigned from her position as unit manager, citing chronic stress disorder and deteriorating health. As unit manager, Tolley was given a 29 cent per hour raise, bringing her total wage to $ 11 per hour. According to her, when a 22-year-old was elevated to unit manager after Tolley's subsequent discharge in October, the younger woman allegedly was to receive $ 13.10 an hour.

After resigning as unit manager, Tolley alleges that Daniel criticized her constantly and was reluctant to grant her leave. She contends that younger employees were not similarly criticized nor did they encounter similar resistance to requests for time off. On September 8, Tolley met with **[*4]** her supervisors about her performance and attendance problems and left the meeting in tears. She alleges she was told that if she left the meeting to resolve herself, she would be fired.

In early October, due to an administrative error, Jackie Anderson, also a nurse at Oakmont West facility, failed to give a patient required medication and failed to indicate that she had done so on the patient's chart for four days. During the same period, however, Tolley continued to administer the medication to the patient when she was on duty. On October 11, when Tolley discovered that the patient's chart was incomplete for four days, failing to reveal that Anderson had administered the required medicine, Tolley initialed the chart for Anderson, thereby indicating that the patient had been given the medication by Anderson. Tolley then called Anderson, who ratified Tolley's initialing the chart for her. Tolley claims that she initialed the chart for Anderson because she had thought that Anderson had given the patient the medication and that in those circumstances it was routine for nurses to fill in charts for other nurses. She did not realize, however, that Anderson had not administered the medication. **[*5]** Accordingly, as it turned out, Tolley's entries created a false medical record for the patient.

When HCR supervisors first learned of this situation, they informed Tolley and Anderson that they would receive warnings for their actions. But on October 20, 1994, each was given a choice of resigning or being fired. Anderson, who was 42 years old, elected to resign; Tolley did not elect to resign and was fired. Sometime after October 20, Daniel indicated to Anderson she had done nothing wrong. Furthermore, the director at Oakmont West told her

that she could come back to work at Oakmont West sometime in the future. Tolley contends that other nurses at Oakmont West filled in blanks on patients' charts and had engaged in other poor record-keeping practices, but that no one else was fired for these practices.

Tolley filed suit in a South Carolina state court, alleging age discrimination, retaliation, slander, breach of contract, and breach of contract accompanied by a fraudulent act. HCR removed the action to federal court where the slander claims were subsequently dropped. The district court thereafter entered summary judgment for the employer, concluding that Tolley had failed to make **[*6]** out a prima facie case of discrimination; that no employment contract ever existed; and that Tolley had defaulted her retaliation claim because she did not exhaust her administrative remedies.

II

_HN1_ To establish a prima facie case of discrimination in the enforcement of employee disciplinary measures under the ADEA, the plaintiff must show: (1) that she is a member of the class protected by the ADEA; (2) that the protected conduct in which she engaged was comparable in seriousness to misconduct of employees substantially younger than she; and (3) that the disciplinary measures enforced against her were more severe than those enforced against those other employees. Cf. Cook v. CSX Transp. Corp. , 988 F.2d 507, 511 (4th Cir. 1993) (applying test to Title VII); see also O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996). Once a plaintiff has made out a prima facie case that disciplinary measures were discriminatorily taken, the employer must articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, **[*7]** 101 S. Ct. 1089 (1981). Finally, the plaintiff must rebut the defendant's proffered reason with evidence that the employer's reason was a pretext, and that the discipline was instead imposed for discriminatory reasons. Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 515, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).

In this case, we agree with the district court's conclusion that Tolley had not sufficiently supported her claim that she was treated more harshly than younger employees. Tolley's case rests primarily on the affidavits of three of her co-workers. The first affidavit, given by Anderson, states that Anderson, who was 42 years old but still substantially younger than Tolley, was told that she would be able to come back and work at HCR in the future. Tolley was not so told. The second affidavit is from Estelle Edwards, stating that, on one previous occasion at HCR forms were falsified to indicate that unadministered medication had been administered. The affidavit also states that Daniel was "aware that many nurses were filling in blanks" on patient charts. The third affidavit, given by Rhonda Hooper, states that the performance plan given to Tolley **[*8]** as unit manager was impossible to meet and that Beth Warner, who became unit manager after Tolley had been discharged, was to receive $ 13.10 an hour, over $ 2 an hour more than Tolley had been paid when she held the unit manager job several months earlier. Hooper also states that Daniel often filled in blanks for other nurses and that Tolley was treated more harshly than other nurses, "particularly the nurses under the age of forty," for her alleged tardiness and misconduct.

