IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Civil Division)

| | | |
|---|---|---|
| MICHAEL SHIELDS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. MJG 02CV1783 |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| AND PATRICK J. QUIRKE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF PATRICK J. QUIRKE

I, Patrick J. Quirke, declare:

1.      I have been employed with Federal Express Corporation ("FedEx") since November 17, 1979. I have been a Managing Director for FedEx since March 16, 1995. From July 1, 2000 until August 1, 2002, I was the Managing Director for the Capital District. As the Managing Director for the Capital District, I supervised the Senior Managers responsible for the following stations: BCB in Herndon, Virginia, DCA in Washington, D.C., NYG in Springfield, Virginia, JPN in Washington, D.C., NDV in Alexandria, Virginia, WAS in Washington, D.C., LVL in Alexandria, Virginia, BOF in Winchester, Virginia, and FRR in McLean, Virginia. Michael Shields was the Senior Manager for the BCB and BOF stations when I became the Managing Director for the Capital District. Mr. Shields was under my direct supervision, as were Senior Managers Cheryl Stone, Clint Barnes, Joyce Perry, and Naomi Powell. Accordingly, I have personal knowledge of the facts stated herein and, if called to testify, would testify as follows.

**EXHIBIT**

**1**

2.      I issued Mr. Shields a performance evaluation on February 19, 2001. His most recent performance evaluation prior to the one I issued in February was May 19, 2000.

3.      In February, 2001, I issued performance evaluations to four additional Senior Managers under my supervision: Cheryl Stone, Clint Barnes, Joyce Perry and Naomi Powell.

4.      Cheryl Stone's most recent performance evaluation prior to the one I issued in February 2001 was administered in May, 2000; Clint Barnes' most recent performance evaluation prior to the one I issued in February 2001 was administered in May, 2000; Joyce Perry's most recent performance evaluation prior to the one I issued in February 2001 was administered in March, 2000; and, Naomi Powell's most recent performance evaluation prior to the one I issued in February 2001 was administered in May, 2000.


FURTHER DECLARANT SAITH NOT

EXECUTED at _____ this 21 th day of April, 2003.

_____
PATRICK J. QUIRKE

476131

1    received a GFT packet for employee's Step 1

2    hearing?

3        A.    Yes.

4        Q.    What role as a senior manager did you

5    have in GFT's filed by subordinate employees?

6        A.    Well, the manager themselves would

7    complete the GFT packets and make sure that was

8    forwarded to the appropriate people.

9        Q.    As a senior manager, what was your

10   responsibility in the GFT process?

11       A.    Well, other than attending to it with

12   the ops manager, that would be it and, of course,

13   Jeff's expectations was to make sure he had it 24

14   hours in advance, but I wouldn't have prepared the

15   GFT.  It would have been prepared by the ops

16   manager and then forwarded on to the appropriate

17   people.

18       Q.    At Step 1 of the GFT process, if it is

19   an hourly employee that has filed the GFT, are you

20   the person who would have responsibility for

21   investigating it at that level?



EXHIBIT

2

*Al Betz & Associates, Inc.*
Maryland 410-875-3376
Washington, D.C. 202-265-0015

1        A.    No.

2        Q.    Who would be?

3        A.    The manager director.

4        Q.    Do you have any responsibility for

5    investigating GFT concerns?

6        A.    Well, if the manager is going to issue

7    some sort of performance, in most cases that

8    manager would have talked to the senior manager,

9    you know, to get his input on which would be the

10    way to go about the discipline, so I would have

11    been involved in that discussion.

12        Q.    After the discipline has been issued to

13    an hourly employee, does the senior manager have

14    any input or any duties with respect to the GFT

15    process?

16        A.    No.  Once it is issued, the employee has

17    the right to decide whether or not he wants to

18    initiate the GFT process.

19        Q.    So as a senior manager, you would sit in

20    on the Step 1 meeting, but that would be all of

21    your responsibility with respect to a GFT filed by

1    that meeting?

2        A.    Yes.

3        Q.    Who is the black employee who told you

4    who was in attendance at Pat Quirke's meeting?

5        A.    Dave.  What's Dave's last name?  Dave, I

6    can't recall Dave's last name.

7        Q.    Were any managers invited to attend the

8    meeting that Quirke held in mid September of 2000?

9        A.    No.

10        Q.    And you were not invited to attend?

11        A.    No.

12        Q.    This meeting that Quirke held with

13    employees of BCB in mid September 2000, was that

14    what was known as a skip level meeting?

15        A.    Did he call it -- we have skip level

16    meetings now.  Was this Pat's skip level meeting,

17    I don't recall, but I guess by the definition,

18    since I wasn't there, I guess it was a skip level

19    meeting.

20        Q.    What is a skip level meeting?

21        A.    Is when the manager meets with the

```
 1        two or three times a week and where the priorities

 2        had to be drawn, does a manager deliver packages

 3        or does he stay in the building and allow freight

 4        to sit.  So I don't think much credence was given

 5        to the real issue of the freight availability.

 6             Q.   Did Pat Quirke tell you that despite the

 7        service issues, he expected your managers to

 8        conduct two TLAs per week?

 9             A.   Despite the service issues?

10             Q.   Yes.

11                  MR. McDANIEL:   TLA?

12             A.   Talk, listen and answer.  I think he

13        implied that or said regardless to what your

14        freight issues were, then he wanted the TLAs.

15             Q.   And is that something that you disagreed

16        with Mr. Quirke about?

17             A.   I disagreed with the fact that you

18        should not allow packages that people have paid

19        money to have delivered to sit over a 15-minute

20        meeting with the employee.  The priority was to

21        deliver packages.
```

191

1    that you needed to use managers from other

2    stations so that checkrides could be conducted,

3    two per week?

4        A.   I don't recall that he -- him asking me

5    to do that, no.

6        Q.   Did you tell John Formisano during your

7    GFT of the warning letter, performance reminder

8    that you received on January 8, 2001, that the

9    efforts to coordinate checkride assistance with

10   managers from DCA failed due to lack of

11   coordination efforts?

