IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Civil Division)


MICHAEL SHIELDS                    )

Plaintiff,                         ) CIVIL ACTION: MJG02CV1783

                                   )

        v.                         )

FEDERAL EXPRESS CORPORATION,       )
AND PATRICK J. QUIRKE
                                   )
Defendants.

---

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

---

Plaintiff Michael Shields, by and through his attorneys, Brian K. McDaniel and

Kevin Chapple, move that this Honorable Court deny Defendants' Motion for Summary

Judgment and each count. The grounds for this motion are set out in the accompanying

Memorandum.


                              Respectfully Submitted,

                              _____
                              Brian K.McDaniel, Esq.
                              Kevin Chapple, Esq.
                              1211 Connecticut Avenue
                              Suite 303
                              Washington, DC 20036
                              202-331-0793
                              Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Civil Division)

MICHAEL SHIELDS                              )

Plaintiff,                                   ) CIVIL ACTION: MJG02CV1783

v.                                           )

FEDERAL EXPRESS CORPORATION,                 )
AND PATRICK J. QUIRKE
                                             )
Defendants.

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on this _____ day of _____,

2003, a copy of the foregoing Motion in Opposition to Defendants' Motion for Summary

Judgment and Memorandum in Support thereof was filed with the Clerk's office for the

United States District Court for the District of Maryland and a copy was mailed by first

class mail, postage prepaid to Eric Hemmendinger, Shawe & Rosenthal, LLP, Sun Life

Building, 20 South Charles Street, Baltimore, MD 21201, and Mary Jane Palmer, Federal

Express Corporation, 3620 Hacks Cross, Building B, 3rd Floor, Memphis, TN, 38125.


_____

Brian K. McDaniel, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Civil Division)

| | |
|---|---|
| MICHAEL SHIELDS | ) |
| Plaintiff, | ) CIVIL ACTION: MJG02CV1783 |
| v. | ) |
| FEDERAL EXPRESS CORPORATION, | ) |
| AND PATRICK J. QUIRKE | |
| | ) |
| Defendants. | |

---

### ORDER

Upon consideration of the Plaintiff's Motion In Opposition to Defendant's Motion

for Summary Judgment and all the information in the possession of this court, it is this

_____ day of _____, 2003.


ORDERED, that the Plaintiff's Motion is hereby **Granted**.




_____

Honorable Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Civil Division)

MICHAEL SHIELDS )

Plaintiff, ) CIVIL ACTION: MJG02CV1783

v. )

FEDERAL EXPRESS CORPORATION, )
AND PATRICK J. QUIRKE

)

Defendants.

---

**MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Michael Shields, by and through his attorneys, Brian K. McDaniel and

Kevin Chapple, Esq. submit this memorandum in support of his Response in Opposition

to Defendant's Motion for Summary Judgment.

**UNDISPUTED STATEMENT OF FACTS**: See Plaintiff's Declaration Attached

herein.

**I.      STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

In considering a motion for summary judgment, the court must determine whether

"the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56 (c); *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In order for the non-moving party to

prevail upon a motion for summary judgment, the non-moving party must "make a

showing sufficient to establish the existence of [every] element essential to that party's

case and, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

All reasonable inferences must be drawn in favor of the non-movant *Anderson* 477 U.S. at 256. Additionally, the court must accept as true all well-pleaded allegations of fact in a plaintiff's complaint, construe the complaint in the light most favorable to the plaintiff, and determine whether "under any reasonable reading of the pleading, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township*, 838 F.2d 663, 665-66 (3d Cir. 1988). Moreover, the court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *Hairston-Lash v. R.J.E. Telecom, Inc.,* 161 F.Supp.2d 390, 393 (E.D. Pa. 2001) (quoting *Big Apple BMW, Inc. v. BMW of N. Am, Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992)) A complaint is properly dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## II.    PAT QUIRKE IS A PROPER DEFENDANT

Federal Express asserts that Plaintiff's claim against Defendant Quirke should be dismissed because the Fourth Circuit does not hold supervisors individually liable under Title VII. *42 U.S.C. § 2000e-2(a)* defines employer as "a person engaged in an industry affecting commerce who has fifteen or more employees" and "any agent of such a person." The court in *Lissau v. Southern Food Serv., Inc.* 159 F.3d 177, 180 (4th Cir. 1998) admits that the statute does not define the term "agent." The *Lissau* court concluded that the inclusion of "agent" did not signal a congressional desire to impose

liability on individual supervisors. *Id.*  We disagree.  If the inclusion of the term "agent" does not impose liability on individual supervisors than the last part of the definition of employers would have no meaning nor purpose.  We contend that the inclusion by Congress of the term "agents" signaled the intention of Congress to hold individual supervisors liable under Title VII.  Thus, this Court should allow Plaintiff's claim against Defendant Quirke to continue.

III.    **PLAINTIFF HAS EXHAUSTED ALL HIS ADMINISTRATIVE REMEDIES WITH RESPECT TO HIS CLAIM OF RACIAL HARASSMENT**

"Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual with respect to his compensation, **terms, conditions**, or privileges of employment." (emphasis added) 42 U.S.C.S. § 2000 e-2 (a) (1). The goal of Title VII is to accomplish a resolution of the pending discriminatory charge in the attempt to avoid subsequent litigation. 42 U.S.C.S. § 2000 e-5 (b). This is achieved through administrative remedies constituted by the Equal Employment Opportunity Commission ("EEOC") or the appropriate state fair employment practices agency. (in the instant matter it is the Fairfax County Human Rights Commission).

When a subsequent civil action is brought by the individual and not the EEOC, "the allegations in the complaint need only be reasonably related to the administrative charges." *John A. White, et al v. Federal Express, 729 F. Supp. 1536 quoting Oubichon v. North American Rockwell Corp., 482 F.2d 569, 571 (9th Cir. 1973).*  The 'reasonable relation' test balances the interests of both parties. It permits the Plaintiff to initiate the EEOC investigation without having to frame his charges in precise or legalistic detail. *Id.*

Furthermore, there is the unfolded principle that "Title VII is a remedial provision and should be broadly construed." *Id., citing Henderson v. Eastern Freight Ways, Inc.,* 460 F. 2d 258, 260 (4th Cir. 1972).

The Defendants allege in their Motion for Summary Judgment that "to exhaust one's administrative remedies under Title VII, a Plaintiff must file a charge within 300 days of the alleged discriminatory treatment*." See Defendant's Motion for Summary Judgment at 14* quoting 42 U.S.C. § 2000e-5.  The Defendants go further in stating that the absence of said filing within the statutory time period, renders all charges alleged are subsequently barred. Plaintiff Shields was discriminatorily discharged on February 26, 2001, at the directive of Patrick Quirke who acted within the scope of his employment as an agent for the Defendant Federal Express Corporation. As a result, Plaintiff Shields filed a charge of discrimination with the Fairfax County Human Rights Commission, a local agency that has the same expressed authority as the Equal Employment Opportunity Commission on June 7, 2001. Contained within the charge Plaintiff Shields stated that the last act of discrimination took place on the date that he was discharged, February 26, 2001. Within the portion of the form entitled 'the particulars' Plaintiff Shields lists examples of instances which exemplified a racially motivated hostile working environment, while Senior Manager under the supervision of Defendant Quirke. (See attached).

Therefore, in accordance with the aforementioned legal authority, Mr. Shields acted well within the statutory time frame allotted when he filed his discrimination charge within three months of the last dated discriminatory act.

The Defendants also allege that Plaintiff Shields failed to exhaust his administrative remedies with respect to his racial harassment claim because Plaintiff Shields' EEOC charge alleges "only retaliation and discipline and termination based upon race" and is silent in regards to the charge of racial harassment. *See Defendant's Memorandum in Support of Motion for Summary Judgment* at 15. At the time of filing the Plaintiff lacked assistance of counsel and should not be "expected to articulate the entire range of allegedly discriminatory practices of which they feel they are victims." *Hubbard v. Rubbermaid, Incorporated,* 436 F. Supp. 1184.

Moreover, "as a general proposition, the scope of an EEOC complaint should not be strictly interpreted." *Id.* When faced with the question of the proper scope of a complaint under Title VII of the Civil Rights Act of 1964, courts have used a "reasonable relation" test. *See White,* 729 F. Supp. 1536. "The charge merely provides the EEOC with 'a jurisdictional springboard to investigate whether the employer is engaged in any discriminatory practices; and that investigation may well "disclose, illegal practices other than those listed in the charge." . *See EEOC v. General Electric Company* [1] 532 F.2d 359.

