1 of 100 DOCUMENTS

E. DAVID GABLE & ASSOCIATES, Plaintiff-Appellant, v. DEAN WITTER REYNOLDS, INCORPORATED, Defendant-Appellee.

No. 97-1499

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 29831

September 24, 1998, Argued

November 23, 1998, Decided

**NOTICE:**
[*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**
Reported in Table Case Format at: *1998 U.S. App. LEXIS 37124*.

**PRIOR HISTORY:**
Appeal from the United States District Court for the District of Maryland. John R. Hargrove, Senior District Judge. (CA-96-1534-HAR).

**DISPOSITION:**
AFFIRMED.

**COUNSEL:**
ARGUED: Richard Louis Gershberg, GERSHBERG & PEARL, L.L.P., Owings Mills, Maryland, for Appellant.

Kathleen A. Ellis, PIPER & MARBURY, L.L.P., Baltimore, Maryland, for Appellee.

ON BRIEF: Lewis A. Dardick, Tina Sharma McCormack, GERSHBERG & PEARL, L.L.P., Owings Mills, Maryland, for Appellant.

John R. Wellschlager, PIPER & MARBURY, L.L.P., Baltimore, Maryland, for Appellee.

**JUDGES:**
Before LUTTIG and MOTZ, Circuit Judges, and BULLOCK, Chief United States District Judge for the Middle District of North Carolina, sitting by designation.

**OPINION:**

**OPINION**

PER CURIAM:

Appellant E. David Gable & Associates brought this diversity action alleging, inter alia, breach of contract, breach of fiduciary duty, negligence, and intentional interference [*2] with contract, arising out of appellee Dean Witter Reynolds's suspension of trading in appellant's stock account with Dean Witter. The district court granted summary judgment in favor of Dean Witter on all counts. For the reasons that follow, we affirm.

I.

In March, 1996, E. David Gable opened two trading accounts with account executive Mark Stull at the Baltimore office of Dean Witter Reynolds, Inc. -- one in the name of Gable & Associates and the other in the name of Grandname Ltd. ("Grandname"), a foreign corporation for whom Gable served as an agent.

On March 12, 1996, Gable deposited 100,000 shares of Texas American Group, Inc. ("TXAG") stock into each account. On that date, he informed Stull that he was also holding six million shares of TXAG on behalf of Grandname. Stull encouraged Gable, then and on several occasions thereafter, to deposit all six million shares with Dean Witter. Between March 29 and April 12, Gable ordered a number of sales from the Gable & Associates account, and on April 10 deposited the six million shares of TXAG stock into the Grandname account. On Friday,

April 12, Gable ordered 300,000 shares to be transferred from the Grandname account to the Gable [*3] & Associates account. Later that day, a trader in Dean Witter's New York office informed Stull that Dean Witter would not trade TXAG shares from the Gable & Associates account until an investigation of those shares could be completed. Stull immediately informed Gable that there was "a temporary stop on trading ... because of an SEC investigation."

The next business day, Monday, April 15, Stull and his manager, Daniel Deegan, tried to determine the reason for the trading suspension. In the process, Dino Sainati, a Dean Witter employee in the Restricted Securities Department, advised Stull to fill out a questionnaire about the TXAG shares and call TXAG's transfer agent to determine how many shares were outstanding. Meanwhile, Sainati called Alan Humphrey, president of TXAG, to find out whether there were any restrictions on the sale of the shares. Humphrey informed him that the shares were subject to a one or two year holding period, during which they were not to be sold.

On Tuesday, April 16, Stull advised Gable that the investigation was an internal, rather than SEC, investigation. The next day, Gable and his attorney David Pearl visited Stull's office and demanded either the proceeds [*4] from sales on April 11 and 12 and the resumption of trading or the turnover of all the Gable & Associates and Grandname shares. After several more meetings, Dean Witter informed Gable and Pearl that it would no longer sell any of the TXAG shares.

