<u>**UNPUBLISHED**</u>

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

--------

**No. 03-2103**



**0 200**

COURT

**MICHAEL D. SHIELDS,**

**Plaintiff - Appellant,**

and

**RVA PENDLETON**

**Plaintiff**

versus

**FEDERAL EXPRESS CORPORATION; PATRICK J. QUIRKE,**

**Defendants - Appellees.**

Appeal from the United States District Court for the District of Maryland, at Baltimore.  Marvin J. Garbis, Senior District Judge. (CA-02-1783-MJG)

--------

Argued:  October 28, 2004          Decided:  January 19, 2005

--------

Before WILKINS, Chief Judge, and MICHAEL and TRAXLER, Circuit Judges.

--------

Affirmed by unpublished per curiam opinion.

--------

**ARGUED:** Richard Lee Swick, SWICK & SHAPIRO, P.C., Washington, D.C., for Appellant.  Michael Edwin Gabel, FEDERAL EXPRESS CORPORATION,

Memphis, Tennessee, for Appellees.  **ON BRIEF:** Eric Hemmendinger SHAWE & ROSENTHAL, L.L.P., Baltimore, Maryland, for Appellees.

————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**PER CURIAM:**

Michael D. Shields appeals the order of the district court granting summary judgment to Federal Express Corporation "FedEx") on his Title VII claims alleging that he was subjected to disparate treatment based on race, racially hostile working conditions, and retaliation for his opposition to FedEx's illegal employment practices. We agree with the district court and affirm its ruling.

**I**

Shields worked for FedEx from 1981 until his termination in February 2001. Shields, an African American, apparently received high performance evaluations during most of his tenure at FedEx By 1989, Shields had obtained the level of manager, and, by January 2000, he had been promoted to the position of Senior Manager in charge of the Herndon, Virginia station (known as the "BCB" station).

In July 2000, Patrick Quirke became the Managing Director of FedEx's Capital District, which included the BCB station. As the Managing Director, Quirke ranked in the corporate hierarchy immediately above Shields and the other Senior Managers in the Capital District. Shields therefore reported to Quirke, who is Caucasian, on issues related to the performance of the BCB station

Shortly after Quirke assumed his new position, he concluded that the BCB station was not meeting the standard, company-wide

3

performance objectives in a number of areas   FedEx had established standards for evaluating the overall performance of Senior Managers and other employees through its Functional Operating Plan ("FOP" which established standards such as the number of hours employees were to work during a given "phase of the station's operation." J.A. 548.  The FOP standards were tailored somewhat to account for the historical performance of each station.   Shields, like Senior Manager, could seek a modification to reduce performance goals if conditions warranted such a change. Shields's performance was also measured against a station budget established by the FedEx Finance Department, which specified the number of packages that should be handled and sorted by the BCB station during a given period of time   Finally, Shields was evaluated based on ability to meet prescribed goals relating to client service, profitability, and management skills

During the time that Shields served as Senior Manager of the BCB station, the station did not meet many of the standard performance objectives.  Shields acknowledged during his deposition that the station fell short of its productivity goals, and, on appeal, he does not dispute that the BCB station also did not FedEx's performance expectations in other areas, such as safety, volume, employee retention, and cost per package.

From August 2000 to October 2000, FedEx Vice President John Formisano and Senior Vice President Ken May received a series of

4

emails from hourly employees at the BCB station complaining that the crush of overtime hours, in addition to Shields's inability to communicate effectively, created an impediment to good morale in the BCB station, which had a higher rate of employee turnover any other station in the Capital District. On October 7, Quirke met with Shields's subordinates to discuss "multiple complaints regarding Mr. Shields'[s] management style, his demeanor treatment of hourly employees, and the lack of communications by and between management." J.A. 551

Against this backdrop, Quirke scheduled a meeting with Shields on October 10, 2000, to discuss the various performance deficiencies. Quirke suggested Shields step down to a lower Senior Manager position    Shields would have been relieved of responsibility for the BCB station but could have continued to manage another station in Winchester, Virginia -- as an alternative to "receiving discipline for the performance deficiencies that [Quirke] outlined for him." J.A 551    Shields rejected option.    In turn, Quirke was obligated to follow FedEx's Performance Improvement Policy "PIP" to address the problems at the BCB station    Pursuant to the PIP, Shields was required to create a Performance Agreement detailing the specific remedial steps Shields planned to take in order to improve his performance deficiencies and the morale problems at the BCB station

5

Quirke rejected Shields's proposed Performance Agreement failure to delineate the specific measures Shields intended to take to improve his performance   With Quirke's assistance, Shields eventually produced a Performance Agreement that was sufficiently specific for Quirke and Shields signed the agreement in October 2000.