The first affidavit does not advance Tolley's position. Although Tolley and Anderson were both involved in the same conduct of completing false records, they were both given the option to resign or be fired for that act. Thus, their discipline was virtually identical. Otherwise, however, their circumstances differed. While Anderson elected to resign, Tolley refused to resign and therefore was fired. Tolley was the person who created the false record, and Anderson's input is ambiguous. And finally Tolley had been cited for tardiness and attendance problems in the previous months. While Anderson may have been told that she might be rehired at some later date, such a speculative disparity, in these circumstances, **[*9]** is not enough as a matter of law to constitute differential treatment. The fact remains that in response to the creation of the false charts, HCR took identical action with respect to

both Tolley and Anderson.

The Edwards' affidavit indicates that a falsification of forms took place on at least one other occasion, but it does not indicate how or if the employees who falsified the records were disciplined. It also fails to state the names or ages of the persons falsifying the records. Thus, no inference that younger workers were treated less harshly than older workers can be from this affidavit.

Finally, Hooper's affidavit provides Tolley with little or no support for similar reasons. First, even though Hooper states that Tolley's performance plan was impossible to complete, the affidavit does not compare her plan with those given to other, younger employees. Second, the affidavit's statement about Daniel filling in blanks for other nurses does not indicate that Daniel falsified any records. Tolley was fired for creating a false record, not for filling out blanks without authorization. Third, Hooper's statement that Tolley and Warner were paid different rates does not compare **[*10]** similar jobs at the same period. Tolley's resignation from the unit manager post may have required greater compensation for the position, or Warner may have been given more responsibility. The record is blank on these issues. And finally, Hooper's statement that Tolley was treated harsher than younger workers, while relevant, is excessively general. It describes no particular parties or instances. *HN2*A party cannot make out a prima facie case of discrimination by producing an affidavit that states, at a high level of generality and without supporting facts, simply that older workers are treated more harshly than younger employees.

In short, we conclude that a reasonable jury could not return a verdict favorable to Tolley for age discrimination on these facts.

III

Tolley also contends that HCR retaliated against her because she publicly protested the discharge of her former supervisor, Lamm, who was 51. The only evidence that Tolley advances to support this claim, however, is the single fact that Tolley was discharged four months later. "Temporal proximity . . . is simply too slender a reed on which to rest a . . . retaliatory discharge claim." Wagner v. Wheeler, 13 F.3d 86, 91 **[*11]** (4th Cir. 1993) (stated in the context of a 42 U.S.C. § 1983 discrimination claim); see also Hughes v. Bedsole , 48 F.3d 1376, 1387 (4th Cir. 1995).

IV

Tolley also contends that HCR breached a contract created when it issued its employee handbook to her. She contends that termination of employment for "falsifying" as used in the handbook is ambiguous as to whether it requires scienter, and therefore that the interpretation of the contract should be submitted to the jury.

The substance of Tolley's contract claim is governed by South Carolina law. *HN3*In South Carolina, "a contract for permanent employment of an indefinite duration, which is not supported by any consideration other than the obligation of service to be performed on the one hand and wages to be paid on the other, is terminable at the will of either party." Satterfield v. Lockheed Missiles & Space Co., 617 F. Supp. 1359, 1361 (D.S.C. 1985). In the right circumstances, however, an employee handbook can create a binding employment contract, see Small v. Springs Indus., Inc., 292 S.C. 481, 357 S.E.2d 452, 454-55 (S.C. 1987), and if an employer wishes the handbook not to form the basis of a contract, it must include **[*12]** a conspicuous disclaimer in the handbook. See id.; Marr v. City of Columbia, 307 S.C. 545, 416 S.E.2d 615, 616 (S.C. 1992); Johnson v. First Carolina Financial Corp., 305 S.C. 556, 409 S.E.2d 804, 806 (S.C. Ct. App. 1991).

In this case, the employee handbook contained an acknowledgment page that specifically

h       e    c    ee ch e e e      b e f e e   c f c   f       c  c  e

included a disclaimer making clear that employees were at-will employees, that they had no employment security, and that no employee had an employment contract with HCR unless the president of HCR agreed to the contract in an instrument signed by the president. Tolley signed this acknowledgment page, indicating that she had received the handbook and had read it. The fact that the disclaimer was contained on a separate page that was to be severed from the handbook, that was to be signed by the employee, and that was to be included in the employee file made it, as a matter of law, conspicuous. The whole purpose for having Tolley sign the disclaimer was to bring to her particular attention that the employment was atwill and that the handbook did not create a contract. This, we conclude, adequately addresses South Carolina's requirement that an employer's disclaimer be **[*13]** "conspicuous."