12       A.   If there was a coordination effort, it

13   was because the managers at DCA were dealing with

14   their own freight issues and they were running

15   routes which was a standard practice in Pat's

16   district and a manager from DCA could not come to

17   BCB and do a checkride if he was delivering or

18   handling late freight in his facilities.  That was

19   just a common practice in the District.  The

20   freight availability was not reliable.

21       Q.   If I'm understanding what you're saying,

1    to do the right thing, maybe just let me sit down

2    and talk to her and explain how to handle the

3    situation in the future and give a written

4    documentation that that had occurred.

5        Q.   The white employee that Rva Pendleton

6    and Clifton Barnes were dealing with --

7        A.   Clifton Dalton.

8        Q.   Clifton Dalton were dealing with, was

9    her name Noelle Olsen?

10       A.   Correct.

11       Q.   And do you know when the altercation

12    involving Noelle Olsen occurred?

13       A.   It was mid August, about the second week

14    of August.

15       Q.   Mid August of 2000?

16       A.   Correct.

17       Q.   Were you at work on the day that Noelle

18    Olsen had this altercation with Rva Pendleton and

19    you're saying Clifton Dalton?

20       A.   Clifton Dalton.

21       Q.   Okay.  Were you at work that day?

1      A.    No.

2      Q.    Okay.  Were you in charge of

3   investigating what happened in mid August 2000

4   with the Noelle Olsen situation?

5      A.    Well, I wasn't at work.  Rva called me

6   at home at the request of Noelle and when I came

7   to the phone, Noelle was screaming at the top of

8   her lungs about we were trying to take money out

9   of her pocket and just being very unprofessional

10  and just unreasonable.  And I said to her, you

11  need to calm down and leave.

12         And between her yelling at me and her

13  stepping away from the phone and yelling at Rva

14  and Clifton, it was just -- it was just an episode.

15  I mean, she was screaming to the top of her lungs.

16  And I had asked her, you know, she needed to calm

17  down and leave and she did not follow that simple

18  request.  When Rva tried to get her to leave is

19  when she became even louder.  And between her and

20  Clifton, they were trying to calm her down.

21     Q.    How long were you on the phone with

265

1          I called Pat.  Said Pat, I have spoken

2     to Dick and I told him about the situation, how

3     Bobby has referred to me as a nigger and I said

4     that's unacceptable behavior to me and I said, I'm

5     going to move to terminate him.

6          Pat's response was basically, I know

7     it's not the thing that someone should say, but

8     have you talked to Personnel?  I told him I had

9     spoken to Dick.  He said, well, what's Dick's

10    recommendation?  Dick said I should think about

11    this because the guy has 10 years.  And I said,

12    Pat, we need to move on this.

13         Pat was very noncommittal and said --

14    well, he didn't say much of anything.  He basically

15    told me that I should kind of follow the

16    recommendations of Personnel.

17        Q.   And Personnel's recommendation from

18    Schmidt was not to terminate?

19        A.   Yes.  That I should sit down and talk to

20    him and possibly issue him a warning letter.

21        Q.   Let's break this down just a little bit.

1    A.    Well, it was conducted in my station.    I

2    saw various people go into the conference room and

3    I was asked to assist by getting some of the

4    couriers off the road who needed to be brought in

5    to speak with.

6    Q.    Do you know what the resolution of the

7    internal EEO that Carl Jones filed was and what

8    was ultimately decided?

9    A.    Well, according to Gay Burvis, because I

10    asked her about, you know, the investigation and

11    what was going on, she said to me because you are

12    a part of the EEO, that you'll never know what was

13    said and who said what.    This will be put in the

14    archives at Fed Ex.

15    What ultimately happened, and Pat nor

16    Gay, neither one called me to let me know what

17    happened, one of my managers who was my admin

18    manager, a white female, walked into the office

19    and said, I just got a call from Bobby Richardson

20    and I said, oh, yeah.    She said, yeah, he just

21    told me that Pat gave him his job back and he was

1    going to assign him to NDV.  And that Bobby

2    Richardson at that point said, thank you, but no

3    thanks.  I'm going to quit.  And for the record,

4    NDV was probably 95% Afro-American.

5            So my point with Gay and with Pat was if

6    his behavior is exhibited in BBC which is maybe

7    30% Afro-American, how is he going to conduct

8    himself if it was 90, 95%?  You're putting him in

9    a position to, you know, to, I mean exhibit that

10    unacceptable behavior in another location and put

11    other employees -- subject them to that kind of

12    treatment.

13        Q.    Who was the white female manager that

14    you're saying told you what Richardson told her?

15        A.    Louise Persario.

16        Q.    Did Mr. Richardson ever come back to

17    work at Fed Ex?

18        A.    No.  The day that Pat called him or Gay,

19    whomever called him to tell him that they were

20    restating him and reassigning him to another

21    location is when he called Louise to tell her that

1      Q.   Do you know of any senior managers

2   reporting to Quirke who received multiple location

3   pay?

4      A.   If at that time I think I would have been

5   the only one that was eligible.

6      Q.   Do you know what criteria applied to

7   determine whether someone is eligible to receive

8   multiple location pay?

9      A.   If you have more than one operation,

10   station, under your control.

11      Q.   So, you had control over the BCB station

12   and the BOF station.  Is that right?

13      A.   I reported, yes.

14      Q.   And the BOF station is in Winchester,

15   Virginia?

16      A.   Yes.

17      Q.   Did you complain to Gay Burvis that Pat

18   Quirke was not giving you multiple location pay?

19      A.   I brought it to her attention.

20      Q.   Did you ultimately receive multiple

21   location pay?