Furthermore, the charge of racial harassment may be deemed as a valid claim that has risen out of the original charge of retaliation and discipline based upon race. *Id.* The use of the "reasonable relation" test "balances the interest of both parties." *See White,* 729 F. Supp. 1536. "It affords the defendant reasonable protection from the unfair surprise

---

[1] In *General Electric*, the appellate court found that the district court erred when it granted summary judgment to General Electric on the grounds that the EEOC did not have standing to maintain the additional claim of sexual discrimination because the new charge could not have arisen out of the original claim filed. Although the facts are distinguishable the same "reasonable relation" test is used to determine the sufficiency of the original charge filed that warrants action by the EEOC as well as a civil suit under the

and prejudice of defending against claims in court that are unrelated to the administrative charge." *Id.* Thus, allowing the Plaintiffs to commence the EEOC investigation without having to confine charges in "precise or legalistic detail." *Id.*

Plaintiff Shields noted within his administration charges some instances where he had experienced first hand discriminatory practices and behavior of certain agents of Federal Express, Patrick Quirke, specifically. If applied in the instant case, the "reasonable relation" test makes it apparent that the Plaintiff's claim of harassment based on race is reasonably related to the charge filed with the EEOC. Additionally, when reading the two documents together "the core" of Plaintiff Shields' complaint "can be easily deduced from the EEOC charges." *Id.*

Therefore, the Defendants have no basis for a claim of "unfair surprise or prejudice" *Id.* Plaintiff Shields in his charge did accordingly state a discriminatory act "within the purview of Title VII," *King v. Seaboard Coast Line Railroad Company, et al,* 538 F. 2d 581. An appropriate EEOC investigation "could under any theory have enlarged that charge to embrace harassment based on race." *Id.*

In addition, Plaintiff Shields has proven a prima facie case for racial harassment under *Faragher v. City of Boca Raton,* 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998). In order to establish a hostile work environment, a plaintiff must prove that a racially objectionable environment existed which was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id. at 787 (quoting Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)). "To determine whether an

---

Act for **any discrimination** (emphasis added) stated in the charge itself or developed in

environment is hostile or abusive, the court should look at all the circumstances, including the frequency and severity of the conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nichols v. Comcast Cablevision,* 84 F. Supp. 2d (D. Md. 2000).

"It is well-established in other circuits that a working environment overrun by racial antagonism constitutes a Title VII violation." *Snell v. Suffolk County et al.; Citing Gilbert v. City of Little Rock,* 722 F. 2d 1390 (8th Cir. 1983). Plaintiff Shields was satisfactorily performing his duties in September of 2000, and was indeed performing them in an outstanding manner.

During his employ at Federal Express, Plaintiff Shields under the directive of Defendant Quirke was ordered to administer an unusually harsh disciplinary action to an African American subordinate, Rva Pendleton, and not a similarly situated Caucasian subordinate. *See Plaintiff's Complaint at ¶ 33.* Plaintiff Shields complained to Defendant Quirke about the disparate discipline that was being rendered. In turn, Defendant Quirke implied that Plaintiff Shields was unwilling or afraid to administer disciplinary actions to African American subordinates. *Id. at 34.* Shortly thereafter, Plaintiff reported to Defendant Quirke that a Caucasian subordinate called Plaintiff "nigger" (*Id. at ¶ 35)* and "faggot." Defendant Quirke failed to take any substantive disciplinary or corrective actions against said Caucasian subordinate. Plaintiff reported the incident and Defendant Quirke's inaction to upper management. *Id. at ¶ 37.*

---

the course of a reasonable investigation of that charge.

"The Fifth Circuit put it succinctly, ' a discriminatory and offensive work environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers' may constitute a violation of Title VII." *Snell,* 782 F.2d 1094.  Plaintiff Shields had exhausted his administrative remedies and well beforehand experienced a work environment so fueled by racial animus which Plaintiff Shields, **as a reasonable person perceived** (emphasis added) to be both hostile and abusive. That the patterns of said behavior was continuous and so **severe** that it ultimately was to the detriment of Plaintiff Shields when he was subsequently terminated.

Additionally, the discriminatory behavior **unreasonably interfered** with Plaintiff Shields work performance; the blatant undermining of Plaintiff Shields' authority by Defendant Quirke was known to all those that worked at the BCBA station. As a result, Caucasian workers disregarded Plaintiff Shields' supervisory authority as shown by the behavior of Bobby Richeson, who called the Plaintiff a "nigger" and "faggot" during working hours.

Furthermore, prior to Plaintiff Shields arrival at the BCBA station there were numerous factors that affected the stations' productivity. *See Plaintiff's Declaration ¶ 4.* This includes but not limited to freight arrivals from the Indianapolis Regional Hub, a station where Patrick Quirke had several established relationships. These issues were major factors that affected the overall performance of the BCBA station. Defendant Quirke often relayed during Senior Staff Meetings that he possessed the ability to affect change and to improve freight arrivals into the Capitol District market. However, when Plaintiff Shields approached Defendant Quirke on several occasions concerning the

issues affecting the station and guidance on how to proceed with regards to meeting his expectations, in light of the systematic issues, he failed to lend support or provide leadership or direction. *Id.*

Furthermore, the inequitable budget allocations that were approved by Patrick Quirke, although disputed by Verna Foster, tenured Senior Financial Analyst in the Capitol District, was assigned despite Plaintiffs Shields own submission, of assessments that Ms. Foster concurred were more suitable for the BCBA station. The budget allocations assigned set the BCBA operation up for failure. *Id.* Defendant Quirke ignored Verna Forster's knowledge and expertise. *Id.*

Plaintiff's charge of racial harassment should not be dismissed.

## IV.    PLAINTIFF'S RACE DISCRIMINATION CLAIM SHOULD NOT BE DISMISSED AS A MATTER OF LAW

Under Title VII, the Plaintiff has established the elements required to substantiate a *prima facie* case of race discrimination. Plaintiff Shields is an African-American male and a member of the protected class. Plaintiff Shields allegedly failed to achieve projection goals as set by Defendant Quirke, as a result, Plaintiff was subsequently terminated. It is Plaintiff's contention that he attempted to achieve his station's projection goals but the goals set were unrealistic and unattainable in the time frame allotted. Moreover, that Senior Managers from neighboring stations who are Caucasian and whose stations were operating at the same or lower standard than that of the Plaintiff's were not as severely disciplined by Defendant Quirke. *See Moore v. Charlotte*, 754 F.2d 1100 (4th Cir.).

If the court takes into consideration evidence submitted in the light most favorable to the Plaintiff, and he is given the benefit of all reasonable inferences, a reasonable juror could find that a *prima facie* case has been established of racial discrimination.

**A.    PLAINTIFF SHIELDS CAN ESTABLISH THAT HE WAS DISCIPLINED MORE SEVERELY THAN SIMILARLY SITUATED NON-AFRICAN AMERICAN EMPLOYEES WERE.**

Plaintiff can demonstrate that FedEx treated him less favorably than similarly situated Caucasian employees. *See Moore,* 754 F.2d at 1105-1107. In his deposition, Mr. Quirke acknowledged the distinction between the volume of freight and product handled by the BCB station and that of the DCA station which was managed by Mr. Barnes, a Caucasian Senior Manager. *See Declaration of Patrick Quirke* at 56, l. 5 – p. 57, l. 11. An employee can show unlawful discrimination under Title VII if he was disciplined more strictly than similarly situated white FedEx employee who had committed a similar infraction. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282, 49 L. Ed. 2d 493, 96 S.Ct. 2574 (1976). While it is acknowledged that Mr. Shields was responsible for a station with a much larger volume responsibility than any other station in the district, many of the problems experienced in the BCB station were being suffered in other stations. Most pointedly revealing the disparate treatment was the disciplinary history and subjective approach of Mr. Quirke to the management of the DCA station and it's senior manager, Barnes.