On Monday, April 22, 1996, ten days after the initial trading suspension, Pearl faxed Dean Witter letters requesting transfer of all TXAG shares to other brokerage firms. Dean Witter informed Pearl that it could not accept faxed signatures, so the next day Pearl hand-delivered letters with the same request. Three days later, on April 26, Dean Witter transferred all 320,000 shares in the Gable & Associates account to Merrill Lynch and all but 100,000 of the shares in the Grandname account to Legg Mason. On May 1, while reviewing a stock ledger of Grandname's account, Pearl discovered Dean Witter's failure to transfer the 100,000 shares. Pearl called Dean Witter on that date, and the broker transferred the remaining 100,000 shares, as it had originally been ordered, to the Legg Mason account. Between April 12, when Dean Witter suspended trading, and April 26, when all but the 100,000 shares were transferred, TXAG stock price dropped from $ [*5] 1.43 per share to $ 0.63. Gable & Associates filed this lawsuit on May 15, 1996. On November 18, 1996, Dean Witter filed a motion for summary judgment, and by February 3, 1997, briefing on that motion had been completed. Four days later, plaintiffs filed a Motion for Leave to Amend the Complaint and a proposed amended complaint. The district court denied plaintiff's motion to amend and granted the defendant's motion for summary judgment on all counts. Gable & Associates appeals the district court's orders denying its motion to amend and granting summary judgment in favor of the defendant Dean Witter.

II.

Gable & Associates first contends that the district court abused its discretion by denying appellant's motion to amend its complaint in light of evidence acquired from Dean Witter's eleventh-hour production of relevant documents. The district court denied the motion, which was made after all briefs had been submitted on defendant's motion for summary judgment, on the grounds that it was "prejudicial to the opposing party and unduly late." Because we find that the timing of appellant's motion provided ample justification for the district court's denial, we affirm the order.

Appellant [*6] argues that it did not have access to Dean Witter's internal policy manuals until they were produced late in the discovery process, and that it merely sought to amend its complaint to conform to this newly acquired evidence. However, the theory appellant advanced in its amended complaint, that appellee Dean Witter breached its contract and fiduciary duty by not conducting its investigation in a timely manner, was available to appellant from the outset. As appellee argues, the internal policies to which appellant refers in its amended complaint simply reflect SEC regulations and case law to which appellant had access at the time of its original pleadings. The district court correctly concluded that appellee would be unduly prejudiced if appellant were permitted to shift the focus of its complaint -- from a claim that appellee breached its contractual and fiduciary duties merely by suspending trading to one that the suspension and investigation were lawful but untimely -- in response not to newly acquired evidence but to a persuasive summary judgment submission. Similarly, the "newly acquired" information assertedly justifying appellant's attempt to amend Counts I and II, in which appellant [*7] alleged appellee breached their contract by failing to trade on April 9 and on or about April 10, was actually information that was peculiarly within appellant's possession. An investor alleging liability for failure to execute its trade orders may be expected to possess information at the time of its complaint, or at least before extensive briefing has been conducted, regarding the volume and timing of its own sell demands. As a result, the district court did not abuse its discretion by denying a motion to amend after the summary judgment briefs had been filed. See *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 941 (4th Cir. 1992)*. This is especially so where, as here, the motion appears to be no more than

"an apparent attempt to avoid the likely effect of summary judgment." *Kleinhans v. Lincoln Savings Profit Sharing Trust, 810 F.2d 618, 625 (7th Cir. 1987).* See also *Jameson v. Arrow Co., 75 F.3d 1528, 1535 (11th Cir. 1996)* (affirming denial of motion to amend filed one month after motion for summary judgment); *Cleveland v. Porca Co., 38 F.3d 289, 297-98 (7th Cir. 1994)* (affirming [*8] denial of motion to amend filed after close of discovery and briefing on motion for summary judgment). Because the district court did not abuse its discretion in concluding that an amendment of the complaint at such a late stage in the case would unfairly prejudice appellee, we affirm the order denying appellant's motion to amend.

### III.

Appellant also argues that the district court erred in granting appellee's motion for summary judgment on its unamended complaint. Because we find that the evidence in this case, after adequate time for discovery, "is so one-sided that one party must prevail as a matter of law," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*, we affirm the district court's grant of summary judgment with regard to all but a single count of appellant's complaint.