In the ensuing three months, however, Shields failed to meet or follow various goals established in the Performance Agreement Although failure to follow a Performance Agreement can provide grounds for termination under FedEx's PIP, Quirke issued Shields a performance reminder on January 8, 2001, and informed Shields he would have to improve substantially to merit a satisfactory performance evaluation score. Additionally, Quirke offered Shields a severance package if he opted to resign instead of risking additional sanctions for poor performance   Shields rejected the severance package   On February 19, 2001, Shields received an unsatisfactory overall performance rating.  Quirke then directed Shields to submit a second Performance Agreement, but Shields not able to submit a proposal that was specific enough for Quirke Quirke ultimately terminated Shields as a result of his having received three disciplinary letters within a 12-month period grounds for termination under the FedEx PIP.

Shields contends that his poor performance evaluations  his placement  in  the  PIP,  and  ultimately  his  dismissal,  were

6

retaliatory acts by Quirke in response to what Shields claims was his opposition to illegal employment practices by FedEx Specifically, Shields claims that Quirke retaliated against because he reported two instances of racial discrimination in September 2000. The first instance involved an incident that occurred at the BCB station on Shields's day off. Manager Pendleton, who was under the direct supervision of Shields, became involved in a dispute with Noelle Olson, a courier at the station, and eventually terminated Olson as a result of her conduct. Olson challenged her termination through FedEx's internal grievance procedure, which led to an investigation of the incident by Quirke. Quirke concluded that Pendleton had acted inappropriately in her capacity as a manager by provoking confrontation, and he directed Shields to issue Pendleton a formal Warning Letter  a very serious form of discipline at FedEx. Although Shields issued the Warning Letter as he was instructed, he told Quirke that he disagreed with this mode of punishment. First Shields believed that a Warning Letter was unwarranted and that a less severe "documented counseling" was more appropriate in light of Pendleton's inexperience as a manager  Second, Shields claims that he told Quirke that any discipline administered to Pendleton should likewise be administered to Cliff Dalton, another manager under Shields's supervision who was on duty that day. According to Shields, both Pendleton and Dalton "tr[ied] to handle this

7

disruptive employee," J.A 122, and thus he urged Quirke not to punish Pendleton more severely than Dalton. In Shields's mind, the only difference between Pendleton, who is black, and Dalton, who is white, was race. Ultimately, however, Shields never mentioned race. Although Shields advocated uniform treatment for Pendleton and Dalton, he never suggested to Quirke or to anyone else at FedEx that Pendleton was being treated more harshly because of her race

The second incident underlying Shields's retaliation claim involved a racial slur against Shields that was not uttered in his presence but was reported to Shields by Dalton. In September 2000 Bobby Richesin, an hourly worker who reported directly to Shields referred to Shields in racially offensive terms and crude pejorative terms relating to Shields's sexual orientation Although Shields decided to suspend Richesin, he first consulted Dick Schmidt, the Human Resources manager for the Capital District Schmidt cautioned Shields about reacting in an "emotional" fashion and suggested that Shields consider Richesin's ten-year employment history at FedEx before acting. Shields also discussed the matter with Quirke, who, according to Shields, concurred with Schmidt. Nevertheless, Shields suspended Richesin for six weeks pending an investigation of the incident    Quirke ultimately decided that "Richesin had made inappropriate remarks in the presence of hourly

---

[1]Subsequently, Pendleton filed an internal grievance and succeeded in having the discipline imposed against her modified to that initially recommended by Shields -- a documented counseling.