Tolley contends, however, that even if the disclaimer disavowed contractual rights, it did not do so in her case because she did not have a chance to peruse and understand the disclaimer that she signed. In South Carolina, however, "one who is capable of reading and understanding but fails to read a contract before signing is bound by the terms thereof." Sims v. Tyler, 276 S.C. 640, 281 S.E.2d 229, 230 (S.C. 1981). The very first line of the acknowledgment she signed states, "I have received a copy of the HCR Employee Handbook which includes Rules for Your Protection and have read it carefully." She cannot now disavow that document by claiming she did not read it.

Accordingly, we affirm the summary judgment entered by the district court.

AFFIRMED

Service: **Get by LEXSEE®**
Citation: **1998 us app lexis 866**
View: Full
Date/Time: Friday, February 7, 2003 - 7:41 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **1995 us app lexis 12518**

*1995 U.S. App. LEXIS 12518, \**

LURENDA FEATHERSTONE, Plaintiff-Appellant, v. UNITED PARCEL SERVICES, INCORPORATED, Defendant-Appellee.

No. 94-2331

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1995 U.S. App. LEXIS 12518

April 25, 1995, Submitted
May 23, 1995, Decided

**NOTICE: [\*1]**   RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: <u>56 F.3d 61, 1995 U.S. App. LEXIS 19093.</u>

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, Senior District Judge. (CA-93-513-HAR).

**DISPOSITION:** AFFIRMED

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee appealed a judgment from the United States District Court for the District of Maryland, at Baltimore, that granted defendant employer summary judgment in the employee's Title VII action, which alleged racial and religious discrimination and retaliation in violation of <u>42 U.S.C.S. §§ 2000e-2</u>(a), 2000e-3(a), and 2000e-5.

**OVERVIEW:** The employee, an African-American Jehovah's Witness, claimed that the employer subjected him to stringent supervision and discriminated against him on the basis of his religion and race and retaliated against him for filing union-based grievances against the employer. The employer maintained that disciplinary action taken against the employee was due to the employee's inefficiency and continued failure to abide by company procedures. In the employee's Title VII action, the district court granted the employer summary judgment. On appeal, the court ruled that the employer established that the employee received numerous written warnings regarding, among other things, his failure to deliver and pickup all packages on his route, to fill out time cards and delivery logs, his involvement in traffic accidents. The employer also undertook to "retrain" the employee. The court ruled that the employer established non-discriminatory reasons for the disciplinary action taken against the employee and, although he made prima facie showings of discrimination and retaliation, he failed to raise a genuine issue of fact that the asserted reasons were merely a pretext for unlawful discrimination.

**OUTCOME:** The court affirmed the judgment.

### LexisNexis(TM) HEADNOTES - Core Concepts - ♦ <u>Hide Concepts</u>

📄 Civil Procedure > Summary Judgment > Burdens of Production & Proof
📄 Civil Procedure > Summary Judgment > Summary Judgment Standard
📄 Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1*⚓ An appellate court reviews de novo a district court's grant of summary judgment and affirms only if the record reveals no genuine issue of material fact. A genuine issue of material fact exists when, viewed in the light most favorable to the nonmovant, the evidence presents a sufficient disagreement to require submission to a jury. At summary judgment, all issues of credibility are resolved in the nonmovant's favor. A party moving for summary judgment must show the lack of evidence to support his opponent's case. However, the nonmovant then bears the burden of demonstrating the presence of a contested issue of fact. The nonmovant must point to specific evidence establishing a triable dispute, and cannot rely upon bare allegations.

📁 Labor & Employment Law > Discrimination > Disparate Treatment
📄 Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN2*⚓ The order and allocation of proof for Title VII cases in which plaintiff alleges disparate treatment is: (1) plaintiff must establish a prima facie case of discrimination; (2) once a prima facie case is presented, defendant must articulate some legitimate nondiscriminatory reason for the disparate treatment, and; (3) the articulated nondiscriminatory explanation is presumptively valid, and plaintiff must demonstrate that the explanation is pretextual and meet the ultimate burden of proving intentional discrimination by a preponderance of the evidence. The burden of proof never shifts from plaintiff in a Title VII case.