LEXSEE 1999 us app lexis 32483

**ELIZABETH CRAWFORD, Plaintiff-Appellant, v. UNION CARBIDE CORPORATION, Defendant-Appellee, and AETNA U. S. HEALTHCARE, Party in Interest.**

**No. 98-2448**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*1999 U.S. App. LEXIS 32483*

**October 26, 1999, Argued**

**December 14, 1999, Decided**

**NOTICE:**
[*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**
Reported in Table Case Format at: *1999 U.S. App. LEXIS 37414.*

Certiorari Denied June 12, 2000, Reported at: *2000 U.S. LEXIS 4077.*

**PRIOR HISTORY:**
Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CA-96-281-2).

**DISPOSITION:**
AFFIRMED.

**COUNSEL:**
ARGUED: Daniel Mark Press, CHUNG & PRESS, P.C., McLean, Virginia, for Appellant.

Victoria Jean Sopranik, JACKSON & KELLY, Lexington, Kentucky, for Appellee.

ON BRIEF: Frederick S. Mittelman, Arlington, Virginia, for Appellant.

Roger A. Wolfe, Erin Magee Condaras, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Appellee.

**JUDGES:**
Before MURNAGHAN, WILKINS, and TRAXLER, Circuit Judges.

**OPINION:**

PER CURIAM:

Elizabeth Crawford appeals an order of the district court granting summary judgment in favor of Union Carbide Corporation (Union Carbide) on her claims of discrimination brought pursuant to Title I of the Americans with Disabilities Act (ADA), see *42 U.S.C.A. §§ 12111-12117* (West 1995), and § 504 of the Rehabilitation Act of 1973, as amended, see *29 U.S.C.A. § 794* [*2] (West 1999). n1 Because we conclude that the district court correctly determined that Crawford is not entitled to relief, we affirm.

> n1 For ease of reference, and because the two statutes generally are construed to impose the same requirements, see *Baird v. Rose, 192 F.3d 462, 1999 WL 739413,* at *4 (4th Cir. 1999), we refer to the ADA and Rehabilitation Act collectively as "the ADA."

I.

Crawford began working for Union Carbide at its facility in the Kanawha Valley of West Virginia in 1980. In the early 1980s, Crawford assumed the position of environmental laboratory technician. She developed skin allergies in 1983, and as a result could no longer work in an environment in which she would be directly exposed to chemicals. Union Carbide accommodated Crawford by transferring her to a senior engineering information technician position, the particular responsibilities of which the company tailored for Crawford. As a senior engineering information technician, Crawford spent most of her [*3] time working on material safety data sheets (MSDSs). Her other responsibilities included managing the chemical data sheets system and assigning fire and stability ratings for Union Carbide chemicals.

In 1986, Crawford developed asthma. There is no indication in the record that either her allergies or her asthma interfered with her job performance or that she received any unsatisfactory job performance evaluations.

At some point in late 1993 or very early 1994, Union Carbide decided to alter the way in which the MSDSs were developed. Rather than have employees at different Union Carbide facilities work on discrete sections of an MSDS for a single chemical, the company created an MSDS/Label Skill Center at its Bound Brook, New Jersey site. At the new Skill Center, one employee would be responsible for all of the information on the MSDS for a single chemical. The change was pursued for reasons of efficiency and economy.

Because the primary responsibilities of her job would be performed at the new Skill Center and because her other duties were insufficient to support a full-time job, Crawford's department lost funding for her position. Crawford was informed on January 27, 1994 that [*4] her job was being eliminated. n2 She offered to transfer to New Jersey, but Union Carbide rejected the offer. n3 The company attempted to find Crawford another suitable position at the Kanawha Valley facility, but the parties dispute the intensity of this effort.

n2 Union Carbide wrote a letter to Crawford dated March 31, 1994, formally notifying her that her position had been "designated as surplus." J.A. 251. The letter stated that "if you are not placed in another job by May 31, 1994, you will be laid off for lack of work as of that date." Id. The letter described the company's Enhanced Separation Program. To be eligible for the Program, Crawford would have had to have signed a release stating that she would not sue the company for any employment related claims, including discrimination. Crawford refused to sign the release.

n3 The parties do not dispute that Crawford was unable to work at the Bound Brook facility due to her disabilities. However, although Union Carbide appeared to concede at oral argument that Crawford would have been transferred to New Jersey but for her disabilities, the record indicates that all of the Skill Center positions were filled with individuals already working at the New Jersey site. Resolution of this factual question is not necessary to our disposition of this appeal, however.

[*5]

Union Carbide officials first considered Crawford for a position as a process group assistant. She interviewed for the position with Thomas Maliszewski on March 4, 1994. However, Maliszewski determined that Crawford was not qualified for the position and therefore did not offer it to her. Although Crawford asserts in her brief that she was qualified for the position, she admitted in district court that she was not so qualified. n4

n4 Crawford failed to respond to Union Carbide's request for her to admit that she was not qualified for the process group assistant position. By failing to respond, Crawford is deemed to have admitted that she was not qualified. See Fed. R. Civ. P. 36(a).

The company also identified a Grade 4 polyolefins records clerk position as a possibility for Crawford. This position "involved strictly office work consisting of looking up records, changing manuals, coordinating records and creating and shipping out manuals." J.A. 124. During an interview for the position, Crawford "voiced [*6] concerns about the lifting aspect of the job" and indicated her belief that she was overqualified for the position. Id. Craig Morkert, an employee of Union Carbide's Human Resources Department, offered Crawford the position, and the company even offered to maintain Crawford's then present salary although the new position otherwise would have entailed a decrease in pay. The company claims that it advised Crawford it would accommodate her lifting restrictions.

On March 28, 1994, Crawford; her physician, Dr. L. Blair Thrush; and Union Carbide's Kanawha Valley Medical Director, Dr. Donald F. Teter, participated in a brief conference call in which they discussed the records clerk position. Thrush concluded, based on that call and statements made to him by Crawford, that she "probably could not" perform the records clerk duties. J.A. 138.