On numerous occasions Mr. Shields, during his meetings with Mr. Quirke, would explain that a number of the failures to reach goal pursuant to the FOP program were due to the understaffing of the BCB station. Shortly thereafter, Mr. Shields was disciplined for failure to meet FOP goals. During that same time period a similarly situated

Caucasian Senior Manager, Mr. Barnes was disciplined for failure to meet FOP goals (ostensibly the same reason that Mr. Shields was originally disciplined). Mr. Barnes received an overall performance appraisal rating of 3.1. During the same period and with allegations of similar failures, Mr. Shields received an overall performance rating of 1.9. This is remarkable due to the application of the rating scale in which an overall rating of 2.0 or less is considered unsatisfactory and may lead to sanction. Mr. Quirke also acknowledged this within his deposition. *See Defendant's Declaration* at p. 74 l. 1 – 18.

It is within this context that Mr. Quirke, on January 8, 2001, issued Mr. Shields a warning letter for failure to follow a Performance Agreement. The issuance of the warning letter further evidences Mr. Quirke's intent to provide a record for the ultimate termination of Mr. Shields. In fact the warning letter was not the appropriate form of discipline for the alleged failure to follow the Performance Agreement as the warning letter is more appropriately employed for conduct-related issues as oppose to performance deficiencies. Mr. Barnes' aforementioned performance evaluation resulted in a mandate for a Performance Agreement, which was to detail "how he intended to improve productivity and safety performance at the DCA station." *See Declaration of Patrick Quirke* at pg. 12 п 36. Both the assessments of the original plan and the compliance with the same were in the exclusive control and application of Mr. Quirke. Mr. Quirke acknowledged that, while Mr. Barnes had not complied with the outline in his performance agreement, it was not his intent to discipline him in anyway similar to that discipline which Mr. Shields was faced with in the face of the same alleged failures. *See Declaration of Patrick Quirke* p. 86 l. 12 – p. 90 l. 3.

It is clear based on the evidence proffered that 1.) Mr. Shields is a member of a protected class as an African-American; 2.) that it is alleged that he failed to meet the strictures of the performance agreement which he voluntarily entered into in the same or similar fashion as the failure of Mr. Clint Barnes, 3.) and that Mr. Quirke's response to Mr. Shields' failure to meet the goals outlined in his plan met with an inappropriate warning letter and his ultimate termination while it was not the intent of Mr. Quirke to either demote or terminate Mr. Clint Barnes, a white Senior Manager, in the face of the same failure at a more fully staffed station. The disparate discipline in the absence of any reasonable explanation for the differing treatment of the similarly situated Senior Managers reveals a *prima facie* case of race discrimination. *See Moore v. Charlotte*, 754 F.2d 1100 (4th Cir.).

## V.    PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF RETALIATION

To establish a prima facie claim of retaliation in violation of Title VII, 42 U.S.C. § 2000 e-3 (a), Plaintiff Shields must show that he engaged in protected activity; and that Federal Express by and through certain employees took adverse employment action against him; and that a causal connection existed between the protected activity and the adverse action. *Ross v. Communications Satellite Corp.,* 759 F. 2d 355, 365 (4th Cir. 1985).

### A)  PROTECTED ACTIVITY:

"Section 2000e-3(a) of the Civil Rights Act makes it unlawful for an employer to discriminate against any employee either ' be cause he has opposed any practice made an unlawful employment practice' under Title VII (the opposition clause),

or 'because he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII (the participation clause). *Title VII v. Section 2000e-3(a)*. Furthermore, "an employee's verbal protests to the employer regarding what the employee perceives as discriminatory practices are **protected activities**." *See Chappell v. Southern Maryland Hospital, Inc., et al.* 320 Md. 483.[2]

The court in *Chappell* stated that the opposition and participation clauses of § 2000e –3(a) "have been liberally applied by the courts to shield employees who speak out against an employer's unlawful employment practices, the obvious rationale being that without some guaranteed protection to assert equal employment rights, the ultimate purpose of the act would be severely limited." *Id. (quoting E.E.O.C. v. Crown Zellerbach Corp.,* 720 F. 2d 1008[3] and *Armstrong v. Index Journal Co.,* 647 F.2d 441 (4th Cir. 1981)[4].

To establish a prima facie case for retaliation case under § 2000e-3(a) the following prongs must be satisfied:

a)      that there was a statutorily protected "opposition" or "participation";

b)      that an adverse employment action occurred;

c)      that there was a causal link between the **protected activity** and the adverse employment action.

*See Ross v. Communications Satellite Corp.,* 759 F. 2d 355, 365 (4th Cir. 1985).

---

[2] Chappell alleged that he was fired for complaining to his employer about allegedly discriminatory employment practices.
[3] A letter protesting unspecified "racism" and "discrimination" in employer's practices is a permissible form of protected opposition to discriminatory practices.
[4] A female employee who was discharged because she complained to her employer about its discriminatory practices of  soliciting applicants for sales work according to their sex, and by limiting  the job

Plaintiff Shields participated in protected activity when he verbally protested the discriminatory actions taken by Defendant Quirke in regards to unfairly disseminating disciplinary initiatives among African American and Caucasian employees and imposing lesser reprimands to the latter. Plaintiff Shields voiced his concerns to Patrick Quirke with regard to the disparity of the disciplinary treatment of Rva Pendleton and Clifton Dalton. *See Plaintiff's Declaration at ¶ 55.*

Plaintiff Shields took issue with the fact that Defendant Quirke mandated that Plaintiff Shields discipline Rva Pendleton, (an African American female), with a warning letter and not Clifton Dalton (a Caucasian male). *Id.* This occurred, after an in station altercation with an employee, where Ms. Pendleton, tried to passively diffuse the situation to no avail. Mr. Dalton, an active participant in the altercation was issued no reprimand. *Id.*

When Plaintiff Shields delved further into the incident, by speaking with Gay Burvis, Human Resource Representative, it was related to him that the only investigation of the matter was an interview with Mr. Dalton who absolved himself totally, thus placing the brunt of the blame on Ms. Pendleton. *Id.*  Several of the hourly employees who witnessed the altercation were not interviewed by Patrick Quirke, and at the encouragement of Ms. Pendleton coupled with that of Plaintiff Shields, submitted written statements all refuting Patrick Quirke's claim. *Id.* Furthermore, Plaintiff Shields insisted that upon the filing of a Guaranteed Fair Treatment Procedure (GFTP) by Ms. Pendleton that it be heard by an impartial Managing Director, other than Patrick Quirke, who issued the original reprimand. *Id.* Subsequently, the discipline that Ms. Pendleton received was

opportunities and base pay of its female salespersons, was entitled to reinstatement with back pay and salary equal to male counterparts, court costs and attorney fees.

modified to documented counseling, a discipline that Plaintiff Shields requested that

Defendant Quirke allow him to administer to Ms. Pendleton originally. *Id.*

In addition, on or about September 23, 2000, Plaintiff reported to Defendant

Quirke that Bobby Richeson, a subordinate Caucasian courier, while on the job and

during working hours publicly called Plaintiff a "nigger" and "faggot." It is Federal

Express' contention that it "took prompt and effective action to suspend Bobby

Richeson," (*See Defendants' Motion for Summary Judgment at ¶ 57).* Plaintiff contends

that is untrue, and that the action was taken by his own initiative without the support of

the Human Resource Manager of the Capitol District, Dick Schmidt and Defendant

Quirke. *See Plaintiff's Declaration at ¶ 57.* Once, the incident occurred, Plaintiff Shields

immediately called Mr. Schmidt and told him of his intention to suspend Bobby

Richeson, pending termination for his behavior. *Id.*

In turn, Mr. Schmidt replied that Plaintiff Shields was "being emotional and

should think twice about firing a ten year employee." *Id.* Plaintiff Shields insisted that no

matter Mr. Richeson's tenure that his behavior was unacceptable and should not be

tolerated. Plaintiff Shields then resorted to calling Defendant Quirke, the next to be

informed according to Federal Express protocol, who in turn concurred with Mr.

Schmidt. Ultimately, Mr. Richeson was suspended for six weeks with pay and given the

option to remain at the BCBA station or relocate to the NDVA station.[5] *Id.* Bobby

Richeson refused both options and voluntarily resigned from Federal Express.