Three of the ten counts in appellant's complaint alleged damages arising out of appellee's breach of its brokerage contract. In counts I and II, appellant alleged that appellee breached its contract by failing to execute sales ordered on April 9, 1996 and on or about April 10, 1996, for 20,000 and 62,000 shares, respectively, [*9] of TXAG stock. In response to appellee's brief in support of its motion for summary judgment, after it had become clear that the claim had no factual basis, appellant asked the district court to "construe" counts I and II instead to allege that appellee had failed to trade 10,000 shares on April 12, 1996. n1 The district court refused to so construe the claim, and because appellant had alleged no set of facts to support its breach of contract allegations, granted the motion for summary judgment. Even were we to "construe" the complaint as appellant would have us do, evidence in the record clearly establishes that appellee sold 40,000 of the 50,000 shares it was instructed to sell on April 12, and no evidence was introduced to support the conclusion that Dean Witter failed to trade the remaining 10,000 shares for any reason other than an absence of buyers.

 n1 Appellant also contends that the district court should have amended the pleadings to conform to the evidence pursuant to Fed. R. Civ. P. 15(b). However, the district court properly refused to do so, as Rule 15(b) refers to "issues not raised by the pleadings ... tried by express or implied consent of the parties." (emphasis added). As its terms would suggest, Rule 15(b) is generally invoked when parties have actually gone to trial. See, e.g., *Aiken County v. BSP Division of Envirotech Corp., 866 F.2d 661 (4th Cir. 1989)* (reversing district court's sua sponte 15(b) posttrial amendment of the pleadings). In addition, appellee has done nothing to suggest "consent," express or implied, to the trial of issues outside the four corners of appellant's original complaint.

[*10]

As another reason for granting summary judgment on Counts I and II, the district court found that the contract, styled a "Partnership Certification of Investment Powers," in unambiguous terms permitted Dean Witter, "subject to [its] policies" to "choose which instructions to follow and which to disregard." Thus, according to the district court, a suspension of trading in order to investigate suspicious accounts did not violate the express terms of the contract, which the court was required by Maryland law to "enforce[ ] as written." *Catalina Enterprises v. Hartford Fire Ins. Co., 67 F.3d 63, 65 (4th Cir. 1995)* (applying Maryland law). Appellant contends on appeal that, in fact, a genuine dispute exists as to the meaning of the contractual provision in question and that summary judgment was therefore not appropriate. Because appellant did not raise this argument in its opposition to summary judgment below, we will consider it on appeal only where refusal to do so would be plain error or would result in a fundamental miscarriage of justice. *Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993).* n2 We decline to find either plain error or a [*11] fundamental miscarriage of justice in the district court's literal reading of the unambiguous contractual terms in this case. Thus, because appellant did not present any evidence to suggest that Dean Witter had failed to trade in accordance with appellant's instructions and because, in any event, it makes its argument of contractual interpretation for the first time on appeal, we affirm the district court's grant of summary judgment on these claims.

 n2 Appellant contends that it addressed the issue of the contract's ambiguity in its brief opposing summary judgment, but in those pages appellant actually concedes the literal interpretation it now rejects, relying instead on a broader argument about the intent of the parties and the implied covenant of good faith. See J.A. at 103 (Plaintiff's Memorandum in Opposition to

Defendant's Motion for Summary Judgment) ("Although the written agreement between Gable and Dean Witter states that Dean Witter may decide not to follow certain instructions, it was never the intent of the parties to allow the defendant [such] sweeping authority."); id. at 104 ("In order to determine the true intent of the parties in a fiduciary relationship, it is sometimes necessary to look not just into the writing but also the nature of the parties' relationship and dealings.").

[*12]

In Count III, appellant alleged that appellee breached its contract by failing to transfer the 320,000 shares of TXAG remaining in the Gable account to Merrill Lynch until April 26, 1996, nine days after appellant now contends it had orally instructed appellee to do so. The district court granted summary judgment on this claim as well, concluding that the transfer instruction was not given until either April 22, by fax, or April 23, by letter, and that a three or four day delay was reasonable and therefore could not constitute a breach of the contract. With regard to the effective date of the transfer order, appellant itself alleged in its unamended complaint that the transfer order was given on April 22. In its brief in opposition to Dean Witter's motion for summary judgment, and again on appeal, appellant contended nevertheless that it authorized the transfer on April 17. Even were we inclined to construe appellant's complaint to allege a transfer order on the earlier date, this claim is negated by the undisputed fact that, on April 17, appellant had not yet opened another account into which the shares could be transferred. The district court was therefore correct in concluding [*13] that the record evidence could not support a finding that appellant ordered the shares transferred on April 17 rather than upon receipt of the written requests on April 22 and 23. Similarly, the district court could only conclude that there was no genuine issue of material fact as to the reasonableness of a three or four day delay, as appellant presented no evidence to dispute the deposition testimony in the record that such transfers could take anywhere from ten days to a month and a half. J.A. at 164-167 (testimony of George Johnson). Thus, summary judgment in favor of appellee was appropriate on this third breach of contract claim as well.