8

co-workers," J.A. 562, and concluded that the appropriate sanction was a formal Warning Letter and a transfer to another station. Richesin opted to resign

In this lawsuit, Shields asserts three claims against FedEx under Title VII   First, he claims that he was subjected to a racially hostile work environment at the BCB station.   Second, Shields contends that FedEx subjected him to disparate treatment by terminating him for poor performance when it did not impose a like sanction on two similarly situated white Senior Managers   Third, Shields argues that FedEx gave him poor performance evaluations and ultimately terminated him in retaliation for his objecting to Pendleton's discipline and reporting Richesin's racial slurs protected activities under Title VII, Shields argues   The district court granted summary judgment to FedEx on each of these claims. Shields now appeals the ruling of the district court.[2]

## II

### A

Shields seems to believe that a hostile work environment existed because of the statements Richesin made to a co-employee

---

[2]Shields named Quirke as a defendant in his individual capacity. The district court dismissed Quirke from the action as an improper defendant. See Lissau v. Southern Food Service, Inc., 159 F.3d 177, 181 (4th Cir. 1998). The district court's ruling was clearly correct, and Shields does not appeal this portion of the district court's order.

9

which were ignored by management.  To get this claim to trial Shields "must demonstrate that a reasonable jury could find [the] harassment  1  unwelcome; (2) based on race; and  3  sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere."  <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 183-84 (4th Cir. 2001).  Then, even if Shields creates an issue of fact with respect to each of these elements, he must demonstrate "that there is some basis for imposing liability" upon FedEx for Richesin's conduct.  <u>Id.</u> at 184  internal quotation marks omitted)

The district court concluded that Shields failed to produce sufficient evidence for a trier of fact to find that the alleged harassment was so "severe and pervasive" that it "alter[ed] the terms and conditions of employment."  J.A. 375.  In his appellate brief, Shields does not develop a separate and independent argument contesting the district court's rejection of Shields's hostile work environment claim  However, in arguing that FedEx retaliated against him because he reported the racially offensive language used in the workplace, Shields essentially claims that a racially hostile work environment existed at the BCB FedEx station.  Like the district court, we fail to see sufficient evidence that the unwelcome conduct at issue was "severe and pervasive" for purposes of a Title VII hostile work environment claim.

10

Shields suggests that the singularly offensive racial slur used by Richesin, coupled with what Shields perceived to be upper management's laissez-faire attitude about such conduct, sufficient to satisfy the <u>prima facie</u> elements in this case. Shields relies on our own observations about the impact of sanctioned use of this particular term on a given work environment "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." <u>Spriggs</u>, 242 F.3d at (internal quotation marks omitted)  Of course, whether Richesin's slur was highly offensive, unwelcome, and racially motivated is not the issue -- clearly, it was  Rather, the question is whether the use of racial epithets and abusive language so pervaded the work environment at the BCB station that it was essentially transformed into an atmosphere tinged with racial hostility and altered the conditions of Shields's employment  "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." <u>Feingold v. New York</u>, 366 F.3d 138, 150 (2nd Cir. 2004  internal quotation marks omitted)  Thus, "isolated incidents (<u>unless extremely serious</u>) will not amount to discriminatory changes in the 'terms and conditions of employment.  <u>Faragher v. City of Boca Raton</u> 524 U.S 775, 788 (1998) (emphasis added).

11

There are obvious and substantial differences between this
case and Spriggs. Spriggs involved "frequent" and "pervasive"
of racially degrading insults that substantially impeded
victim's "ability to concentrate" or "effectively interact

customers." Spriggs, 242 F.3d at 185-86 (internal quotation
marks omitted)   Shields, on the other hand, bases his claim on a
single racial slur that was not uttered in his presence.   Another
distinguishing factor is that Shields wielded supervisory power to
make Richesin cease making his racist comments by suspending him
In sum, there is no evidence that the workplace environment at the
BCB station, for which Shields was largely accountable, was
racially oppressive, hostile, or abusive.   Thus, we affirm
district court's grant of summary judgment as to the hostile work
environment claim.