📁 Labor & Employment Law > Discrimination > Disparate Treatment
📄 Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN3*⚓ An employee can show unlawful discrimination under Title VII if he was disciplined more severely than another employee who had committed a similar infraction. To determine whether a comparison between employees is valid, a court examines whether defendant had as much cause to discipline the non-minority employee as it had to discipline plaintiff. Instead of insisting on identical infractions for purposes of comparison, the inquiry assesses the gravity of the offenses in order to find acts against the employer of comparable seriousness. Where the record discloses no sufficiently analogous offenders, no inference of discriminatory animus can be drawn from the "uniqueness" of a plaintiff's punishment.

📁 Labor & Employment Law > Discrimination > Disparate Treatment
📄 Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN4*⚓ Seniority systems are afforded special treatment under Title VII.

📄 Labor & Employment Law > Discrimination > Racial Discrimination > Enforcement
📄 Labor & Employment Law > Discrimination > Religious Discrimination > Enforcement

*HN5*⚓ To establish a hostile environment claim based upon race or religion discrimination, an employee must show: (1) that he was subjected to harassment based upon his race or religion; (2) that the harassment was sufficiently severe or pervasive to alter the conditions of (a reasonable person's) employment and create an abusive working environment; (3) that he subjectively perceived the harassment, and; (4) that the employer knew or should have known of the harassment.

📄 Civil Procedure > Summary Judgment > Burdens of Production & Proof
📄 Labor & Employment Law > Discrimination > Retaliation

*HN6*⚓ In a suit for retaliation under Title VII, unsupported allegations as to motive do not

confer talismanic immunity from summary judgment. Moreover, an employer's mere knowledge that an employee has filed a discrimination charge is insufficient counter substantial evidence of legitimate reasons for the action.

**COUNSEL:** Charlene Adelle Wilson, Baltimore, Maryland, for Appellant.

Peter Francis Healey, Jr., FULBRIGHT & JAWORSKI, L.L.P., Washington, D.C., for Appellee.

**JUDGES:** Before ERVIN, Chief Judge, and LUTTIG and MICHAEL, Circuit Judges.

**OPINION:**

**OPINION**

PER CURIAM:

Lurenda Featherstone, an African-American Jehovah's Witness, appeals the district court's order granting summary judgment to his employer, United Parcel Service, Inc. ("UPS"), in his Title VII action alleging racial and religious discrimination, and retaliation. 42 U.S.C.A. §§ 2000e-2(a), 2000e-3(a), 2000e-5 (West 1994). We previously granted the parties' motion to submit this appeal on the briefs, and we now affirm.

Featherstone began working for UPS in 1978 as a part-time package handler and obtained his present job as a full-time package car driver in 1987. Featherstone's complaint centers **[*2]** around a series of disciplinary actions taken against him by his supervisors from 1990 to 1993 in response to his inefficiency and repeated violations of company procedures. Featherstone asserted that he was singled out for harassment by management because of his race and religion, that his work was scrutinized to an unbearable degree, and that company policies were applied and enforced more stringently against him than against his co-workers. Moreover, Featherstone alleged that UPS management intensified their discriminatory practices after he filed grievances pursuant to a collective bargaining agreement.

UPS denied discriminating against Featherstone and outlined instances of Featherstone's inefficiency and failure to follow company policies which led to the disciplinary actions. Prior to suspending and discharging Featherstone, UPS issued numerous warnings to him for failing to follow supervisory instructions. These letters reported that Featherstone repeatedly:

(1) failed to deliver and pickup all packages on his route;
(2) failed to report missed pickups and deliveries;

(3) failed to follow UPS's procedures for COD transactions;
(4) **[*3]** failed to call his dispatcher to notify UPS that he would be returning late to the center;
(5) failed to fill out his time card, misload card, delivery sheets, and control logs properly;
(6) was involved in avoidable traffic accidents;
(7) performed inefficiently when left unsupervised; and
(8) reacted negatively to supervision.

In addition to written warnings, UPS management conducted numerous on job supervision ("OJS") rides in order to "retrain" Featherstone. On the OJS rides, a supervisor would accompany Featherstone on his route, observe his performance, and prepare a written report

listing his improper or inefficient procedures. Featherstone was expected to make the necessary corrections to his work and was held thereafter to a level of efficiency equal to his most efficient performance during any supervised ride. After the OJS rides, UPS conducted written interviews with Featherstone to reinforce the need to continue using standard procedure. Despite these retraining efforts, Featherstone failed to maintain acceptable job efficiency and continued to disobey his supervisor's instructions regarding standard procedures. A [*4] series of suspensions and terminations ensued.