However, Thrush subsequently admitted that he had not inspected the worksite, that he "didn't know that much about the job," J.A. 139, and that in order to render an authoritative medical opinion regarding Crawford's ability to perform the duties of the position he would have had to have known more about the situation. Teter, in contrast, had examined [*7] the worksite and duties and determined that Crawford "was medically capable of performing the job with appropriate accommodations." J.A. 126.

On April 12, 1994, Crawford wrote to Morkert expressing her frustration over the elimination of her position and the offer of the records clerk position. Crawford wrote that the records clerk position was "utterly beneath [her] qualifications" and that the offer "deeply offended" her. J.A. 146. She further stated that "until you can answer my concerns more fully or demonstrate to my reasonable satisfaction that there is no other position within Union Carbide that better suits my talents, education and skills, I simply decline to accept your degrading offer." J.A. 147.

Also on April 12, 1994, Thrush wrote a letter to Teter in which Thrush stated that Crawford's asthma was worsening, and that

it is certainly my IMPRESSION that from an occupational point of view she is extremely limited. She needs to be in an environment that is essentially free of air pollutants such as heavy dust, chemicals or heavy dirt, including paper dust. I also think that any physical exertion other than desk work would be a problem for her.

J.A. 131. [*8] Thrush did not refer to any particular employment position or duties. He mentioned that he had urged Crawford to apply to Social Security for disability benefits.

Crawford formally rejected Union Carbide's offer of the records clerk position on April 18, 1994 in a memo that stated, in its entirety, "At the recommendation of my physician, L. Blair Thrush, and as explained in my correspondence to C. Morkert dated April 12, 1994, I decline to accept the position of Grade 4 Polymers Engineering Records Center Clerk." J.A. 230.

In a subsequent letter to Morkert, dated May 18, 1994, Crawford described the rejection as follows:

As you know I have turned down the [records clerk] position as I have been advised by my physician that such employment would be detrimental to my health. In essence, the ... job offer is to me no offer at all as it fails to accommodate my health much less my skill.

J.A. 128.

In spite of her assertion that the position was beneath her, Crawford maintains that she would have accepted the records clerk position if Union Carbide had agreed to accommodate her disabilities by not requiring her to lift heavy boxes and by equipping the worksite with air [*9] filters. She contends, however, that the company effectively denied her requests for such accommodations by failing to respond to them.

During her deposition, Crawford stated that she verbally communicated her requests and that she thought she put them in writing to R. D. Kennedy, the Chief Executive Officer of Union Carbide. The record contains no evidence of such a written request; the record does contain a copy of an April 12, 1994 letter from Crawford to Kennedy, but in this written communication Crawford did not mention a request for accommodations for her disabilities. In response to a deposition question as to the specific accommodations verbally requested, Crawford stated that "the accommodations that were requested was [sic], 'I can't lift these heavy boxes, I need some help, and this room is awfully dirty.'" J.A. 63. Crawford was also asked during her deposition, "Did you express ... that you would take this job if these specific accommodations that you had requested were granted?" J.A. 65. Crawford answered, "I was asking for the accommodations, so that was to be insinuated, that if the accommodations were made I would do the job." Id. Crawford was also asked whether [*10] Union Carbide had denied her request for accommodations; she replied, "They didn't do it. There again, they were operating in a mode where if I'd ask questions or say something, they would ignore me." J.A. 64. Union Carbide maintains that the company told Crawford that it would accommodate her need for assistance with lifting. The company asserts, however, that Crawford failed to communicate a request for an air filter.

April 21, 1994, was the last day Crawford actually performed work at Union Carbide. Union Carbide maintains that it continued to look for a suitable position for Crawford until May 31, 1994, when she was removed from the payroll. However, the company asserts that nothing within Crawford's range of qualifications and physical capabilities became available. Crawford contends that there were positions for which she was qualified and which she could have performed with reasonable accommodations, but the company did not consider her for them.

Crawford's health deteriorated after April 21, 1994. She maintains that the stress related to her employment situation was a major factor that exacerbated her asthma.

1999 U.S. App. LEXIS 32483, *

In fact, Crawford's deposition testimony was that she was not capable [*11] of working after April 21, 1994.

Crawford filed this action on March 29, 1996. As relevant to this appeal, Crawford alleged: (1) that Union Carbide failed to agree to her requests for reasonable accommodations which would have made it possible for her to perform the duties of the records clerk position; and (2) that the company failed to consider her for other positions that were available during the relevant time period.

Upon completion of discovery, Union Carbide moved for summary judgment. The district court granted the motion on the basis that Crawford had failed to establish that she could perform the essential functions of the records clerk position, or any other position, as of May 31, 1994, "the date on which her employment was terminated." J.A. 345. The court therefore concluded that Crawford was not a "qualified individual with a disability" eligible for relief under the ADA.

II.

On appeal, Crawford maintains that a genuine issue of material fact exists as to whether she was a qualified individual with a disability as of May 31, 1994. She also argues that the district court erroneously selected May 31, 1994 as the relevant date for purposes of determining whether she [*12] was a qualified individual with a disability. We review the grant of summary judgment de novo, viewing the disputed facts in the light most favorable to Crawford and drawing all reasonable inferences in her favor. See Figgie Int'l, Inc. v. Destileria Serralles, Inc., 190 F.3d 252, 255 (4th Cir. 1999).

The ADA prohibits discrimination against a "qualified individual with a disability" with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). To establish a violation of the ADA, Crawford must show (1) that she has a disability; (2) that she is an otherwise qualified individual; and (3) that she has suffered unlawful discrimination based on her disability. n5 See Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 212 (4th Cir. 1994). [*13] One form of discrimination prohibited by the ADA is failing to make a reasonable accommodation. See 42 U.S.C.A. § 12112(b)(5). However, "an employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation." Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998).

n5 The parties do not dispute that Crawford was disabled for ADA purposes.

We note that although the standard for establishing liability under § 504 of the Rehabilitation Act is slightly different than under the ADA, see Baird, 1999 WL 739413, at *4-5, that difference is not relevant to this appeal.