Neither Federal Express, nor Defendant Quirke subjected Bobby Richeson to any

substantive disciplinary or corrective action regarding his racial and derogatory slurs

directed at Plaintiff Shields. *See Plaintiff's Complaint at ¶ 22.* Following the

aforementioned incidents, on or about October 23, 2000, Defendant Quirke unjustly placed Plaintiff Shields on a "Performance Improvement Plan." During the week of January 8 - 26 of 2001, Plaintiff Shields was unjustly issued a disciplinary write-up for allegedly failing to make gains under the "Performance Improvement Plan" that Defendant Quirke placed the Plaintiff on. *See Plaintiff's Complaint at ¶ 24-26.*

Plaintiff Shields responded to the Defendant's unfair actions by filing internally via on-line a "Guaranteed Fair Treatment Program, " complaint where he indicated that Defendant Quirke had issued him a written warning. *Id.* Within the complaint the Plaintiff alleges that he had been issued a written warning by Defendant Quirke for issues which were based on performance and contrary to Defendant Federal Express' policy and procedure. *Id.* At no time did Defendant Quirke provide Plaintiff written documentation outlining the performance expected of him. *Id.* On or about January 26, 2001, Defendant Quirke also issued to Plaintiff a written evaluation containing false and negative performance ratings. *Id.* Nearly a month later on or about February 22, 2001, Defendant Quirke issued to Plaintiff a write-up based on false accusations of unsatisfactory work performance, Plaintiff Shields was discharged four days later. *Id.*

Based upon these reasons, there was a statutorily protected "opposition" where Plaintiff Shields is under law "encouraged to call to his employers' attention discriminatory practices of which the employer may be unaware or which might result in protracted litigation to determine their legality if they are not voluntarily changed." *See Eichman v. Indiana State University Board of Trustees*, 597 F.2d 1104. Plaintiff Shields

---

[5] A station of Federal Express that has an even greater population of African American employees.

**adamantly opposed**[6] (emphasis added) the disciplinary action rendered by Defendant

Quirke, **with Defendant Quirke's knowledge** against Ms. Rva Pendleton, and the lack

thereof in response to the inappropriate behavior of Bobby Richeson.

Subsequently, Defendant Quirke retaliated by threatening Plaintiff Shields with an

unsatisfactory performance review in January 2001, when the Plaintiff wasn't due a

review until May 2001. *See Plaintiff's Declaration at ¶ 23.* In addition, Defendant Quirke

requested that the Plaintiff submit a Performance Planner contrary to the Performance

Improvement Policy outlined in the FedEx People Manual.

Defendant Quirke used his capacity as the Plaintiff's supervisor to further

intimidate the Plaintiff by constantly reminding the Plaintiff that failure to submit a plan

to his liking would mean a third letter of warning. *Id.* Defendant Quirke refused to accept

the planner that contained realistic projections for the BCBA station, but still insisted on

a planner that contained projections that were unrealistic and would ultimately result in

the issuance of a third letter and voluntary resignation for failure to submit an acceptable

planner. *Id.* Three letters of warning within a 12- month period was considered automatic

termination. *Id.* Plaintiff Shields' opposition of Defendant Quirke's discriminatory

disciplinary remedies in regards to the disparity showed in reprimands given to African-

American employees in comparison to their Caucasian counterparts, and sometimes

subordinates, caused the adverse employment action taken by Defendant Quirke.

Defendant Quirke's actions occurred only after Plaintiff Shields voiced his concern about

Defendant Quirke's remedial measures. Soon thereafter, Plaintiff Shields was terminated.

---

[6] See *Ross v. Communications Satellite Corp.,* 759 F.2d 355, where the prongs to satisfy a prima facie case for retaliation under § 2000e-3 are set forth. Also see Plaintiff's Motion in Opposition for Summary Judgment at page 12.

Accordingly, Plaintiff's claim of Racially Retaliatory Acts against the Plaintiff should be heard.

**B.     A Causal Connection Exist Between Plaintiff's Protected Activity and Federal Express' Adverse Action**

In most cases of retaliation, as in this case, the perpetrator of retaliatory acts do not expressly inform his victim that the adverse actions being inflicted on him is directly related to a protected activity that the victim engaged in that the perpetrator did not like. Since such explicit evidence is typically unavailable in retaliatory cases, the standard set by the Supreme Court is that a plaintiff need only show that a protected activity was a substantial and motivating factor behind the adverse actions inflicted on the plaintiff by his employer. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

In the case at bar, the protected activities that Plaintiff Shields engaged in were standing up for and supporting a subordinate employee, Rva Pendleton, who was subjected to harsh and unfair discipline by Defendant Quirke, and reprimanding a subordinate employee who called him a "nigger" and who also spoke of his fellow African American co-worker in derogatory terms. These events occurred in August and September of 2000. These actions by Plaintiff Shields angered Defendant Quirke and in turn he retaliated against Mr. Shields, which ultimately led to Mr. Shields' dismissal.

After a shouting incident involving Ms. Pendleton, one of her Caucasian peers, Clifton Dalton and one of their subordinates, Noelle Olsen, occurred in the workplace, Quirke mandated that Mr. Shields issue Ms. Pendleton a warning letter. Receiving a warning letter is one of the most severe forms of discipline a Federal Express employee can receive and can seriously affect one career with Federal Express. Quirke contended

that Ms. Pendleton was responsible for escalating the incident, although several written statements of eyewitnesses contradicted Quirke's contention. (See Plaintiff's Declaration at ¶ 40-42).

Typically such disciplinary action would be within the discretion of Mr. Shields who was Ms. Pendleton's immediate supervisor.  Mr. Shields believed that such actions against Ms. Pendleton were unfair, overly harsh and unjustified, and he made his opinions known to Quirke.  Mr. Shields requested that if Quirke insisted that Ms. Pendleton be disciplined that only a documented counseling should be issued.  Mr. Shields also questioned Quirke regarding the inconsistency of disciplining Ms. Pendleton and not Mr. Dalton who was equally involved in the incident.  However, Quirke insisted that only Ms. Pendleton be disciplined.  Subsequently, Mr. Shields was forced to issue Ms. Pendleton a warning letter.  (See Plaintiff's Declaration at ¶ 40-42).

With the support of Mr. Shields, Ms. Pendleton initiated a Guaranteed Fair Treatment Procedure (GFTP), wherein the disciplinary actions which was issued to her would be reviewed by Mr. Shields' superior.  However, since Quirke, Mr. Shields' superior, was the person who insisted on Ms. Pendleton's discipline, one of Quirke's peers reviewed the fairness of the disciplinary action against Ms. Pendleton.  As a result of this review, Ms. Pendleton's warning letter was rescinded and her discipline was downgraded to a documented counseling as Mr. Shields originally suggested. (See Plaintiff's Declaration at ¶ 40-42).

During the same time period, Mr. Shields suspended Bobby Richesin, a subordinate Caucasian employee, who referred to him as a nigger and spoke to in derogatory terms about his African American co-workers.  Mr. Shields sought to

22

terminate Richesin's employment with Federal Express because of his unacceptable behavior, which lowered the morale among his subordinates.  Although Quirke believed that Richesin did indeed make such derogatory statements, he opposed Mr. Shields' efforts to dismiss Richesin.  (See Plaintiff's Declaration at ¶ 43-47).

Although Federal Express stated in its motion that it took prompt and effective action to suspend Richesin, investigate his conduct, and prevent any recurrence of the his misconduct, Mr. Shields is the only one who instituted disciplinary actions against Richesin.  Because Quirke strenuously opposed Mr. Shields' efforts to terminate Richesin, Richesin's suspension was essentially six weeks of vacation because his six week suspension was with full pay and benefits.  (See Plaintiff's Declaration at ¶ 43-47).

We contend that Mr. Shields' challenge of Quirke's mandate of issuing a warning letter to Ms. Pendleton, the embarrassment Quirke must have experienced when his discipline of Ms. Pendleton was overturned by one of Quirke's peers at the urging of Mr. Shields, and Mr. Shields efforts to terminate Richesin, an effort which Quirke opposed, all angered Quirke and were substantial and motivating factors behind Quirke's unfair treatment and harsh discipline of Mr. Shields which ultimately led to Mr. Shields' dismissal.

Soon after these events occurred, in October 2000, Quirke demanded that Mr. Shields make unreasonable and unrealistic improvements in the performance of his station.  Upon the request of Quirke, Mr. Shields drafted a performance agreement for his station that outlined realistic goals and expectations considering the staffing issues, significant new hire training and learning curve, and the late freight arrivals.  Mr. Shields' performance agreement was unacceptable to Quirke.  Subsequently Quirke

drafted an unrealistic and unfair performance agreement that did not acknowledge the systemic issues that were outside the control of Mr. Shields that affected the performance and operations at Mr. Shields' station. Quirke's performance agreement ensured Mr. Shields' failure and ultimate termination. (See Plaintiff's Declaration at ¶ 17-18).