IV.

The district court properly granted appellee's motion for summary judgment on the claims of intentional interference with contract (Count VII), breach of fiduciary duty (Count VIII), and negligence (Count X) primarily on the grounds that Dean Witter had a legal obligation to suspend trading in order to conduct an investigation, and that it conducted that inquiry in a reasonable fashion. Under SEC regulations, broker-dealers like appellee have a duty to investigate suspicious trading. "When a dealer is offered a substantial block of [*14] a little known security ... where the surrounding circumstances raise the questions as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for." SEC Release No. 33-4445 (1962)(emphasis added), quoted in Br. of Appellee at 16. In this instance, Dean Witter was presented with a large number of low-priced shares of foreign origin issued by a relatively unknown company, thus triggering its obligation to conduct such an inquiry.

In its original complaint, appellant alleged liability arising out of appellee's decision to conduct the investigation at all. In its proposed amended complaint, the rejection of which by the district court we affirm herein, appellant based its claims instead on the timing of the investigation. Thus, although appellant now concedes that the circumstances indeed warranted a "searching inquiry," it insists that Dean Witter was required to conduct the inquiry before trading in the account was begun. As appellee argues in response, however, SEC rules requiring investigation are derived from the Securities Act of 1933 and the Securities Exchange [*15] Act of 1934, both of which were designed for the protection of investors. *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1978)*. We cannot agree with appellant that this obligation to protect investors simply evaporates after trading has begun.

With this understanding of appellee's legal obligation in mind, we proceed to consider the district court's grant of summary judgment on counts relating to the conduct of the investigation. The district court granted summary judgment on Count VII, tortious interference with appellant's contract with Grandname, because appellant failed to produce evidence of appellee's "intentional acts, without justification or privilege, designed to induce [a] third party to breach [its] contract" with appellant, an element of the tort under Maryland law. See, e.g., *Macklin v. Robert Logan Assocs., 334 Md. 287, 296-98, 639 A.2d 112 (1994)*. Appellant claimed that its relationship with Grandname was harmed when representatives of Dean Witter contacted executives of TXAG to inquire whether there were restrictions on the sale of the shares. Because the broker-dealer in conducting [*16] an investigation may not rely upon the assurances of its customers or their counsel, *SEC v. Culpepper, 270 F.2d 241, 251 (2d Cir. 1959)*, or the absence of a restrictive legend on the share certificate, *Quinn & Co. v. SEC, 452 F.2d 943, 947 (10th*

*Cir. 1971)*, we conclude that appellee had sufficient justification for its limited inquiries of TXAG. Furthermore, appellant's claim, based as it is upon appellee's discharge of its legal obligation, is foreclosed by the well-settled Maryland rule that there can be no recovery for tortious interference with contractual relations unless the alleged "interference" is either wrongful or unlawful. *Travelers Indemnity Co. v. Merling, 326 Md. 329, 343, 605 A.2d 83 (1992)*. Accordingly, because appellant produced no evidence that could establish the elements of a tortious interference claim, we affirm the grant of summary judgment as to Count VII.

In Count VIII, appellant claimed that appellee had breached its fiduciary duty by failing to trade as requested. The district court declined to consider whether the broker-client relationship is a fiduciary one, instead following Maryland state law in [*17] concluding that Dean Witter in its capacity as agent had a duty to act in appellant's best interests and to communicate truthfully all relevant information to appellant. J.A. at 353 (district court order citing *Huppman v. Tighe, 100 Md. App. 655, 668, 642 A.2d 309 (1994)*). Because Dean Witter was required by law and internal policy to investigate the origin of the shares, however, we conclude as did the district court that it would have acted improperly had it continued to trade the shares during the pendency of its inquiry.