**B**

In order to clear the summary judgment hurdle on his
retaliation claim, Shields must demonstrate that "(1) [he] engaged
in a protected activity:   (2) the employer took an adverse
employment action against [him]; and (3) a causal connection
existed between the protected activity and the asserted adverse
action."   Von Gunten v. Maryland, 243 F.3d 858, 863 (4th
2001).   An employee who "oppose[s] any practice made an unlawful
employment practice by [Title VII]" has engaged in protected
activity.   42 U.S.C.A § 2000e-3(a) (West 2003); see Kubicko v.

12

Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999) (noting that "protected activities" may consist of either "opposition" or "participation" activities).   Protected "[o]pposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Kubicko, 181 F.3d at 551 (internal quotation marks omitted).   A plaintiff need not demonstrate that the employer has actually violated Title VII; rather, the plaintiff must show that "he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." Peters v. Jenney, 327 F.3d 307  320 (4th Cir. 2003) (internal quotation marks omitted).

The district court granted FedEx's motion for summary judgment on the retaliation claim, reasoning that Shields failed to demonstrate he had engaged in protected activity.   Specifically, the district court concluded that there was "no evidence that [Shields] sought to expose any discriminatory activity," J.A. 381 when he expressed disagreement with Quirke's intended course of discipline for Pendleton, and thus there was no protected activity Likewise, the district court concluded Shields's objection to the racial slur did not qualify as opposition activity because Shields could not have reasonably believed that such conduct violated Title VII since Shields "was accosted by a subordinate, reported the

13

offensive behavior, and compelled action against the subordinate
J.A 382

On appeal, Shields argues that he was engaged in opposition
activity for purposes of Title VII because he reasonably believed
that he was opposing disparate treatment of Pendleton that could
only be explained in terms of race, and that he was opposing
unlawful racial harassment related to Richesin's conduct    See
Alexander v. Gerhardt Enters., Inc. 40 F.3d 187, 195-96 7th Cir
1994 (concluding that it was protected activity for an employee to
send company officials a memorandum reporting supervisor's use of
single racial slur)    Even assuming that Shields's actions
constituted protected activity, we hold that summary judgment was
nevertheless appropriate because Shields failed to provide
sufficient evidence of a causal link between the protected activity
and the alleged adverse employment actions   Although the district
court did not rest its holding on this basis, we may affirm summary
judgment for any reason supported by the record   See Republican
Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)

A plaintiff claiming retaliation must establish that the
employer had knowledge of the protected activity in order for its
subsequent adverse employment actions to be retaliatory    See
Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004   "[A]n
employer cannot retaliate when it is unaware of any complaints" of
illegal employment practices    internal quotation marks omitted)

14

Although Shields voiced his disagreement regarding Quirke's proposed discipline of Pendleton, it is undisputed that Shields did not communicate to Quirke or any one else at FedEx that he was opposing what he believed to be a racially discriminatory action Instead, Shields's own testimony revealed that his complaints focused on basic fairness as he believed that Pendleton should have been afforded leniency because of her inexperience, and that Dalton should receive identical discipline   Having presented no evidence of Quirke's knowledge that Shields was engaged in protected activity when he opposed the discipline administered to Pendleton, Shields failed to show the required causal link to the alleged adverse employment actions

We likewise conclude that the lack of evidence showing causation defeats Shields's retaliation claim to the extent it is based on his complaint to Quirke and Schmidt, the Human Resources manager, about employee Richesin's use of a racial epithet Shields's only evidence of causation is the temporal proximity of the protected activity and the alleged adverse employment action taken by FedEx. Generally speaking, temporal evidence alone cannot establish causation for a prima facie case of retaliation, unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268  273 (2001) (per curiam) (internal quotation marks omitted)   Clark does

15

not establish the outer boundaries for temporal proximity to be considered "very close," but it does cite examples of insufficient temporal proximity -- evidence that the employer took the adverse action three or four months after the protected activity cannot alone establish causation    See id. at 273-74    After the Clark decision, we concluded that a ten-week gap between protected activity and termination "gives rise to a sufficient inference of causation" but was "sufficiently long so as to weaken significantly the inference of causation between the two events."    King v. Rumsfeld, 328 F.3d 145, 151 & n.5 (4th Cir. , cert. denied, 124 S Ct. 922 (2003)