UPS suspended Featherstone for one day for disobeying his supervisor's instructions and for allegedly telling his supervisor, "I don't care," when confronted about it. Featherstone maintained that his words were taken out of context and that his supervisor made false accusations in order to harass him. Featherstone appealed through a grievance, and a panel of UPS and union representatives upheld the suspension.

UPS suspended Featherstone for three days without pay for failing to follow his supervisor's instructions. Featherstone again acknowledged that he violated certain instructions but maintained that they were petty infractions and that management was scrutinizing his conduct to the point of harassment in order to find violations. In response to his suspension, Featherstone sent a letter to his union, asserting that his supervisor was biased against African-Americans and Jehovah's Witnesses. Featherstone also circulated a petition to his customers, asking them to sign it if they believed that he was a good worker.

Featherstone received his next suspension after two warning notices and an interview for failure to follow instructions, [*5] failure to deliver and pick up packages, failure to report his service failure to management, and failure to fill out his time card properly. A three-day suspension was imposed after Featherstone again missed a pickup, failed to report it to his supervisor, and incorrectly filled out his time card.

UPS terminated Featherstone's employment due to a customer complaint that Featherstone failed to pick up a parcel. Featherstone admitted that the missed pickup was his fault. However, he alleged that a white driver who had made the same mistake on the same day was called by a supervisor while he was still out on his route so he could pick up the missed package and avoid punishment.

After the intervention of Featherstone's union, his discharge was reduced to a thirteen-day suspension without pay. Featherstone's reinstatement was shortlived, however, and he was again discharged for failure to follow proper COD procedures, defacing UPS property, and for leaving a note to a customer on a UPS delivery notice which read, "you should learn to be nice then somebody would take your package."

Featherstone challenged the second discharge by filing a grievance. The union conceded that Featherstone [*6] had "made some poor decisions" and "honest mistakes." The grievance committee reduced the discharge to a forty-one-day suspension without pay.

Featherstone was again discharged after warnings for failure to follow supervisory instructions and making derogatory remarks to customers about UPS. Featherstone grieved his discharge through his union. In its brief filed on behalf of Featherstone, the union argued on his behalf that UPS had originally promoted Featherstone to full-time driver without regard to his qualifications and then punished him for being unqualified. The grievance committee reduced Featherstone's termination to a forty-nine day suspension without pay.

Featherstone originally filed an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). He then filed his retaliation claim with the EEOC. The EEOC issued Featherstone a right to sue letter and this lawsuit ensued.

HN1 This Court reviews de novo a district court's grant of summary judgment and affirms

only if the record reveals no genuine issue of material fact. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 130 L. Ed. 2d 24, 115 S. Ct. 67 (U.S. 1994). A genuine issue of material  [*7]  fact exists when, viewed in the light most favorable to the nonmovant, the evidence presents a sufficient disagreement to require submission to a jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). At summary judgment, all issues of credibility are resolved in the nonmovant's favor. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990), cert. denied, 498 U.S. 1109 (1991). A party moving for summary judgment must show the lack of evidence to support his opponent's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). However, the nonmovant then bears the burden of demonstrating the presence of a contested issue of fact. The nonmovant must point to specific evidence establishing a triable dispute, and cannot rely upon bare allegations. Anderson, 477 U.S. at 248; Fed. R. Civ. P. 56.

## I. Discrimination

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), the Supreme Court established the familiar "*HN2*order and allocation of proof" for Title VII cases in which the plaintiff alleges disparate treatment. First, the plaintiff must establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. Once a prima  [*8]  facie case is presented, the defendant must "articulate some legitimate nondiscriminatory reason for the" disparate treatment. Id. The articulated nondiscriminatory explanation is "presumptively valid," and the plaintiff must demonstrate that the explanation is pretextual and "meet the ultimate burden of proving intentional discrimination" by a preponderance of the evidence. Moore v. City of Charlotte, 754 F.2d 1100, 1106 (4th Cir.), cert. denied, 472 U.S. 1021 (1985). The burden of proof never shifts from the plaintiff in a Title VII case. St. Mary's Honor Ctr. v. Hicks, 125 L. Ed. 2d 407, 423, 113 S. Ct. 2742 (U.S. 1993).