Crawford argues that a genuine issue of material fact exists as to whether she was a qualified individual with a disability as of May 31, 1994. We disagree. During her deposition, Crawford was asked by her attorney whether she was capable of working after April 21, 1994. Obviously, a [*14] witness giving deposition testimony is free to phrase an accurate and truthful response as she desires; such freedom is probably most evident in an exchange between a party and her own attorney. We therefore deem it critical that Crawford's response to this question was a simple "no." J.A. 224. Although Crawford now argues that she meant that she was unable to work without reasonable accommodations, she did not say that. By analogy to the "well established" principle that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct," Halperin v. Abacus Tech. Corp., 128 F.3d 191, 198 (4th Cir. 1997) (internal quotation marks omitted), we are unwilling to accept Crawford's invitation to read into her own testimony something that simply is not there. n6

n6 By reference to the same principle, we see no need to address Crawford's contention that the district court erred in discounting her physician's May 12, 1994 letter because it was not sworn. Assuming arguendo that we properly could consider the letter, it conflicts with Crawford's own sworn statement. Accordingly, it is insufficient to create a genuine issue of fact.

Crawford also argues that, in determining whether she was a qualified individual with a disability as of May 31, 1994, the district court erred in failing to take into account Crawford's assertion that the decline in her health after April 21, 1994 was due to the stress of her employment situation. The cause of Crawford's physical condition on May 31, 1994 is not relevant to a determination of whether she was then capable,

with or without reasonable accommodation, of working.

[*15]

Crawford also argues that the district court erred by assessing whether she was a qualified individual with a disability as of May 31, 1994 because she contends that the acts of discrimination occurred prior to that date. She suggests three alternative times for assessing her status under the ADA: as of January 27, 1994, because that is when she was informed that her position was being eliminated; after the records clerk position was offered but prior to April 21, 1994, because that is when Union Carbide effectively denied reasonable accommodations; or as of April 21, 1994, because that is the last day Crawford worked at Union Carbide and is therefore the actual date of her termination.

Even if Crawford were correct that her status as a qualified individual with a disability should have been evaluated as of a date prior to May 31, 1994, and even if she were adjudged to possess that status as of some prior date, summary judgment is nevertheless appropriate because no reasonable jury could find that Union Carbide's actions with respect to the records clerk position violated Crawford's rights under the ADA. First, there is no genuine issue of material fact as to whether Union Carbide [*16] offered to accommodate Crawford's lifting restrictions. Although the wiser course may have been for the company to document that its offer of the records clerk position included a lifting accommodation, and although the parties do not agree that the company clearly verbalized its agreement to Crawford, the chain of events described in the record requires a conclusion as a matter of law that the offer included the lifting accommodation: during the job interview Crawford clearly stated the need for an accommodation in the form of lifting assistance, and she subsequently was offered the position. These circumstances do not support an inference that the offer did not include the lifting accommodation.

We emphasize that the following chain of events is not presented by this record: employee interviews for position, employee is offered position, employee then requests accommodation, employer is silent. In such a situation liability may attach to the employer's failure to respond to the request for an accommodation. See, e.g., *Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1012 (7th Cir. 1997)* (stating that "after an employee's request, both [*17] parties bear responsibility for determining what accommodation is necessary" (emphasis omitted)); *Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)* (explaining that "the employee's initial request for an

accommodation ... triggers the employer's obligation to participate in the interactive process of determining one"). We simply hold that when, as here, the company is aware of an accommodation request when it extends an offer of employment, the only reasonable inference is that the offer includes the accommodation. Here, Crawford admits that the company never expressly refused to accommodate her lifting restrictions, and the record does not indicate that she made any attempt to clarify that the offer did not include the accommodation requested. Especially given the surrounding circumstances--that Union Carbide had accommodated Crawford's disabilities for the preceding ten years, had attempted to find her a replacement job when hers was eliminated for reasons completely unrelated to her disability, and even had offered to maintain her salary at its then-present level--we conclude that the record does not support a reasonable inference that the lifting [*18] accommodation was denied. See *Beck v. University of Wis. Bd. of Regents, 75 F.3d 1130, 1135-37 (7th Cir. 1996)* (affirming summary judgment in favor of employer when facts indicated that employer had history of accommodating employee's disability and employee was primarily responsible for breakdown in communications concerning reasonable accommodation).

Second, with respect to the air filter accommodation, there is no more than a scintilla of evidence that Crawford ever requested such an accommodation. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (stating that "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff"). As support for her assertion that she requested an air filter accommodation, Crawford points to her comment that "this room is awfully dirty," J.A. 63 (internal quotation marks omitted), and the April 12, 1994 letter from Thrush to Teter. We conclude that neither of these pieces of evidence is adequate to create a genuine [*19] issue of material fact.

Crawford's comment that "this room is awfully dirty" is so vague that no reasonable jury could conclude that it was a request for an accommodation. n7 Nor does the April 12, 1994 letter from Thrush to Teter constitute a request for an air ventilation accommodation. While the letter did state that Crawford needed "to be in an environment that is essentially free of air pollutants such as heavy dust, chemicals or heavy dirt, including paper dust," J.A. 131, it did not mention the records clerk position or worksite (or any other employment position, worksite, or duties), nor did it identify any mechanism, such as an air filter, that would be necessary to assure a

dust-free environment. In fact, Crawford's deposition testimony was that she had never discussed the possibility of accommodations for the records clerk position with Thrush, and Thrush admitted during his deposition that he had not inspected the worksite, "didn't know that much about the job," J.A. 139, and could not render an authoritative medical opinion on whether Crawford would be able to perform the duties of the position without additional information. As Crawford never communicated a request for [*20] an air filter accommodation, Union Carbide cannot be responsible for failing to provide one. n8 See *Taylor, 93 F.3d at 165* (stating that "if the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one").

n7 Although the record makes abundantly clear that Crawford was willing and able to communicate other concerns to company officials in writing, there is no evidence that she requested any accommodations in writing.

n8 Because we conclude that Union Carbide satisfied any duty it may have had to accommodate Crawford by offering her the records clerk position with the lifting accommodation, we need not address Crawford's allegation that the company violated her rights under the ADA by failing to consider her for other positions. See *Baert , 149 F.3d at 633*.