Alternatively, Quirke offered Mr. Shields a lower level position at the BOFA Station in Winchester, Virginia which would cause Mr. Shield to suffer a ten percent pay cut and a two hour commute from his home. Accepting this position would have cause an undo hardship and financial strain for Mr. Shields and his family. Thus, Mr. Shields did not accept this position. (See Plaintiff's Declaration at ¶ 15).

In January 2001, Quirke threatened Mr. Shields that he would receive an unsatisfactory performance review, which would lead to his termination. Mr. Shields' last performance review was in May 2000, which he received a score of 3.8 highest score being 4.0. Mr. Shields was not schedule to receive another performance review until May 2001. Since Federal Express' performance reviews are very subjective and are administered differently by Managing Directors depending upon which region one works, Mr. Shields inquired of Quirke his specific criteria. However, Quirke refused to provide Mr. Shields his performance criteria. In February 2001, Mr. Shields received the unsatisfactory score of 1.9 on the performance review administered by Quirke, wherein a score of 2.0 would have been considered satisfactory. (See Plaintiff's Declaration at ¶ 25). Considering the 20 years of dedicated service to Federal Express, the exemplary performance reviews Mr. Shields had received in the past, the very subjective nature of performance reviews, and the fact the addition of one-tenth of one point would have

caused Mr. Shields to obtain a satisfactory score, we contend that Mr. Shields'

unsatisfactory score was not only predicted but also predestined by Quirke.

Federal Express contends that Quirke's treatment of Mr. Shields preceded Mr.

Shields' engagement in the protected activities outline above.  Federal Express asserts

that Quirke's discipline of Mr. Shields commenced in August 2000 when Vice President

John Formisano apprised Quirke of a BCB employee's complaints regarding BCB

management.  The BCB employee's complaint that Federal Express is referring to is the

emails that Donald Wells emailed to Kenneth May, John Formisano's superior. (See Ex.

3 attached to Federal Express' motion).  In these emails Mr. Wells' complaints are of

John Formisano and not Mr. Shields.  Specifically, Mr. Wells complained about low

salary, long hours due to the turn over rate of employees, the low morale due to the long

hours and low pay, the zip code sectoring policy, the policy requiring driver's side doors

to be closed, and the micro management of the upper management.  The issues Mr. Wells

was complaining of were matters that Mr. Shields had no control over.

Mr. Wells sent Mr. May two emails, one three pages long and the other six pages

long.  In neither email did Mr. Wells even mention Mr. Shields' name.  The fact that Mr.

Wells sent his emails to Mr. May, Formisano's superior, and not to Quirke or Formisano,

Mr. Shields' superiors, indicated that Mr. Wells' complaints were regarding Formisano

and not Mr. Shields.  Thus, Mr. Wells' complaints to Mr. May would not lead Quirke to

discipline Mr. Shields, as Federal Express alleges.

We assert that the animosity directed to Mr. Shields by Quirke is indicative of the

retaliatory anger Quirke felt towards Mr. Shields.  We also assert that a jury could

reasonably conclude that the protected activities that Mr. Shields engaged in were

substantial and motivating factors behind Quirke's adverse actions toward Mr. Shields.

Thus, whether a causal connection exists between Mr. Shields' protected activity and

Federal express' adverse actions is a genuine issue of material fact that should be

determined by a jury during the course of a trial.

## VI.    PRETEXT IS REVEALED THROUGH ANALYSIS OF THE DISPARATE APPLICATION OF DISCIPLINE.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-04, 36 L. Ed. 2d 668,

93 S.Ct. 1817 (1973), the Supreme Court established the "order and allocation or proof"

for Title VII cases in which the plaintiff alleges disparate treatment. The plaintiff must

first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.

Once a prima facie case is presented, as has been here, the defendant must "articulate

some legitimate nondiscriminatory reason for the "disparate treatment.  Id. The

articulated nondiscriminatory explanation is "presumptively valid," and the plaintiff must

demonstrate that the explanation is pretextual and "meet the ultimate burden of proving

intentional discrimination" by a preponderance of the evidence. *Moore v. City of*

*Charlotte*, 754 F.2d 1100, 1106 (4th Cir), cert. denied, 472 U.S. 1021 (1985). The burden

of proof never shifts from the plaintiff in a Title VII case. *St. Mary's Honor Ctr. v. Hicks*,

125 L. Ed. 2d 407, 423, 113 S. Ct. 2742 (U.S. 1993. as cited in *Featherstone v. United*

*Parcel Service*, 56 F.3d 61 (1995 U.S. App.)

Here defendant FedEx alleges that it had legitimate, nondiscriminatory reasons

for the discipline and subsequent termination of the plaintiff and that the history of

discipline supports its contention that the plaintiff was not discriminated against. A closer

look at the assertions of the plaintiff and the undisputed record of discipline of Mr.

Shields and Mr. Barnes, reveals the inappropriate focus of the defendants position. When one focus on the disparate and inequitable dissemination of discipline between Sr. Managers by defendant Quirke and the seeming support for the same by FedEx management, the pretextual nature of the defendant's explanation is revealed.

The question herein is not whether Mr. Shields had been disciplined or whether Quirke created a record upon which he could support the final termination of Mr. Shields. The central question is whether, in light of Mr. Shields' alleged failures outlined by Mr. Quirke, he was treated differently in the dissemination of discipline when compared to similarly situated Senior Managers who were guilty of the same failures.

In his deposition, Mr. Quirke acknowledged the distinction between the volume of freight and product handled by the BCB station and that of the DCA station, which was managed by Mr. Barnes:

Q.     Now these stations have various sizes. Is that correct?
       Some are larger than others and some are responsible for
       a larger volume than others?

A.     Yes

Q.     And would you say BCB was the largest station?

A.     Describe largest.

Q.     By volume.

A.     Yes

Q.     Who was the senior manager responsible for BCB prior to
       Mr. Shields assuming that responsibility?

A.     It was before my tenure.

Q.     Do you know who it was though?

A.     It was Clint Barnes.

Q.      And DCA is a smaller station in terms of volume than is BCB Correct?

A.      Yes.

Q.      And do  you know who it is that decided to transfer Mr. Barnes
        From BCB to DCA?

A.      My predecessor.

Q.      Which was who?

A.      Jeff Brown.

Q.      And is Jeff Brown the individual who decided to place
        Mr. Shields in the BCB station as senior manager?

A.      Yes.

(D. Quirke dep. p. 56, l. 5 – p. 57, l. 11 see attached as Exhibit 1(a)-1(a-1).)

        An employee can show unlawful discrimination under Title VII if he was

disciplined more strictly than similarly situated white FedEx employee who had

committed a similar infraction. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273,

282, 49 L. Ed. 2d 493, 96 S.Ct. 2574 (1976). There exists a genuine issue as to whether

Mr. Shields was disciplined more strictly and more severely than the similarly situated

Clint Barnes. While it is acknowledged that Mr. Shields was responsible for a station

with a much larger volume responsibility than any other station in the district, many of

the problems experienced in the BCB station were being suffered in other stations. Most

pointedly revealing the disparate treatment was the disciplinary history and subjective

approach of Mr. Quirke to the management of the DCA station and it's senior manager,

Barnes. Mr. Quirke proffers that in assessing the performance level of each of the stations

under his supervision in the Capitol district, he employed the objective review of charts.

"Some of the charts and graphs that I reviewed showing the BCB station's failure to meet

FOP, budget, service, cost per package, employee retention, and productivity

expectations" were attached to the defendants' motion as Attachment A. Ostensibly,

similar charts were available for his review of the performance level of each station. On

numerous occasions Mr. Shields, during his meetings with Mr. Quirke, would explain

that a number of the failures to reach goal pursuant to the FOP program was due to the

understaffing of the BCB station. The chart, which outlined the "Number of Position

Vacated, supported this assertion by Station in the Capitol District." In addition, the

correspondence advanced by Mr. Donald Wells on September 5, 2000, proffered by the

defendants as support for their contention that the managerial style of the plaintiff

resulted in the low morale of the BCB station, is in large part an outline of the issues not

controlled by Mr. Shields and by which he too was affected that maligned the BCB

station as a result of the district to properly man the facility:

Manning:

"Many issues at BCB/WGO, at present, stem mainly from lack of manning.