In its tenth count, appellant alleged damages from appellee's negligent conduct of its investigation. Again, appellant's amended complaint stressed the untimely nature of the investigation, while the original complaint merely alleged that appellee violated its duty "by conducting [its] investigation in an inappropriate, inconclusive, and unreasonable manner, by not contacting the Plaintiff, Plaintiff's securities counsel, or Plaintiff's transfer agent, when the existence and identity of each were known or could have been easily determined by the Defendant." J.A. at 20 (emphasis added). In the unamended complaint, which is the [*18] only one we need consider, the allegation of negligence is clearly limited to an objection to the specific manner in which the investigation was conducted. As we have previously noted, in conducting its "searching inquiry," appellee was under no obligation to begin or end its investigation by directing its inquiries to the customer whose shares were being investigated. Thus, the district court did not err in holding that Dean Witter did not act negligently in choosing instead to contact TXAG directly regarding restrictions on trading that may have been placed on the stock when it was initially conveyed to Grandname. n3

n3 The district court's consideration of the timeliness issue with regard to the negligence claim was unnecessary, but we do agree with its conclusion that it is "ludicrous to suggest that Defendant forfeited all rights to investigation by failing to investigate the shares at the opening of the accounts." J.A. at 356.

V.

In Count XI, appellant alleged a breach of fiduciary duty arising out of [*19] appellee's failure to transfer 100,000 of Grandname's shares to the new Legg Mason account until May 1, 1996. In its original complaint, appellant alleged that Dean Witter improperly transferred those 100,000 shares to its transfer agent, resulting in Grandname's loss of confidence in Gable and its consequent withdrawal of signing authority. In granting summary judgment on this count, the district court correctly found that there was no evidence in the record to support the claim that the shares were transferred to appellee's transfer agent, and concluded that the delay in transferring the shares was merely an "oversight." On appeal, appellant has abandoned its contention that the shares were transferred to a transfer agent, and alleges harm from the decline in value of the shares during the nine days in which they remained, improperly, in appellee's possession. Br. of Appellant at 42. Because this allegation of harm arising out of simple delay was not raised below, it should not be considered on appeal. *Muth, 1 F.3d at 250*. Even were we to consider this revised claim, there is no evidence to support a finding of any harm caused by the delay in transferring [*20] the shares, as none of the 5.65 million shares that were properly transferred to the Legg Mason account on April 26 was sold until July 8, 1996 -- more than two months after the disputed shares were ultimately transferred.

Finally, in Count IX, appellant alleged a breach of fiduciary duty arising out of Mark Stull's initial statement on April 12 that it was the SEC, as opposed to Dean Witter, that had launched an investigation. The district court acknowledged that Dean Witter had a duty to inform appellant "of the investigation and the investigator's true identity." J.A. at 354. Nonetheless, the district court granted summary judgment to Dean Witter, stating that a "mere" four day delay in revealing the investigator's true identity was "clearly insignificant."

We do not believe that as a matter of law a delay of four days -- or two business days -- in the delivery of such relevant information will always be insignificant. However, in this instance, appellant has forecast no evidence to establish material harm from Dean Witter's delay. Even when appellant ultimately learned on April 16th that it was Dean Witter that had stopped trading and

begun an investigation, it did not order [*21] a transfer until April 22nd or April 23rd, which transfer was not completed until the 26th, when the shares traded at an average price of $ .63 per share. Appellant is of course entitled to the inference that it would have acted with the same degree of dispatch had it learned the correct identity of the investigator on April 12th -- especially given that it had on that date no account into which the shares could be transferred. Appellant is therefore entitled to the inference that it would have ordered the transfer either four or five business days later -- on the 18th or 19th -- and that the transfer would have been completed on the 24th, when the share price averaged $ .57, or six cents less than on the 26th. Thus, because appellant presented no evidence to suggest that it would have, or could have, executed a transfer any more quickly had it learned of the investigator's identity on April 12th rather than 16th, we can only conclude that the delay was, in this case, legally insignificant.

CONCLUSION

For the reasons stated herein, we affirm the judgment of the district court.

AFFIRMED