According to Shields, the relatively short gap between the time he reported Richesin's despicable workplace language and the time Shields suffered an adverse employment action gives rise to an inference of causation.  Shields argues that even before he was terminated on February 26, 2001, FedEx took various adverse employment actions against him, including the issuance of an unsatisfactory rating on his formal performance evaluation on February 19, 2001, and even the issuance of a Performance Reminder/Warning Letter on January 8, 2001  Assuming for the sake of analysis that the Performance Reminder qualified as an adverse employment action, see Roberts v. Roadway Exp., Inc., 149 F.3d 1098, 1104 (10th Cir  1998), Shields's only evidence that a causal link existed is the fact that only three to four months passed

16

between Shields's protected activity and the first warning letter
he received.  He argues that this evidence is sufficient to get
by summary judgment, given that it is consistent with Carter v.
Ball, 33 F.3d 450, 460 (4th Cir. 1994), where the four-month
separating a protected activity -- Carter's filing of formal EEO
charges -- from Carter's demotion was sufficient to establish the
requisite causal link.  We disagree.  First, the Supreme Court
issued Clark County after our decision in Carter, casting some
doubt on the extent to which we can use a four-month gap alone as
sufficient proof of causation  Second, even before the Richesin
incident in September 2000, Quirke "became aware that the BCB
station was not meeting performance expectations." J.A. 549.  FedEx
introduced documentary evidence to this effect from Shields's file
detailing a number of problems at the BCB station.  Additionally
Quirke, having received extensive emails from the hourly
employees, had good reason for concern about Shields's management
style before Shields ever discussed Richesin's behavior with him
Shields presented no further evidence demonstrating that
discipline and termination were linked in any way whatsoever to his
complaint of Richesin.

Accordingly, we affirm the grant of summary judgment to FedEx
on the retaliation claim

## C.

Finally, Shields challenges the district court's entry of summary judgment against him on his disparate treatment claim. thrust of this claim is that Shields suffered more severe consequences for failure to meet performance expectations than did two similarly-situated Senior Managers, Clint Barnes and Charlie Hergesheimer, both of whom are white. The district court held that Shields failed to proffer sufficient evidence to create a question of fact on the issue of whether he was treated differently than Barnes and Hergesheimer. We affirm

In the context of a discipline case, the familiar elements of a prima facie showing are that (1) plaintiff belongs to a protected class; (2) plaintiff "engaged in prohibited conduct similar to that of a person of another race;" and (3) "that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir 1985). Only the third element remains an issue on appeal

Barnes was the Senior Manager of a station in the same district as the BCB station. In February 2001, Quirke issued Barnes a Performance Evaluation with unsatisfactory ratings in two of ten categories -- certainly not an enviable score, but, unlike Shields, Barnes still obtained an acceptable overall total like Shields, Barnes submitted and followed a Performance

18

Agreement.  Barnes realized some gains in the deficient categories but he did not achieve the level of progress anticipated by Quirke Like Shields, Barnes received a Performance Reminder when he failed to reach the target performance levels.  Ultimately, Barnes asked to be transferred back to a manager position once again, with a three-grade level reduction in pay

Hergesheimer was the Senior Manager of a station in Alexandria that was under Quirke's supervision in the Capital District Hergesheimer had only been on the job for six months when Quirke, reviewing the station's deficient performance, asked Hergesheimer to accept a demotion to a manager position in Maryland at a three-level reduction salary.  Hergesheimer agreed.

All three were deficient in their job performances as managers and each was given the same chance to accept a demotion in order to avoid further disciplinary action.  In other words, they were each treated the same  The fact that the Caucasian managers chose the demotions and Shields chose a challenge he would eventually lose does not show at all disparate disciplinary measures by FedEx.

Accordingly, for the reasons set forth above and stated in the opinion of the district court, we affirm the ruling of the district court on Shields's disparate treatment claim.

19

## III.

For the reasons set forth above, we affirm the ruling of the district court.

AFFIRMED