## A. Discipline

Featherstone maintains that he has established a prima facie case of discriminatory disciplinary action by UPS. He asserts that he presented evidence sufficient to create a genuine issue as to whether he was disciplined more strictly than similarly situated white and non-Jehovah's Witness UPS employees. *HN3*An employee can show unlawful discrimination under Title VII if he was disciplined more severely than another employee who had committed a similar infraction. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282, 49 L. Ed. 2d 493, 96 S. Ct. 2574 (1976). A plaintiff must  [*9]  show: (1) that he is within a protected class; (2) that he "engaged in prohibited conduct similar to that of a person" outside of his protected class; and (3) that he received "more severe" discipline than was received by the other employee. Moore, 754 F.2d at 1105-06.

To determine whether a comparison between employees is valid, we examine whether the defendant had as much cause to discipline the non-minority employee as it had to discipline the plaintiff. Moore, 754 F.2d at 1107. Instead of insisting on identical infractions for purposes of comparison, the inquiry assesses the gravity of the offenses in order to find acts against the employer of comparable seriousness. Id. Where the record discloses no sufficiently analogous offenders, no inference of discriminatory animus can be drawn from the "uniqueness" of a plaintiff's punishment. Id. at 1109-10.

Featherstone identifies three examples of disparate treatment by Defendant in disciplining its drivers. First, he cites the warnings he received for two avoidable traffic accidents, alleging that a white employee received the same disciplinary action for his involvement in a more serious accident. Taking Featherstone's  [*10]  allegation as true, it does not demonstrate disparate treatment. Both drivers received a written warning, even though Featherstone was involved in two accidents. There is no evidence that UPS ever adjusted the type of discipline

it imposed according to the severity of the avoidable accident in which a driver was involved.

Second, Featherstone alleges that he was singled out for punishment for not taking his lunch between the fourth and sixth hours of his work day, as required by UPS regulation. He identified several white drivers who were not punished despite continuously eating lunch late in the day. UPS presented sworn statements explaining that it applies its lunch rule to all drivers. According to UPS, this rule is enforced on all OJS rides. In addition, supervisors will verbally warn a driver about the policy if they learn that the driver is disregarding the rule, and will then expect compliance during future OJS rides.

UPS freely admitted that some drivers may violate the rule without discipline, "particularly if their supervisors are unaware of the violations," because the drivers "complete their routes in a timely fashion and avoid frequent close supervision." Defendant thus [*11] impliedly admits that some drivers escape discipline for violating the lunch hour rule, even though their supervisors are aware of the violation. Based upon Featherstone's sworn testimony identifying specific white drivers who violated the lunch rule and UPS's admission, Featherstone successfully established a prima facie case of disparate treatment on this issue.

We find, however, Featherstone failed to establish that Defendant's articulated reason for the disparate treatment was a pretext for unlawful discrimination. Featherstone did not allege or demonstrate that any of the white drivers failed to complete their routes on time or were otherwise found inefficient such that rigorous enforcement of the lunch hour rule would be necessary. By contrast, Featherstone's admitted numerous infractions made close supervision necessary. Moreover, Featherstone did not cite one instance in which a white or non-Jehovah's Witness driver violated the rule during an OJS ride and avoided reprimand. Finally, Featherstone neither alleged nor proved that UPS exempted white or non-Jehovah's Witness employees from the lunch hour rule entirely.

In his third allegation of disparate disciplinary treatment, [*12] Featherstone identified a white driver who forgot to pick up a package on the same day that Featherstone forgot a package. According to Featherstone, the white driver was notified of the package while still on his route and was therefore able to pick up the package and avoid punishment. By contrast, Featherstone was notified of his error only after he returned to UPS center at the end of his day. He was discharged because of this incident.

UPS did not deny Featherstone's sworn statement but responded that Featherstone did not establish whether the prior disciplinary record of the other driver was in any way comparable to his own. UPS noted that Featherstone had a number of infractions in his record. Defendant's argument does not invalidate Featherstone's prima facie case of disparate treatment but instead provides an explanation for that disparate treatment. n1 Therefore, Featherstone established a prima facie case of discrimination on this issue. See Moore, 754 F.2d at 1105-06.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Arguably, UPS is attempting to show that, in light of Featherstone's prior misconduct, the two infractions were not similar and that UPS did not have as much cause to discipline the white driver as it had to discipline Featherstone. Moore, 754 F.2d at 1107. However, a proper reading of Moore and McDonald focuses the prima facie case inquiry on the specific offense at issue.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*13]