III.

In sum, we conclude that the district court correctly determined that Crawford was not a qualified individual with a disability as of May 31, 1994. And, even if [*21] Crawford was a qualified individual with a disability for purposes of the records clerk position, Union Carbide satisfied its obligations under the ADA by offering her the records clerk position with the only accommodation requested--lifting assistance. Accordingly, we affirm the order of the district court granting summary judgment to Union Carbide.

AFFIRMED

LEXSEE 1999 us app lexis 4818

**ARGERTHA N. JACKSON, Plaintiff-Appellant, v. BOARD OF EDUCATION OF MONTGOMERY COUNTY; WAYNE E. WHIGHAM; NANCY POWELL, in their official capacity as former Montgomery County Public Schools principals at Bethesda-Chevy Chase High School; DR. PAUL VANCE, Superintendent of Schools; STAN SCHAUB, Director of Staffing, Defendants-Appellees, and MONTGOMERY COUNTY PUBLIC SCHOOLS, Defendant.**

**No. 98-1060**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*1999 U.S. App. LEXIS 4818*

**February 23, 1999, Submitted**

**March 22, 1999, Decided**

**NOTICE:**
[*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**
Reported in Table Case Format at: *1999 U.S. App. LEXIS 15433.*

**PRIOR HISTORY:**
Appeal from the United States District Court for the District of Maryland, at Greenbelt. Alexander Williams, Jr., District Judge. (CA-96-3228-AW).

**DISPOSITION:**
AFFIRMED.

**COUNSEL:**
Karl W. Carter, Jr., Washington, D.C., for Appellant.

Charles W. Thompson, Jr., County Attorney, Linda B. Thall, Chief Counsel, Division of Special Projects, Rockville, Maryland, for Appellees.

**JUDGES:**
Before HAMILTON and WILLIAMS, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

**OPINION:**

**OPINION**

PER CURIAM:

Argertha Jackson appeals from a district court order granting summary judgment to her employer, the Montgomery County Board of Education (Board), and four of its employees in her employment discrimination action and dismissing her state tort claims without prejudice. Jackson's discrimination claims were brought under Title VII of the Civil Rights Act of 1964 and Title I of the Americans with Disabilities Act of 1990. Jackson, who is African American, alleges that the defendants discriminated against her on the basis of race and disability [*2] by assigning her to a "split schedule," which required her to teach in two different schools each day. Jackson also asserts that the defendants subjected her to a hostile work environment and retaliated against her because she complained about her new assignment. She contends that the defendants are liable for intentional infliction of emotional distress and negligent supervision. We find no error and affirm.

Jackson began teaching in the Montgomery County schools in 1976. At the time she filed her complaint, she had been teaching business education classes at the Bethesda-Chevy Chase High School (B-CC) for twelve years. At the end of the 1993-94 school year, B-CC put several teachers on "involuntary transfer." Jackson was

1999 U.S. App. LEXIS 4818, *

one of these teachers. Involuntary transfer is usually used when there is not enough work to support a full-time position for a teacher in a particular school. Teachers on involuntary transfer do not lose pay, benefits, or seniority, and the school attempts to find other positions for them. After being placed on involuntary transfer, Jackson filed a grievance alleging that because of her race, the administration was manipulating the schedules to eliminate Jackson's [*3] position. The grievance was denied by the Principal, the Director of School Administration, and a hearing officer. The hearing officer determined that Jackson was placed on involuntary transfer because the enrollment in business education classes at B-CC had dropped.

Jackson was assigned to a split schedule for the 1994-95 school year. She was assigned to B-CC part time and Poolesville High School part time. Teachers assigned to split schedules are compensated for travel time and mileage. After initially rejecting the assignment, claiming it would cause her physical and emotional harm, Jackson began to work the split schedule.

At the beginning of 1995, Jackson submitted a leave request for an indeterminate amount of time because she was having difficulty speaking. The Board denied the request and placed Jackson on leave without pay. Six days later, Jackson submitted notes from physicians, one of which said that her "condition will continue to worsen or be activated if daily tasks involve any of the strainful activity." After discussing the matter with Jackson's doctor, members of the Board determined that Jackson needed accommodation because of an arthritic back problem, which prevented [*4] her from driving the distance required by the split schedule. The Board granted Jackson leave from the Poolesville position. It was during this time that Jackson filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC).

Jackson continued to work part-time at B-CC and used her sick leave for the remaining time, so she received her full salary. In March 1996, Jackson submitted a form stating that she wished to return to work on a full-time basis. When the Board of Education offered her a full-time assignment at Springbrook High School, she declined the position, stating that because of medical problems, she was unable to accept full-time employment. Jackson also declined an offer to teach one extra class at White Oak Middle School. A June 1996 letter from the EEOC informed Jackson that the EEOC would not pursue her charge, and Jackson filed suit in October 1996.

We review the district court's grant of summary judgment de novo and affirm only if the record reveals no genuine issue of material fact. See *Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).* A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, [*5] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* In making this assessment, the court must view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. See *id. at 255.*

The district court properly concluded that Jackson cannot prevail on her Title VII claim of race discrimination. In the absence of direct evidence of discrimination, this claim is subject to the burdens of proof set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* See *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* To prevail, Jackson must first establish a prima facie case by proving: (1) she is a member of a protected group; (2) she suffered some adverse employment action; (3) at the time of the [*6] adverse employment action, she was performing at a level that met her employer's legitimate expectations; and (4) the adverse employment action occurred under circumstances that raise an inference of unlawful discrimination. See *id. at 505* (citing *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-55, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).* Assuming that Jackson establishes her prima facie case by a preponderance of the evidence, the burden then shifts to the defendants to rebut a presumption of discrimination by articulating some legitimate, nondiscriminatory reason for the adverse employment action. See *St. Mary's, 509 U.S. at 506-07.* If the defendants provide a legitimate, nondiscriminatory reason for the action, Jackson may then attempt to prove by a preponderance of the evidence that the reasons asserted by the defendants were a pretext for discrimination. See *id. at 507-08.*