*Couriers that are normally Monday-Friday (days) are required to work mandatory splits, often on routes they do not know, and Saturdays.*

*Cover drivers are working as many as three, sometimes four splits a week, as well as Saturdays. They are lucky if there can get an hour break in, let alone a two-hour break normally allowed for split-shift work. There usually isn't any P2 help available to give the cover drivers. They are forced to run a full day route, then a full night route as well. Our cover drivers were told that they would be assigned one geographic area and cover whatever routes came open in that area. At present, our cover drivers are being bounced around all over the station and running routes that they haven't had any training on, totally in the blind. Couriers are becoming exhausted half way through the workweek due to all the extra demands placed on them.*

*Our accident and injury rate has increased along with the increase in the amount of extra demands on our couriers. When anyone is exhausted it increases the chance of having an accident or injury because they are not as alert as they should be. This type of atmosphere has existed for the past two years and shows no sign of improvement. This is very disheartening."* ...

*"I know that years ago, meetings were held, where the strength of the economy and its' affect on FedEx operations were discussed. It was known that the economy was in a steady state of growth. Hand in hand with that economic growth, our volume was increasing. Also it was known that the employment rate was in decline, paralleling the economic growth, and would eventually make it difficult to find available people to hire. Even with all of this information being presented, too few new people were allowed to be hired. Requiring more and more work out of our current work force, which in due time, has literally worn us out."*

(Def. Motion attachment B)

It is within the context of the climate outlined by Mr. Wells that Mr. Shields alleges the disparate treatment and the pretextual nature of the rationale proffered by Quirke. The BCB station was significantly undermanned which resulted in the failure to meet a number of the projected goals outlined in the FOP for the BCB station. When compared to the productivity level of DCA, which by comparison was fully staffed, there was no market difference in the goal ascertainment between the stations. The subjective nature of the analysis however did leave room for the varying performance appraisals of the senior managers.

Q.     And you would also agree then that the staffing issues,
       if BCB was understaffed, it would effect BCB more heavily
       in terms of at least the revenue generation numbers than it
       would some of your smaller stations?

       MS. PALMER:  Objection incomplete hypothetical and calls
       for speculation.

A.     THE DEPONENT: It would effect the overall people, service,
       Profit performance of the BCB station because inherently that was
       the largest station in the district.

       BY MR. MCDANIEL:

Q.     And would you say that BCB experienced more problems with
       understaffing than did any of your other stations in the Capitol
       district?

MS. PALMER:  Objection, vague as to time.

BY MR. MCDANIEL:

Q.    While Michael Shields was a senior manager.

A.    Based on the size of the BCB station, the understaff or the inability
      to attract and retain employees at the station level did effect
      the performance of the district.

Q.    And you would say that that would have even a greater effect
      on the BCB station pro rata than any of the other stations based
      upon the size of BCB?

A.    It would have more of an effect on the district because of the
      size of  the BCB station.

Q.    And also the station itself, because the staffing controls the level
      of operation of your particular station?

      MS. PALMER:  Objection, assumes facts not in evidence.

      THE DEPONENT:   Ten percent of an employee base at BCB would
      Be much larger than ten percent of an employee base at JPN.
      Size and scope of a BCB station was different.

(D. Quirke dep. p. 122, l. 12 – p. 124, l. 7 see attached as Exhibit 2 (a)-2(a-2).)

During the same period for which Mr. Barnes was disciplined for failure to meet

FOP goals (ostensibly the same reason that Mr. Shields was originally disciplined) Mr.

Barnes received an overall performance appraisal rating of 3.1. During the same period

and with allegations of similar failures, Mr. Shields received an overall performance

rating of 1.9. This is remarkable due to the application of the rating scale in which an

overall rating of 2.0 or less is considered unsatisfactory and may lead to sanction.  Mr.

Quirke also acknowledged this within his deposition:

Q.    And do you recall whether – what is the cut off level for
      satisfactory performance in your scale from zero to four?

      MS. PALMER:  Objection, vague.

BY MR. MCDANIEL:

Q.    You can answer.

A.    I'd have to see the document. I don't know the cut off for
      acceptable versus unacceptable. Acceptable is two, meets expectations.

Q     Right. And 1.9 would be just below that. Isn't that right?

A.    Yes.

Q.    Do you know if Mr. Shields had ever received a rating lower than
      two in his entire tenure as a senior manager prior to your
      assuming responsibility for his supervision?

A.    I don't know.

(D. Quirke dep. p. 74 l. 1 – 18 see attached Exhibit 3(a).)

It is within this context that Mr. Quirke, on January 8, 2001, issued Mr. Shields a

warning letter for failure to follow a Performance Agreement. The issuance of the

warning letter further evidences Mr. Quirke's intent to provide a record for the ultimate

termination of Mr. Shields. In fact the warning letter was not the appropriate form of

discipline for the alleged failure to follow the Performance Agreement as the warning

letter is more appropriately employed for conduct-related issues as oppose to

performance deficiencies. Mr. Barnes' aforementioned performance evaluation resulted

in a mandate for a Performance Agreement, which was to detail "how he intended to

improve productivity and safety performance at the DCA station."(Pat Quirke Decl. pg.

12 π 36.)  Both the assessments of the original plan and the compliance with the same

were in the exclusive control and application of Mr. Quirke. M r Quirke acknowledged

that, while Mr. Barnes had not complied with the outline in his performance agreement, it

was not his intent to discipline him in anyway similar to that discipline which Mr. Shields

was faced with in the face of the same alleged failures:

Q.      And you hadn't gone to Mr. Barnes and suggested to him
        that he be demoted. Right? Correct?

A.      I did not suggest to Mr. Barnes that he demote.

Q.      And it was not your intent to demote Mr. Barnes. Correct?

        MS. PALMER: Objection, vague.

        BY MR. MCDANIEL:

Q.      At the time that he came and asked for the demotion it
        wasn't your intent to ask for him to be demoted or to demote
        him. Correct? That's why you hadn't said anything about it?

A.      We had discussed his performance to plan previously.

Q.      Right.

A.      And he knew what his expectations were and he knew what his
        alternative would be if he could not turnaround his
        performance or the performance of the station.

Q.      So, you told him this. You told him that if in fact he didn't
        turnaround his performance at the station that he would either
        be demoted or terminated?

A.      Well, I would have to look at the contents of the reminder letter.

Q.      That's fair enough. It was either or. Right? It was either you
        didn't intend ever to demote him at all or you gave him the
        option of demotion or termination?

        MS. PALMER:  Objection, assumes facts not in evidence.

        BY MR. MCDANIEL:

Q.      Fair enough?

A.      I don't understand that.

Q.      Well, I asked you whether or not you intended to demote Mr. Barnes.

your response to me was that Mr. Barnes was aware of what his performance review said, what his performance planner said, which suggested that you were saying that he knew either he had to turn it around or be terminated or demoted. Is that why you were telling me that?

A.    Mr. Barnes was aware of his expectations. He was aware of his performance to his plan.

Q.    I understand that. I'm talking about what you want. Were you planning on demoting him?

A.    I wanted Clint Barnes to succeed.

Q.    I understand that.

A.    I want all the senior managers to succeed.

Q.    I understand that. Mr. Quirke, I'm asking a simple question.

A.    Well, I don't understand and I apologize.

Q.    Were you intending to demote him or not when he asked for the demotion?

A.    The meeting in my office when he asked for the demotion, was I asking him to take a demotion?

Q.    No. I know the answer to that question because you said that you did not ask him for the demotion.

A.    Yes.

Q.    So, he came to you and asked for the demotion citing personal reasons?

A.    Yes.

Q.    I'm asking you at that point in time was it your intent to demote him?

A.    At that point in time it was not my intention to demote him.

Q.    Was it your intention to terminate him at that time?

A.    It was not my intention to terminate him at that time?

Q.    And how long after he had submitted his performance planner did he

34

come to you asking for the demotion?

A.    Several months.

(D. Quirke dep. p. 86 l. 12 – p. 90 l. 3 see attached as Exhibit 4(a)-4(a-4).)