We find, however, that UPS's explanation constituted a legitimate nondiscriminatory reason for the disparate treatment, which Featherstone failed to discredit. Featherstone's suspension

h          e   c    ee  ch e  e  e      f   fff  cfe      e  fbb  e  b    c   c  e  i

for the missed package was the culmination of his well-documented history of infractions which led to a gradual increase in the sternness of the disciplinary responses by UPS. Even if the white driver's mistake were identical to Featherstone's, there is no evidence that he had previously committed a single violation of UPS policy. Moreover, there is no evidence that Featherstone was reprimanded in any way for his first such mistake. Because he failed to place in context his comparator's isolated violation, Featherstone did not create a genuine issue as to whether UPS's rationale for failing to punish the white driver was pretextual.

As additional evidence of pretext, Featherstone avers that statistical evidence demonstrates that UPS disciplines its African-American drivers more often than its white drivers. However, his assertion is conclusory and therefore inadequate to survive summary judgment. Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989). Plaintiff's counsel simply submitted **[*14]** the personnel files of thirty-two drivers and UPS's Weekly Operations Reports to the district court, without preparing any sort of statistical analysis on the raw data contained therein. This proffer is inadequate.

## B. Terms and Conditions of Employment

Featherstone also claims that he and other African-American drivers are assigned longer routes with more pick-ups and deliveries than are white drivers. However, Defendant established through sworn affidavits and documented UPS procedures that routes are given to drivers according to a bid system based upon seniority. **HN4**Seniority systems are afforded special treatment under Title VII. Lorance v. AT&T Technologies, Inc., 490 U.S. 900, 904, 104 L. Ed. 2d 961, 109 S. Ct. 2261 (1989); 42 U.S.C. § 2000e-2(h) (1988). Because Featherstone offers no evidence suggesting that the UPS seniority system is not bona fide, his claim on this issue lacks merit, even assuming the bid system has an adverse impact on African-American employees. Lorance, 490 U.S. at 905.

## C. Harassment

Featherstone asserts on appeal that he has established a triable claim of discriminatory harassment or hostile work environment, alleging that he was subjected to verbal epithets and derogatory **[*15]** references to his religion and discrimination in work assignments and management. **HN5**To establish a hostile environment claim, Featherstone must show:

> (1) that he was subjected to harassment based upon his race and/or religion;
> (2) that the harassment was "sufficiently severe or pervasive to alter the conditions of [a reasonable person's] employment and create an abusive working environment";
> (3) that he subjectively perceived the harassment; and

> (4) that UPS knew or should have known of the harassment.

White v. Federal Express Corp., 939 F.2d 157, 160 (4th Cir. 1991).

Featherstone's chief evidence that he was harassed based upon his race or religion is his supervisor's statement that "it's not right for Jehovah's Witnesses to be knocking on peoples doorsic." Featherstone also points to notes taken by UPS Employee Relations Manager Charles Maker, which document severe unrest among the drivers attributable to demeaning treatment they received from management. However, this evidence demonstrates that harassment by management was provided without regard to race or religion. n2 Although Featherstone and a white driver were identified **[*16]** by other drivers as particularly subject to mistreatment, eighteen drivers signed a petition to Maker expressing their

displeasure with the treatment they received. Featherstone may have established that UPS supervisors were mean-spirited and treated their drivers poorly, but not that they were discriminatory in doing so. See Goldberg v. B. Green & Co., 836 F.2d 845, 849 (4th Cir. 1988). We find that Featherstone failed to establish discriminatory harassment or a hostile work environment. To the extent that Featherstone was singled out by management, it was because of his unacceptable job performance.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Maker's notes from a meeting with one group of drivers read as follows: "This was a dominant minority group this morning that stated they didn't think it was a racial issue, but was more favoritism toward certain drivers as well as an outright desire to humiliate others." Maker stated in a sworn affidavit that he found no evidence suggesting that Featherstone was discriminated against because of his race.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*17]**

D. Other Assignments of Error

Featherstone charges that the district court improperly required him to produce direct evidence of discrimination and awarded summary judgment based upon his failure to do so. His assertion is unsupported by the court's opinion. The district court found that Featherstone failed to "articulate specific evidence to support his allegations" and instead relied upon "his own assertions" and "conclusory allegations" which were inadequate to create a genuine issue of fact. We agree.