The defendants do not contest Jackson's presentation of a prima facie discrimination case. However, the defendants offer a nondiscriminatory explanation for Jackson's placement in a split schedule. The defendants assert that Jackson was assigned to a split schedule because [*7] enrollment in business education classes at B-CC had dropped to the point where it only supported one or two classes for the 1994-95 school year. Meanwhile, the county public school system had several half-time vacancies in business education at other schools. The assignment was pursuant to standard school

procedures and involved both Jackson and another full-time teacher, who is white. Because the defendants offered a legitimate, non-discriminatory explanation for Jackson's split schedule assignment, Jackson must show that the explanation is pretextual.

Jackson asserts that the school should have made better attempts to give her full-time employment at B-CC and to keep her classes full. However, "the crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington College, 57 F.3d 369, 383 (4th Cir. 1995)* (citing *Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978))*. Jackson argues generally that school officials accommodated white teachers but provides no evidence showing that she was treated differently from other teachers [*8] on account of race. Jackson also does not deny that a white teacher was assigned to a split schedule at the same time she was. Furthermore, Jackson provides no evidence that her split schedule assignment was not the result of standard school procedure. Viewing the evidence in the light most favorable to Jackson, Jackson fails to produce sufficient evidence of pretext. Furthermore, Jackson fails to present any significant direct evidence of discrimination. Therefore, the district court properly granted the defendants' motion for summary judgment on this claim.

Addressing Jackson's hostile work environment claim, the district court properly determined that the claim is barred because Jackson did not bring the claim in her EEOC complaint. See *Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995)* (citing *EEOC v. General Electric Co., 532 F.2d 359, 366 (4th Cir. 1976))*.

Jackson next argues that the defendants discriminated against her on the basis of her disability in violation of the ADA. To establish a prima facie case of disability discrimination, Jackson must prove that: (1) she was a member of a protected class (she must have a "disability," which is a physical or [*9] mental impairment that substantially limits one or more of the major life activities); (2) she suffered an adverse employment decision; (3) her performance met her employer's legitimate expectations at the time of the adverse action; and (4) the action occurred under circumstances that raise a reasonable inference of unlawful discrimination. See *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995)* (citations omitted). Because there was conflicting evidence as to whether Jackson actually had a disability at all, the district court properly assumed for the purposes of the summary judgment motion that Jackson was disabled. Furthermore, the defendants did not contest the second and third elements of the prima facie case.

Even so, Jackson presents no evidence suggesting unlawful discrimination based on disability. All of Jackson's evidence relates to race discrimination. Moreover, there is extensive evidence in the record that the defendants made reasonable efforts to accommodate Jackson. The defendants granted Jackson's request for part-time leave after she supplied them with documentation of her back condition. Later, when Jackson stated that she wished [*10] to return to a full-time job, the defendants offered her a full-time position at Springbrook High School which she declined after deciding she did not want full-time employment. The defendants then offered her a chance to supplement her part-time schedule without going to full-time. Jackson declined that offer as well. Because Jackson failed to present a prima facie case of disability discrimination, the district court properly granted the defendants summary judgment on Jackson's ADA claim.

Jackson contends that the defendants retaliated against her because she filed a grievance after being put on involuntary transfer. "The series of proofs and burdens outlined in McDonnell Douglas apply to retaliation claims." *Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998)*. In order to establish a prima facie case of retaliation, Jackson must show that: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) there was a causal connection between the two. See id. Assuming that Jackson could establish a prima facie case, the defendants have already set forth a legitimate nondiscriminatory reason for Jackson's assignment to [*11] the split schedule. Therefore, in order to prevail on her claim, Jackson must demonstrate that the defendants' proffered reasons for the assignment are pretextual. See *id. at 1229*.

Jackson fails to establish she was assigned to a split schedule in retaliation for her complaints concerning her involuntary transfer. Although Jackson states she was the only teacher placed on involuntary transfer who complained about the placement, she was not the only teacher assigned to a split schedule. In addition, Jackson does not deny that the county school system as a whole had many teachers assigned to split schedules or that these assignments assured the teachers continued full-time employment. Because Jackson fails to establish that the reasons given by the defendants for the split schedule assignment are pretextual, the defendants are entitled to summary judgment on Jackson's retaliation claim.

In light of the dismissal of Jackson's federal claims, we find that the district court properly declined supplemental jurisdiction over her state law claims. See

1999 U.S. App. LEXIS 4818, *

*United Mine Workers v. Gibbs, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).* For these reasons, we affirm summary judgment [*12] in favor of the defendants and dismissal without prejudice of Jackson's state tort claims. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

LEXSEE 1998 us app lexis 26860

**KEVIN D. MARSHALL, Plaintiff-Appellant, v. HOME DEPOT U.S.A., INCORPORATED, Defendant-Appellee.**

**No. 97-1516**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*1998 U.S. App. LEXIS 26860*

**September 30, 1998, Submitted**

**October 20, 1998, Decided**

**NOTICE:**
[*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**
Reported in Table Case Format at: *1998 U.S. App. LEXIS 35850.*

**PRIOR HISTORY:**
Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (CA-96-194-5-BR, CA-96-608-5-BR).

**DISPOSITION:**
AFFIRMED.

**COUNSEL:**
Mitchell Gittin, Port Jefferson Station, New York; Gregory P. Chocklett, Raleigh, North Carolina, for Appellant.

John F. Wymer, III, Samuel M. Matchett, POWELL, GOLDSTEIN, FRAZER & MURPHY, L.L.P., Atlanta, Georgia, for Appellee.