Here it is clear that 1.) Mr. Shields is a member of a protected class as an African-American, 2.) that it is alleged that he failed to meet the strictures of the performance agreement which he voluntarily entered into in the same or similar fashion as a failure of Mr. Clint Barnes, 3.) and that Mr. Quirke's response to Mr. Shields' failure to meet the goals outlined in his plan met with an inappropriate warning letter and his ultimate termination while it was not the intent of Mr. Quirke to either demote or terminate Mr. Clint Barnes, a white Senior Manager, in the face of the same failure at a more fully staffed station. The disparate discipline in the absence of any reasonable explanation for the differing treatment of the similarly situated Senior Managers reveals the pretextual nature of the non-race based explanation proffered by the defendants and for this reason their motion should fail. *Moore*, 754 F.2d at 1105-06.


VII.    **PLAINTIFF HAS DEMONSTRATED A PRIMA FACIE CASE OF HARASSMENT UNDER TITLE VII.**

In a Title VII action alleging harassment in the form of a hostile work environment, the plaintiff must make a prima facie showing of the following: 1.) the employee was subject to unwelcome harassment in a work related setting; 2.) the harassment complained of was based on race, sex, religion, or national origin; 3.) the harassment, viewed from both a subjective and objective perspective was so severe or pervasive that it affected a term, condition, or privilege of employment; and 4.) the

35

employer either knew or should have known of the harassment and took no effective

remedial action. *Dora L. Hampton v. Conso Products*, 808 F.Supp. 1227 (1992).

Here Mr. Shields was subjected to unwelcome harassment both through the

disparate application of the discipline described herein above but also through the racial

slurs and subversive action of an employee who he was charged with supervising. In

addition, his supervisor Mr. Quirke was made aware of the behavior of the employee, Mr.

Bobby Richiesin; Mr. Quirke completed an internal investigation of the same and

disallowed the discipline proscribed by Mr. Shields further undercutting his ability to

manage his remaining employees.

> THE DEPONENT:
> I'm aware of Mr. Shields' disagreement with me
> regarding disciplinary action taken against an individual, former
> employee called Bobby Richardson.
>
> BY MR. MCDANIEL:
> What is your understanding of the incident that involved Mr. Shields?
> and Mr. Bobby Richieson?

A.    There was an EEO complaint raised from the BCB Station from an
      African-American employee regarding inappropriate language
      and conduct during the sort at BCB. It involved specifically an
      employee named Bobby Richardson—

Q.    Who made the complaints?

A.    --Richardson was the last name.

Q.    Might I ask who was the individual who mad the –

A.    An employee by the name of Carl Jones.

Q.    Mr. Jones complained that?

A.    Mr. Jones complained that Mr. Richardson was making inappropriate
      comments on the belt regarding hi opinion on issues of race.

Q.    And do you recall what those opinions were?

A.     The two issues that were brought up by Mr. Richardson during conversations on the belt that I remember was one regarding a conversation that they had about the OJ Simpson trial where Mr. Richardson allegedly said that he thought Johnny Cochran was wrong. I don't remember the particulars, but something derogatory bout Johnny Cochran and his techniques during the trial. The second one was where he had said something during a conversation that his family members in the past were probably part of the Ku Klux Klan.

Q.     And he made these statements to Mr. Jones?

A.     He made these statements during a conversation with several employees on the belt with Mr. Jones present and Mr. Jones took exception and he filed an EEO complaint.

Q.     And what happened as a result of the EEO complaint?

A.     As a result of the EEO complaint, again, it was my job, along with human resources to investigate. I investigated the situation. We had multiple interviews with employees, witness statements. We had testimony from a manager saying that Mr. Richardson had called Mr. Shields a derogatory racial slur.

Q.     What was that?

A.     The word was nigger.

Q.     And is that on one occasion or more than one occasion?

A.     On one occasion. And that was essentially it.

Q.     Witness statements as it relates to Mr. Richardson's statements on the belt that were complained of by Mr. Jones, these witness statements included individuals, not Mr. Jones, who overheard what it is that Mr. Richardson was saying?

A.     I have to refer back to the file.

Q.     Do you recall those accusations that were made by Mr. Jones being corroborated?

A.     That Mr. Richardson had in fact had discussions that involved saying that his ancestors were part of the Ku Klux Klan and that Johnny Cochran got OJ exonerated.

Q.     And any other inappropriate conversations on the belt.

A.      May I make it contextual?

Q.      Sure.

A.      During this process what I found out during the investigation during the process Mr. Shields, Michael had a meeting with Mr. Richardson. Obviously, there was some flack or, for lack of a better word, flack is probably not a good word. There was some issues with Mr. Jones. Mr. Jones wasn't happy. Mr. Shields had a meeting with Mr. Richardson, don't really don't know what happened in that meeting, but after the meeting Mr. Richardson came back onto the belt with his coworkers present and used a racial slur based on what his impression of the meeting.

Q.      With Mr. Shields?
A.      With Mr. Shields.

Q.      And what did he say at that time?

A.      Mr. Richardson allegedly said according to a written statement that he came back after the meeting and he had put that nigger in his place.

Q.      And this is after the EEO complaint that was filed by Carl Jones?

A.      It was during the process. I am not sure of the exact time frame. It was during this whole process.

Q.      But is it you understanding that the meeting between Mr. Richardson and Mr. Shields was precipitated by the filing of Mr. Jones.

A.      I am not sure. I know it was precipitated by a complaint made by Mr. Jones regarding Mr. Richardson's actions.

Q.      And did you speak with Mr. Shields about the substance of the conversation between he and Mr. Richardson that Mr. Richardson was referring to when he got back to the belt and said he had put that nigger in his place?

A.      Mr. Shields told me that he never made that comment during the conversation that he had.

Q.      I'm sorry.

A.      Mr. Richardson never said that during his conversation or his meeting with Mr. Shields.

Q.      What did Mr. Shields tell you that he did say?

A.    I don't know. I don't remember the specifics, but essentially the meeting was Mr. Shields asking Mr. Richardson what were the issues, what was his problem essentially, why was he acting this way during the operation.

Q.    And what was the outcome of Mr. Jones' EEO complaint as it related to the statements that were being made by Mr. Richardson on the belt?

A.    Mr. Richardson was suspended during the process as we investigated. Based upon our investigation Mr. Richardson was brought back to work with a warning letter and a designation for him to be moved from the station due to this now bad relationship with the senior manager.

Q.    Okay.

A.    Mr. Shields.

Q.    And was there any consideration given to – would you say that Mr. Richardson's statements were insensitive?

A.    Absolutely.

Q.    And would you say that the statements were inappropriate?

A.    Absolutely.

Q.    But you would say thought that there is a place in Federal Express for individuals with Mr. Richardson's type of mentality?

MS. PALMER:   Objection to the characterization and calls for speculation and vague.

BY MR. MCDANIEL:
Q.    Well, in light of him making the inappropriate comments and in light of him being insensitive and in light of the representations he made about his family, it was your decision to still bring him back with a warning letter

A.    Yes.

(D. Quirke dep. p.142, l. 18 – p. 149, l. 21 see attached as Exhibit 5(a)- 5 (a-7).)

Mr. Shields did endure both the underlying malfeasance of Mr. Richardson, but even more troubling was his supervisor's response to those actions even after the allegations had been substantiated. To allow Mr. Richardson's return without any

significant sanction, did materially affect Mr. Shields' ability to exercise control over his station and, in conjunction with the allegations of disparate discipline proffered above, should be considered sufficient to support his claim of harassment violative of Title VII.

## VIII.    PLAINTIFF'S PUNITIVE DAMAGES CLAIM SHOULD NOT BE STRICKEN

"A prevailing plaintiff on an intentional discrimination claim under *Title VII of the Civil Rights Act of 1964*, 42 U.S.C.S. § 2000e-2 (a)(1) may recover punitive damages upon demonstration that the defendant 'engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his or her] federally protected rights.' *See 42 U.S.C. § 1981a (b) (1).* This is done in the instance that the plaintiff cannot recover punitive damages under § 1981. *See 42 U.S.C. § 1981a (a)(1).* § 1981 provides a "federal remedy against discrimination in private employment on the basis of race." *See Johnson v. Railway Express Agency, Inc.* 421 U.S. 454.

The Supreme Court in *Kolstad v. DNA,* 119 S. Ct., set forth a close interpretation of the language of  § 1981a, where a plaintiff is seeking punitive damages for an intentional discrimination claim under Title VII. *See also Lowery v. Circuit City,* 206 F.3d 431 (4th Cir. 2000). The Court states that plaintiffs in alleging an intentional discrimination charge that are not limited to displaying evidence of the defendant's egregious or outrageous discrimination independent of the employer's state of mind. *See Kolstad, 119 S. Ct.* at 2124.