Featherstone also faults the district court for making credibility determinations against him. He contends that absent these inappropriate credibility determinations, there would exist genuine issues of material fact for trial. Featherstone avers that the district court found incredible statements of his co-workers that charged management with unfair harassment of Featherstone. In fact, the district court made proper evidentiary rulings, not improper determinations of credibility. The statements at issue were inadmissible, unsworn hearsay. Fed. R. Evid. 802; Fed. R. Civ. P. 56. Moreover, to the extent that these statements purport to assign legal conclusions to factual occurrences,  **[*18]** they represent the conclusory opinions of Featherstone's co-workers. Credibility aside, a lay witness's legal opinions are simply irrelevant. Finally, other evidence disclosed that the minority drivers interviewed believed that management's conduct was not driven by racial animus.

Featherstone also complains that the district court discounted his sworn testimony in favor of the testimony of UPS witnesses. Specifically, Featherstone notes that he denied (1) disobeying instructions and violating company procedures; (2) telling his supervisor "I don't care," in response to a question; (3) defacing company property; (4) being "rude" to a customer; and (5) making derogatory remarks about UPS to his customers. He asserts that he created a genuine issue of fact as to the validity of UPS's stated reasons for its disciplinary actions.

Again, Featherstone misapprehends the nature of credibility, insisting that his disagreement with Defendant's choice of words creates an issue of fact which should survive summary judgment. In his sworn statements, Featherstone admits the behavior described by UPS. While Featherstone may take issue with such adjectives as "rude" and "derogatory" used by Defendant,  **[*19]** such disagreement does not create an issue of fact as to whether UPS disciplined Featherstone because of his behavior. Because Featherstone confesses to the conduct charged, the district judge's findings did not depend upon a credibility determination.

II. Retaliation

h          e     c     e e ch e e e        f    fff cfe       e  fbb e   b      c  c  e    l

Featherstone maintains that he established a genuine issue as to whether UPS retaliated against him for filing an EEOC complaint on December 26, 1991. For each claim based upon incidents occurring after December 26, 1991, Featherstone alleges that if UPS did not discriminate against him because of his race or religion, it took the challenged actions in retaliation for his EEOC complaints in violation of 42 U.S.C. § 2000e-3(a) (1988).

Featherstone also presented one additional claim under the rubric of retaliation. He contended that after filing his complaint with the EEOC, Defendant assigned him to the Murphy Homes route, a known high crime area. UPS denied that its decision was retaliatory. Undisputed evidence established that the Murphy Homes route was assigned to many drivers as an "add-on route" to fill out a projected 8.5 hour work day. The route was also on Featherstone's way back to the UPS Center. In addition, **[*20]** when Featherstone returned from a suspension, he successfully bid on a new route and has not been reassigned to Murphy Homes since that time.

We find that Featherstone established a prima facie case of retaliation by showing (1) that he engaged in protected activity; (2) that Defendant took adverse employment action against him; and (3) that a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). He satisfied the third element of the prima facie case by showing that UPS acted with knowledge of his EEO filing. Williams, 871 F.2d at 457.

However, once Defendant articulated a legitimate nondiscriminatory reason for its actions, Featherstone had to offer evidence showing that "the adverse action would not have occurred 'but for' the protected conduct." Ross, 759 F.2d at 366. This Court has "rejected the view that Title VII has been violated if retaliation for protected activity was merely 'in part' a reason for the adverse action." Id. "[HN6]Unsupported allegations as to motive do not confer talismanic immunity from [summary judgment]." Id.; Williams, 871 F.2d at **[*21]** 459. Moreover, an employer's mere knowledge that an employee has filed a discrimination charge is insufficient to counter substantial evidence of legitimate reasons for the action. Williams, 871 F.2d at 457.

Featherstone has offered no evidence to contradict Burke's explanation of the Murphy Homes assignment. As for his other claims of retaliation, Featherstone asserts that the same evidence he presented to demonstrate a genuine issue of fact regarding his discrimination complaint establishes that the reasons articulated by UPS for their conduct are pretextual. As in the context of his discrimination claims, Featherstone has offered no evidence rebutting Defendant's nondiscriminatory reasons for its disciplinary actions and supervision. Therefore, we find that his claim of retaliation lacks merit.

We affirm the district court's award of summary judgment to Defendant. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.

AFFIRMED

Service: **Get by LEXSEE®**
Citation: **1995 us app lexis 12518**
View: Full
Date/Time: Friday, February 7, 2003 - 7:53 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.