**JUDGES:**
Before MURNAGHAN, ERVIN, and MOTZ, Circuit Judges.

**OPINION:**

**OPINION**

PER CURIAM:

Kevin D. Marshall appeals the district court's judgment granting summary judgment to Home Depot U.S.A., Inc. ("Home Depot") and dismissing his employment discrimination complaint. Marshall contends the court erred by not specifying the basis for dismissing his complaint. He also contends there were genuine issues of material fact regarding his failure to promote claim and hostile work environment [*2] claim. Finding no reversible error, we affirm.

Marshall, a black male, began working for Home Depot in 1985 in one of its Florida retail locations. In 1989, he was transferred to a store in Patchogue, New York, where he was a supervisor. In 1990, he was transferred to the East Meadow, New York store and became a department supervisor. He was soon promoted to Assistant Manager Trainee and then Assistant Store Manager at which time he was transferred to a store in Commack, New York.

While an Assistant Manager Trainee, a female employee lodged an internal complaint against him alleging sexual harassment. After an investigation by Home Depot, Marshall was warned that any other similar complaint would result in his termination.

In 1992, Marshall transferred to the Farmingdale, New York store. It was at this store that Marshall alleged he was subjected to a hostile work environment. Marshall worked at this store for thirteen months before being transferred to another New York location. In 1994, Marshall transferred to a Home Depot in Cary, North Carolina.

Meanwhile, in April 1994, Marshall filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and New York State [*3] in which he alleged that he was not promoted to Store Manager because of his race.

While Marshall was employed at the Cary, North Carolina Home Depot, a female store employee complained that he had engaged in sexual harassment. In October 1994, after an investigation corroborated much of the details in the complaint, Marshall was terminated.

Shortly after his termination, Marshall filed another EEOC complaint. In this complaint, Marshall alleged he was terminated due to his race and in retaliation for having filed the prior EEOC complaint.

In March 1995, Marshall filed a complaint in the Eastern District of New York under Title VII, *42 U.S.C.A. § § 2000e*-2000e-17 (West 1994 & Supp. 1998) ("Title VII") and New York State Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1997), alleging that he was subjected to a hostile work environment and denied promotional opportunities at the New York stores because of his race.

In March 1996, Marshall filed a complaint in the Eastern District of North Carolina under Title VII and the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.1 (1996), in which he alleged that he was terminated due to [*4] his race and in retaliation for having filed the EEOC complaint in New York. The complaint filed in the Eastern District of New York was consolidated with the complaint filed in the Eastern District of North Carolina.

After discovery, Home Depot moved for summary judgment. Marshall did not file an opposition to the motion. The district court found that "under full review of the pleadings, affidavits, discovery materials and other matters of record the Court concludes that there are no genuine issues of material fact with regard to any of the claims in either of the consolidated cases and that defendant is entitled to summary judgment." (J.A. at 141).

On appeal, Marshall contends that remand is warranted for the purpose of ordering the district court to set forth the reasons for its finding that there was an absence of material issue of fact. This Court reviews de novo a district court's grant of summary judgment. See *Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995).* Because we undertake the same review of the facts and apply the same legal standards used by the district court, see *Gillins v. Berkeley Elec. Co-op., Inc., 148 F.3d 413, 415 (4th Cir. 1998),* [*5] it is not necessary to have before us the district court's specific findings of fact or conclusions of law. See *Summers v.*

*Department of Justice, 140 F.3d 1077, 1079 (D.C. Cir. 1998).* Under Fed. R. Civ. P. 52(a), "findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 ...." Such information may indeed be helpful to a reviewing court, but in this instance, not essential. See *Domegan v. Fair, 859 F.2d 1059, 1066 (1st Cir. 1988).*

Even though Marshall did not respond to the summary judgment motion, the motion may only be granted if Home Depot shows the absence of a dispute over a material fact and that it is entitled to judgment as a matter of law. See *Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).* Marshall contends that summary judgment was inappropriate on his failure to promote claim and hostile work environment claim. * We will take each in turn.

* Marshall does not challenge the court's decision dismissing his wrongful termination claim. Accordingly, we deem the claim abandoned. See 11126 *Baltimore Blvd., Inc. v. Prince George's County, 58 F.3d 988, 993 n.7 (4th Cir. 1995)* (issues not briefed or argued are deemed abandoned).

[*6]

Marshall's failure to promote claim is time-barred. Marshall must have filed a complaint with the EEOC within 180 days of the incident, or within 300 days of the incident if state or local proceedings are initiated. See *42 U.S.C. § 2000e*-5(e)(1) (1994); *Beall v. Abbott Lab., 130 F.3d 614, 620 (4th Cir. 1997).* The failure to file a timely complaint with the EEOC bars the claim in federal court. See *McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 131 (4th Cir. 1994).*

The statute of limitations period commenced to run when the Home Depot made the challenged promotions. See *Price v. Litton Bus. Sys., Inc., 694 F.2d 963, 965 (4th Cir. 1982)* (the filing period runs from the time at which the employee is informed of the allegedly discriminatory employment decision). By Marshall's own admissions, the alleged wrongful promotions occurred in 1992, more than 300 days before he filed his April 1994 EEOC complaint. See *Butts v. City of New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)* (failure to promote claims time-barred because EEOC complaint not filed [*7] within 300 days of the promotion). Marshall cannot point to any promotion that occurred within 300 days of filing the EEOC complaint. Nor does he offer any reason to toll the limitations period. Thus, we find the summary judgment was appropriately granted on this claim.

1998 U.S. App. LEXIS 26860, *

Likewise, Marshall's hostile work environment claim is foreclosed. Marshall never raised this claim in either of his two EEOC complaints. When claims "raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." See *Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995);* see also *Davis v. North Carolina Dep't of Corrections, 48 F.3d 134, 137 (4th Cir. 1995)* ("Before a federal court may assume jurisdiction over a claim under Title VII, however, a claimant must exhaust the administrative procedures.").

Thus, we affirm the judgment of the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the [*8] court and argument would not aid the decisional process.

AFFIRMED