The Court went further to examine the terms "malice and "reckless indifference" found in § 1981a(b) (1), by stating that the terms "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* Furthermore, the Court went on to say that an "employer must at least

discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 2125.

The Court in *Kolstad,* put forth a four-prong test in establishing whether or not a plaintiff may recover punitive damages in an intentional discrimination claim under Title VII.

**A)      THERE IS SUFFICIENT EVIDENCE PROFFERED FOR A REASONABLE JUROR TO FIND THAT DEFENDANT THROUGH THE DISCRIMINATORY ACTIONS OF THEIR AGENTS DID SO IN THE FACE OF A PERCEIVED RISK THAT THEIR ACTIONS WOULD VIOLATE FEDERAL LAW**

As stated in the aforementioned paragraphs, the discriminatory practices of Defendant Quirke in regards to the undisputed record of discipline of Mr. Shields and Mr. Barnes, reveals the inappropriate focus of the defendants' position. The disparate and inequitable dissemination of discipline between Senior Managers by defendant Quirke and the seeming support for the same by FedEx management, is so blatantly apparent that any reasonable juror could infer that Defendant Quirke's in "making significant employment decisions"[7] by his mandating the discipline and subsequent termination of the Plaintiff knew or should of known that he was acting in violation of federal law.

In like manner, a reasonable juror could infer that Defendant Quirke had knowledge of the existence of federal anti-discrimination laws based on evidence submitted by Defendants that FedEx has a "published EEO policy for addressing discrimination complaints, and that this policy is disseminated to all employees." *See Defendants' Motion for Summary Judgment* at 35. Furthermore, that "it is undisputed that FedEx policy prohibits discrimination, retaliation, and harassment." *Id.*  Therefore, the

---

[7] See *Lowery v. Circuit City*, 206 F.3d 431 and *EEOC v. Wal-Mart Stores, Inc.* 187 F.3d 1241.

Defendants made consequential employment decisions concerning the Plaintiff in **the face of a perceived risk that his decision would violate federal law.**[8]

### B)    A REASONABLE JUROR COULD FIND THAT DEFENDANT QUIRKE SERVED FEDEX  IN A MANAGERIAL CAPACITY

"An employer may be held vicariously liable for a punitive damage award in a Title VII case for the intentionally discriminatory conduct of its employee, where the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good faith efforts to comply with Title VII."  *See Lowery v. Circuit City,* 206 F.3d 431 citing *Kolstad v. DNA* at 2129.

The Court goes further to specify that in order to determine whether or not one serves in a managerial capacity courts should review the type of authority that the employer has given to the employee. This is coupled with the amount of discretion that the employee has in what is done and how it is accomplished. *Id.* at 2128.  The Court goes further to state that said employee does not have to be in the top echelon of management or be an officer or director to be in a managerial capacity. *Id.*

As stated within the body of Plaintiff's *Motion in Opposition of Defendants' Motion for Summary Judgment,* it can be deemed that when the evidence is viewed in **the light most favorable to the Plaintiff, and he is given the benefit of all reasonable inferences, a reasonable juror could find that Defendant Quirke served Federal Express in a managerial capacity.** (emphasis added) *See Lowery v. Circuit City,* 206 F.3d 431. Defendant Quirke was the Managing Director for the Capitol District from July 1, 2000 until August 1, 2002. *See Declaration of Patrick J. Quirke* at 1. As the managing

---

[8] See *Kolstad*, 119 S.Ct. at 2125.

director Defendant Quirke supervised the Senior Managers within the Metro area. *Id.* Plaintiff Shields was under Defendant Quirke's direct supervision.

It was within the Defendants' discretion to retain or terminate employees who openly dismissed Plaintiff Shields authority as a Senior manager by calling him derogatory names such as "nigger" and "faggot" during working hours. Furthermore, it was within Defendant Quirke's discretion to nullify any punishment that Plaintiff Shields may have conferred to subordinates under his direct supervision. In addition, Defendant Quirke also had the authority to approve (or in the instant matter) disapprove projections that Plaintiff Shields submitted as realistic projections for his station.

During that time, Plaintiff Quirke used his supervisory capacity as a tool to intimidate the Plaintiff, by continuously threatening him with dissatisfactory reviews that would in turn warrant warning letters that would ultimately lead to Plaintiff's termination. These threats were made outside of the review cycle for managers and were made on a daily basis. Furthermore, Defendant Quirke disregarded the Plaintiff's request for meetings to discuss the station and any suggestions that he may have for its improvement. Defendant Quirke in turn provided no leadership or guidance. *See Plaintiff's Declaration at ¶ 4.* It was also within Defendant Quirke's discretion to subsequently terminate Plaintiff Shields.

FedEx allowed Defendant Patrick Quirke to organize and run the Capitol District stations in his full discretion. Therefore, a reasonable juror could find that Defendant Quirke served FedEx in a managerial capacity, if not top managerial capacity, for purposes of vicarious liability in regards to punitive damages. Defendant Quirke may not have been in a top management position or officer of the corporation but still held a

position that was extremely vital to FedEx. *See Lowery v. Circuit City* 206 F. 3d 431

*citing Wal-Mart Stores, Inc.,* 187 F.3d at 1247.

**C)    DEFENDANT QUIRKE ACTED WITHIN THE SCOPE OF HIS EMPLOYMENT WHEN HE TERMINATED MICHAEL SHIELDS**

       The Court in *Kolstad*[9] used an applicable test to determine whether an

employee's conduct "is of the kind that he was employed to perform, occurred

substantially within the authorized time and space limits, and is actuated, at least in part,

by a purpose to serve the employer. *Id.* at footnote 3. The aforementioned rationale

substantiates the fact that Defendant Quirke acted within the scope of his employment

when he disparately issued punishments to Senior Managers. Punishing Plaintiff more

stringently Plaintiff for not performing up to par in comparison to Caucasian Senior

Managers who were similarly situated.  *See Defendant's Declaration.* Furthermore,

Defendant Quirke discriminatory actions took place during work hours and on company

property. *See Lowery v. Circuit City* at 206 F.3d 431. Moreover, Defendant Quirke's

actions were done for the purpose of serving FedEx. *Id.*

**D)    FEDEX DID NOT EXHIBIT A GOOD-FAITH EFFORT TO COMPLY WITH TITLE VII.**

       " A good faith exception rests on the notion that the existence and enforcement of

an anti-discrimination policy shows that the employer itself 'never acted in reckless

disregard of federally protected rights.'" *See Lowery v. Circuit City* at 206 F. 3d 431. It is

an undisputed fact that FedEx does have a published policy prohibiting discrimination,

retaliation, and harassment. However, "while an employer's institution of a written policy

against race discrimination may go a long way toward dispelling any claim about the

---

[9] See *Kolstad, 119 S. Ct. at 2128.*

employer's reckless or malicious state of mind with respect to racial minorities, such a policy is not automatically a bar to the imposition of punitive damages." *Id.*

Moreover, the evidence will show that Defendant Quirke, who serves in what a reasonable juror may deem as a top managerial capacity, harbors "racial animosity" toward African-American employees and managers using procedures delineated by FedEx to undermine their respective employment capacity. That based on Defendant Quirke's actions of handling Caucasian employees who openly exhibit racial animus left African American employees fearful of using the Guaranteed Fair Treatment Procedure and other methods to voice concern of unfair treatment, in fear of retaliation by Defendant Quirke. Defendant Quirke's actions dispel any "sincerity of FedEx's commitment to a company-wide policy against racial discrimination in the work place." *Id.*

A reasonable juror could find that FedEx due to the actions of one of their senior agents did not make a good faith effort to comply with § 1981, and that Defendant Quirke, who acted within the scope of his employment as a manager behaved with a perceived risk that his actions violated federal law. In accordance, punitive damages should be awarded to Plaintiff Shields.

## **CONCLUSION**

For the foregoing reasons, this Court should not grant Defendants' Motion for Summary Judgment and should dismiss it in its entirety.

Respectfully Submitted,

_____
Brian K.McDaniel, Esq.
Kevin L. Chapple, Esq.
1211 Connecticut Avenue
Suite 303
Washington, DC 20036
202-331-0793-Telephone
202-464-9955
202-331-7004-Facisimile